

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 23, 2021

**BY ECF AND EMAIL**

Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Robert Lemke*, 21 Cr. 100 (AKH)

Dear Judge Hellerstein:

      The Government respectfully requests that the Court reverse the release order pertaining to defendant Robert Lemke that was issued yesterday by a magistrate judge in the Northern District of California ("NDCA"). As brief background, on January 14, 2021, Lemke was charged by complaint (the "Complaint") in the Southern District of New York with making threats against a journalist and a politician. *See* Complaint, ECF No. 1 (attached hereto as Exhibit A). On January 26, 2021, Lemke was arrested in the NDCA. On February 1, 2021, Lemke appeared for the first time in California but the magistrate judge adjourned the initial appearance for approximately three weeks. On February 16, 2021, a grand jury in this District indicted the defendant and the case was assigned to this Court. *See* ECF No. 4. On February 22, 2021, the NDCA magistrate judge ordered the defendant bailed, but stayed that order for 48 hours to allow Your Honor to consider the Government's appeal.

      As described in more detail below, the defendant is a danger to the community and a risk of flight who, starting shortly after the election, sent threats to public figures and their family members, including journalists, U.S. Congressmen, U.S. Senators, and the mayor of a major metropolitan city. These threats, many of which Lemke sent while the U.S. Capitol was under attack, warned of impending harm to Lemke's victims and their families at the hands of purported members of law enforcement and the military. Many of Lemke's messages contained the names of particular family members of his targets and included references to and even photographs of his victims' home addresses. All were sent to threaten, frighten, and intimidate. The defendant should be ordered detained. At the very least, the Government requests that the magistrate judge's release order be stayed until the defendant is transferred to this District, pursuant to Rule 5(c)(3), so that the parties can be heard regarding the issue of detention on a date and time set by this Court.

## Facts

The FBI's investigation into Lemke has revealed that, starting shortly after the 2020 Presidential Election, Lemke began sending threatening text and voice messages to journalists, politicians, and other public figures, as well as their families. These messages were found by the FBI in search warrant returns for an online text messaging service used by Lemke and from a cellphone seized pursuant to a search warrant for Lemke's home in California. For example, the phone found in Lemke's home revealed that, on or about November 9, 2020, Lemke sent messages to a cable news writer and his wife, stating: "Stop referring to Biden as elected. This is a warning." On or about November 16, 2020, Lemke texted an executive at a voting technology firm allegedly tied to election fraud, "Btw, [a particular family member] was a nice young man. He had many questions several weeks ago. Keep him away from the window by the big tree. We are watching you and [your spouse]. Don't make any dumb moves this coming week."

On or about December 22, 2020, Lemke sent a voice message to a print journalist, later found on Lemke's phone, warning that "people . . . are watching your every move. You know what you have to do to no longer be concerned about your safety. And it's not just you we're watching. It's also your parents up in Sonoma County." When the print journalist asked who sent the message, Lemke responded by text message, "I'm actually a sr federal agent. [smiley face emoji]."

As also reflected in the phone found in Lemke's home, on or about December 31, 2020, Lemke sent voice messages to a cable news anchor, warning him that "Words have consequences," and that "[i]t would be my sincere advice to stop the rhetoric." Lemke then stated, "If you don't, there will be consequences. And not just for you, but for [a particular family member], and the rest of your family." Lemke stated, "[W]e will not tolerate one's words brainwashing the masses . . . That won't be tolerated. There will be consequences. And you can perceive that statement and that risk assessment as you wish."

On January 6, 2021—the day the U.S. Capitol was attacked—Lemke's conduct escalated. As described in the Complaint, Lemke sent threatening text messages to the brother and sister-in-law of a New York City-based Congressman, citing the Congressman's statements about the results of the 2020 Presidential Election. *See* Complaint ¶ 3(a)-(d). In those messages, Lemke claimed that he was part of a larger, armed group, that he was watching the Congressman's family on camera in real time, that he was prepared to harm the Congressman's children, and that his confederates were near the home of the Congressman's brother and sister-in-law. *Id*. ¶ 3(b)-(c). Also on or about January 6, 2021, Lemke sent threatening text messages to a relative of a journalist living in New York City, stating: "[The journalist's] words are putting you and your family at risk. We are nearby armed and ready. Thousands of us are active/retired law enforcement, military, etc. That's how we did it." *Id*. ¶ 3(d).

The search warrant for Lemke's online text messaging account showed he also sent messages on January 6 to (i) a U.S. Congressman from California, (ii) the spouse of a different U.S. Congressman from California, (iii) a U.S. Senator, (iv) the spouse of a different U.S. Senator, (v) the mayor of a major U.S. city, and (vi) the leader of an anti-discrimination non-profit group. Each of these messages—similar in form—stated that Joseph R. Biden, Jr. was not the actual winner of the 2020 Presidential Election, claimed that the defendant was working with military

and/or law enforcement, and warned that the victim or the victim's relative was putting their family at risk through their public comments. Some of the messages also leveraged the fear sparked by the January 6 riot at the Capitol Building, claiming that the terror and damage caused by the riot was part of a broader plan with more violence to come. In each message, Lemke included the names of individuals he believed to be related to his targets and an address that he believed to be associated with the victim or the victim's family. For example, in or about the evening of January 6, 2021, Lemke wrote to a California-based U.S. Congressman:

> No, Joe Biden will not be inaugurated. You are making a fool of yourself. What you saw tonight is just the beginning. Tip of the iceberg. The spark and ignition. Thousands of us are retired AND active law enforcement and military. We have underground communication networks and have been planning this for months. Your words are putting you and your family at risk... [names of family members]... we are watching. [address]. (ellipses in original)

Lemke's threats did not end on January 6. The phone in his home showed that, on or about the evening of January 10, 2021, Lemke sent a series of voice notes to a number associated with another California-based U.S. Congressman:

> Hello again, [Congressman]. I wanted to make sure you made the right decision and hired some private protection, private security for you, [your spouse] and the kids. I think that would be a really good idea for you to do since at least 60-65% of law enforcement is, at least privately, if not secretly, members of Oath Keepers and other militias across the country. Be a good idea for you to do.

A week later, on or about January 17, 2021, Lemke sent the following message, targeting the same Congressman:

> And [Congressman], one last thing. I want you to think about it for a second. Even though you have 210 people signing on to your impeachment. How about one and a quarter million at the very least storming the inauguration, storming the Capitol building again. And we'll do it a third, fourth, fifth time if we have to. What will you do then? You are adding fuel to the fire.

## Procedural History

On January 14, 2021, Magistrate Judge Ona T. Wang authorized the filing of the Complaint, charging him with making interstate threatening communications, in violation of Title 18, United States Code, Section 875(c). On or about January 26, 2021, Lemke was arrested and law enforcement searched his home pursuant to a search warrant authorized in the NDCA. In the search, law enforcement found, among other things, a cellphone belonging to Lemke containing additional evidence of threats.

On February 1, 2021, Magistrate Judge Laurel Beeler of the NDCA held an initial appearance. At the conference, defense counsel attempted to explain the defendant's conduct as stemming from his "serious alcohol problem." Feb. 1 Tr. 14-16 (attached hereto as Exhibit B). The judge "ordered Mr. Lemke detained" but "without prejudice to revisiting the issue," noting that her detention decision was warranted "primarily based on danger." *Id*. at 16-17. Although Lemke did not appear to be contesting identity, the court then stated, "I don't know what you want to do then about the Identity and Removal Hearing . . . but I don't have enough of a record to set conditions" and adjourned for further proceedings until February 22. *Id*. at 17.

On February 11, 2021, the Government requested an immediate identity proceeding or Lemke's removal to the Southern District of New York, pursuant to Federal Rule of Criminal Procedure Rule 5(c)(3)(D). *See* Feb. 11 Ltr to Judge Beeler (attached hereto as Exhibit C). As described in that letter, at the initial appearance, the defendant did not appear to contest his identity: the defendant identified himself to Pretrial Services as "Robert Cory Lemke" and defense counsel noted on the record that "Mr. Lemke's mother" was attending by telephone, offered her as a co-signer, and referred to the defendant as "Mr. Lemke" throughout the conference. Ex. B at 2, 13-14. The Government also proffered that in an audio-recorded post-arrest interview, the defendant identified himself as "Robert Lemke" to the FBI, provided his middle name, and confirmed his date of birth. Ex. C at 2. Despite this application, the Court did not alter the date of the scheduled next appearance.

On February 16, 2021, a grand jury in this District indicted the defendant, charging him with making interstate threats, in violation of Title 18, United States Code, Section 875(c). On February 21, 2021, defense counsel submitted a phycological evaluation to the California court. *See* Psychological Assessment (attached hereto as Exhibit D (filed under seal)).[1]

On February 22, 2021, Judge Beeler held another conference. At the outset of the conference, Judge Beeler stated her intention to bail Lemke based largely on her review of the phycological assessment. *See* Feb. 22 Tr. at 6 (attached hereto as Exhibit E). Judge Beeler reasoned that Pretrial Services could monitor Lemke's internet usage and his mother could ensure he abides

---

[1] Due to the sensitive nature of the psychological assessment, the Government requests that the report itself and descriptions of its content in this letter be filed under seal. Such descriptions have been redacted in the public filing of this submission pending further order by the Court.

by the law. *Id*. at 8, 15. In response, among other things, the Government noted that such internet monitoring was flawed, *id*. at 24-25, and that in the psychological assessment on which the court relied, ██████████████████████████████████████████████

At the conclusion of the conference, Judge Beeler asked Lemke if he waived his identity hearing and he agreed. *See* Ex. E at 23. Judge Beeler then ordered that the defendant be released into the custody of his mother on an unsecured bond with home detention and GPS monitoring. *Id*. at 26-29. At the Government's request, the Court stayed the bail order for at least 48 hours to allow the Government to appeal to this Court. *Id*. at 32.

## Legal Standard

This Court, as "the court having original jurisdiction over the offense," has jurisdiction over the Government's appeal of the release order. *See* 18 U.S.C. § 3145(a)(1); *United States v. El-Edwy*, 272 F.3d 149, 153 (2d Cir. 2001) (holding that, for purposes of a motion under § 3145(a) for revocation of a release order issued by a magistrate judge in another district where the defendant was arrested, "the court having original jurisdiction over the offense" is "the district in which the prosecution of the offense is pending," and noting that "[w]ith respect to the decision whether to detain or conditionally release the defendant, . . . section 3145(a) makes clear that the ultimate authority lies with the district that has the primary interest in the question – the district in which the prosecution is pending"); *see also*, *e.g.*, *United States v. Dominguez*, 509 F. App'x 28, 29-30 (2d Cir. 2013) (affirming revocation, by a district court in this District, of an order issued by a magistrate judge in the Southern District of Florida releasing a defendant who had been indicted in this District).

A district court reviews *de novo* a magistrate judge's decision to release or detain a defendant pending trial. *Gotti v. United States*, 358 F. Supp. 2d 280, 283 (S.D.N.Y. 2005); *see also United States v. Leon*, 766 F.2d 77, 80 (2d Cir 1985) ("[A] district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion.").

The Government ultimately bears the burden of showing by a preponderance of the evidence that the defendant poses a risk of flight or, by clear and convincing evidence, that the defendant poses a danger to the community, and that no condition or combination of conditions can address those risks. *See* 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007); *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

In assessing a defendant's risk of flight and the danger to the community presented by release, a court must consider four factors:

> (1) the nature and circumstances of the offense charged . . . ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

## Argument

The defendant should be detained because he is a danger to the community and presents a risk of flight.

The defendant repeatedly placed his victims in fear for their lives, which in and of itself constitutes a grave danger to the community. As described above, the defendant made numerous threats of violence aimed at, among others, politicians and journalists. These threats were personal—naming family members—and specific—identifying victim addresses. They targeted not only public figures, but their family members removed from public life. The threats further invoked claims of the defendant's collusion with those who are supposed to protect our citizenry, the military and police, for the purpose of creating an additional feeling of insecurity, helplessness, and vulnerability. Lemke's intent in sending these threats is clear: to frighten and traumatize his victims and their families, including by threatening their children, some of whom he identified by name.

Importantly, the threats clearly were also intended to intimidate. Lemke sought to silence politicians and journalists with whom he disagreed. He attempted to pressure them, through his threats of violence against them and their loved ones. This conduct poses a danger to those he would and did attempt to place in fear for their lives.

Moreover, this was not an isolated incident. As reflected below, Lemke did not level his threats only on the day of the Capitol attack. He began shortly after the election and continued threatening other Congressmen in the weeks following. In addition, as Judge Beeler recognized at the February 1 conference, the defendant's actions appear to reflect "escalating conduct, which is serious and scary." Ex. B at 15. That determination should have led to his detention pending transport to this District. According to the California pre-trial report, Lemke was charged in 2015 with making threats with intent to terrorize. *See* Ex. B at 10-11. Police reports from that incident reflect that, on or about December 31, 2015, the defendant was stopped for driving a U-Haul

erratically. During his interaction with law enforcement, Lemke falsely claimed to be a deputy with the Alameda County Sheriff's Department and admitted that he had a shotgun in the vehicle. Upon his arrest for driving under the influence, Lemke threatened the arresting officer, telling him, "I'll remember you, I will find you" and "I will hurt a [member of your family]." When asked by the officer if Lemke was making a threat, Lemke responded that he was not, but stated that he "heard someone will hurt a [member of the arresting officer's family]." Lemke did not stop there. Police reports reflect that, after his release, Lemke conducted research on the officer and apparently identified contact information for the officer's family. Lemke then left a message on the home phone of the officer's parents, falsely claiming he was an "investigator." According to phone records, he also called a number associated with the officer's sister and called the officer's precinct using a fake name attempting to reach the officer's supervisor. Quite simply, through his recent stream of violent and relentless threats, and his prior conduct, the defendant has shown himself to be a menace to the community.

Moreover, Lemke's prior conduct, when paired with his actions surrounding the 2020 Presidential Election, illustrate why the confinement to the defendant's home ordered by the California magistrate judge is insufficient to ensure the safety of the community. The defendant committed his crimes at least in part from the comfort of his home on a cellphone. He has shown the ability to strike fear in his victims without ever leaving his house and could do so again with few resources. Any attempts to control his behavior through conditions restricting his cellphone or internet use are unlikely to succeed in preventing him from continuing to threaten members of the community. For example, following the February 21 conference, Pretrial Services confirmed that their monitoring software was designed for child pornography cases and so developed to monitor internet use; while the software will show that the defendant is sending messages, it will not show to whom the messages are sent or the content of those messages. The defendant's 2015 arrest also indicates that the defendant has possessed a firearm in the recent past, indicating an ability to acquire weapons. The defendant has a demonstrated disrespect for law enforcement and, in light of his 2013 conviction for failure to appear in court, *see* Pre-Trial Report 7, a demonstrated unwillingness to obey court orders. His prior interactions with the criminal justice system stemming from his threats to a law enforcement officer did not deter him from engaging in similar, escalating conduct in January. There is no reason to believe that the setting of bail conditions will do anything to deter him now.

Finally, the defendant is a risk of flight. In addition to his conviction for failure to appear, *see* Pre-Trial Report 7, Lemke has also used multiple fake names and claimed at various times to be a private investigator, law enforcement officer, and retired member of the military, as evidenced by his messages and Facebook profile. *See* Complaint ¶ 3(g)(ii). As described above, Lemke has even used aliases when interacting with law enforcement, evidencing a readiness to deceive and a willingness to use an assumed identity to avoid law enforcement scrutiny. These deceptions are particularly troubling because the incentive to flee the charges in this case is great. As described above, the evidence against Lemke is strong—among other things, the Government has searched an online text messaging account used by Lemke and identified threatening messages on a phone located in the defendant's home. In fact, that phone contains threatening voice messages with a voice matching that in the defendant's post-arrest statement. Lemke has now been indicted for a federal felony carrying a potential sentence of five years in prison. In short, the defendant's history of engaging in deception, record of non-appearance, and incentive to flee make him a flight risk.

The Government respectfully submits that for these reasons, no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance in court.  The Court should order the defendant detained for transport to this District to face the charges in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Kyle A. Wirshba / Kimberly Ravener /
Jacob Gutwillig
Assistant United States Attorneys
Southern District of New York
(212) 637-2493

cc: Daniel Bank, Esq., Federal Defenders of the Northern District of California (by email)

Exhibit A

Approved: _____

JACOB H. GUTWILLIG / MATTHEW J. LAROCHE / KIMBERLY J. RAVENER
BENJAMIN W. SCHRIER / KYLE A. WIRSHBA
Assistant United States Attorneys

Before:   THE HONORABLE ONA T. WANG
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - X

## 21 MAG 521

UNITED STATES OF AMERICA

          - v. -

ROBERT LEMKE,

              Defendant.

- - - - - - - - - - - - - - - - - X

**SEALED COMPLAINT**

Violations of 18 U.S.C.
§§ 875 and 2.

COUNTY OF OFFENSE:
BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

TODD ECKERT, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE

### (Threatening Interstate Communications)

1. On or about January 6, 2021, in the Southern District of New York and elsewhere, ROBERT LEMKE, the defendant, knowingly transmitted in interstate and foreign commerce a communication containing a threat to injure the person of another, to wit, LEMKE sent threatening text messages to family members of a New York City-based U.S. Congressman ("Congressman-1") and a New York City-based family member of a journalist ("Journalist-1").

(Title 18, United States Code, Sections 875(c) and 2.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

2. I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with law enforcement agents and other people, and my examination of reports

and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.    Based on my training, experience, involvement in this investigation, discussions with other law enforcement agents, interviews of victims, and review of open source materials, I learned the following:

a.    On January 6, 2021, a group of individuals purporting to protest the 2020 Presidential Election gathered in Washington, D.C. and stormed the Capitol Building. The group breached the Capitol Building, assaulting law enforcement officers and damaging federal property. The group occupied the Capitol Building and disrupted the certification of election results by the U.S. Congress for a period of several hours. Members of Congress sheltered in place during the occupation. Multiple individuals have been arrested in connection with these events for offenses including illegal weapons possession.

b.    Also on or about January 11, 2021, the office of Congressman-1 informed the FBI that, on or about January 6, 2021, Congressman-1's brother ("Victim-1") had received the following text messages from a particular phone number (the "Lemke Phone"), which also included a picture of a home in the same neighborhood as Victim-1's home:

> Your brother is putting your entire family at risk with his lies and other words. We are armed and nearby your house. You had better have a word with him. We are not far from his either. Already spoke to [Congressman-1's son] and know where his kids are.
>
> . . . your words have consequences. Stop telling lies; Biden did not win, he will not be president. We are not[] white supremacists. Most of us are active/retired law enforcement or military. You are putting your family at risk. We have armed members near your home . . . . . Don't risk their safety with your words and lies.

c.   Also   on   or   about   January   6,   2021,
Congressman-1's sister-in-law and the wife of Victim-1 ("Victim-
2") exchanged the following messages with the Lemke Phone:

Lemke Phone:        [Victim-2] calm your husband down

Victim-2:           Who is this? Your number is only coming
                    up not your name

Lemke Phone:        Does that matter? We saw on the hidden
                    camera, he was quite stirred up. You need
                    to have him talk to [Congressman-1].
                    Thanks.

d.   Also on or about January 6, 2021, while in the
Bronx, New York, a relative of Journalist-1 ("Victim-3"), received
the following message from the Lemke Phone: "[Journalist-1's]
words are putting you and your family at risk. We are nearby armed
and ready. Thousands of us are active/retired law enforcement,
military, etc. That's how we do it."

e.   Based on my review of records for the Lemke
Phone, I learned that the Lemke Phone is subscribed to username
"realestaterus1," under the name "Alameda County Sheriffs
Department," and with an email address "info@acgov.org," the
domain of which is used by the Alameda County government.

f.   Based on my review of subpoena returns, I
learned that the email address "realestaterus1@gmail.com," which
incorporates the username for the Lemke Phone, is subscribed in
the name "Robert Lemke."

g.   Based on my review of the publicly available
portions of a Facebook account (the "Lemke Facebook Account"), I
learned the following:

i.   The Lemke Facebook Account has a username
of "Robert Lemke" and, as its profile picture, a photograph of an
individual whose face is partially blocked by the words "Trump
2020" and "U.S. Air Force Veteran." In addition, the Lemke Facebook
Account has as its background image a photograph of Mark and
Patricia McCloskey, who I know from open source information were
charged with criminal offenses this summer after they pointed
firearms at Black Lives Matter demonstrators near their home in
St. Louis, Missouri, and later appeared at the 2020 Republican
National Convention in which Donald Trump was nominated for
President. A screenshot of the profile picture for the Lemke
Facebook Account is below:

3



**Robert Lemke**

        ii.  Publicly available information from the Lemke Facebook Account further indicates that ROBERT LEMKE, the defendant, was a Captain in the United States Air Force and that he is a retired Sergeant with the Alameda County Sheriff's Office, which is also the name of the subscriber of the Lemke Phone.

        iii.  On or about March 3, 2019, the Lemke Facebook Account posted, "These people are LIARS stop believing their words. They really hate you," linking to a New York Post article entitled "Gas-guzzling car rides expose AOC's hypocrisy amid Green New Deal pledge."

        iv.  On or about November 9, 2020, the Lemke Facebook Account posted a picture with the text, "If you have a 'Congratulations Joe Biden Kamala Harris' post celebrating a non-existent victory, please self-identify and unfriend/block me. Thanks."

        v.  On or about November 7, 2020, the Lemke Facebook Account posted, "Folks. Be ready for war. Trump has refused to cede. Evidence shows fraud occurred and the Supreme Court cases will be successful. We blockchained and watermarked ballots in 16 states. Trump will prevail.. Spread this message. . . . FAITH my fellow Republicans. Do not give up. Keep an eye out for a variety of protests, and Stop The Steal Facebook groups for updates."

WHEREFORE, your deponent respectfully requests that a warrant be issued for the arrest of ROBERT LEMKE, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.


S/ Todd Eckert /otw Cred. No. 26603
_____
SPECIAL AGENT TODD ECKERT
Federal Bureau of Investigation



Sworn to me through the
transmission of this Affidavit
by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1,
14th day of January, 2021


_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

5

Exhibit B

Pages 1 – 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable LAUREL BEELER, Magistrate Judge**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | NO. 21-MJ-70156-1 LB |
| | ) | |
| VS. | ) | Monday, February 1, 2021 |
| | ) | |
| ROBERT LEMKE, | ) | San Francisco, California |
| | ) | |
| Defendant. | ) | DETENTION HEARING |
| _____ | ) | |

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC ZOOM SOUND RECORDING – 10:31 a.m. – 10:54 a.m.**

**APPEARANCES VIA ZOOM:**

For Plaintiff:            DAVID L. ANDERSON
                         UNITED STATES ATTORNEY
                         450 Golden Gate Avenue, 11th Floor
                         San Francisco, California 94102
                   **BY:  KEVIN RUBINO,**
                         **ASSISTANT U.S. ATTORNEY**


For Defendant:            FEDERAL PUBLIC DEFENDER'S OFFICE
                         450 Golden Gate Avenue, 19th Floor
                         San Francisco, California 94102
                   **BY:  DANIEL BLANK,**
                         **ASSISTANT FEDERAL PUBLIC DEFENDER**


Also Present:             **PEPPER FRIESEN, PRETRIAL SERVICES**

Also Present:             **TERESSA DUCLAIR**

Transcribed By:           Diane E. Skillman, Transcriber

<u>Monday, February 1, 2021</u>                          <u>10:31 a.m.</u>

P R O C E E D I N G S

o0o

**THE CLERK:**  Calling criminal action 21-70156 U.S.A.
versus Robert Lemke.

Counsel, can you please state your appearances for the
record?

**MR. RUBINO:**  Yes.

Good morning, Your Honor.  Kevin Rubino for the United
States.

**THE COURT:**  Good morning.

**MR. BLANK:**  Good morning, Your Honor.  Daniel Blank
on behalf of Mr. Lemke.  Mr. Lemke --

**THE COURT:**  Good morning.

Do you agree to proceed by Zoom today, Mr. Blank?

**MR. BLANK:**  I do, Your Honor.  I just want to add
that Mr. Lemke's mother and the proposed surety in this case
is on the attendee list under T. Duc (phonetic).  Whenever it
may be appropriate to promote her to being --

**THE COURT:**  Okay.  Let's promote her.

And I don't know -- I'm so sorry because it's -- I -- this
is on me, but I wasn't really aware of this until last night
and I don't recall that I saw a bond form, but I possibly
overlooked it.

**MR. BLANK:**  I -- I just sent the completed bond form

1    around mere minutes ago.  So --

2              **THE COURT:**  Did you send it to me too?

3              **MR. BLANK:**  I did.

4              **THE COURT:**  Perfect.  I am going to go grab my iPad

5    because I can pull up on that.  And then that will -- just

6    give me a sec -- that makes me be able to process.  Hang on

7    one sec.

8        My iPad is in the process of being delivered to me.  As it

9    turns out, I have more support services in a pandemic at home

10   than I would -- than I would if I had gone into the office

11   where I would be alone.  Okay.

12             **MR. BLANK:**  Right.

13             **THE COURT:**  So why don't we promote his mom.

14             **MR. BLANK:**  She is there and she can turn on her

15   video if she is able to do so.

16             **MR. RUBINO:**  Your Honor, the government, to be clear,

17   the Government is seeking detention.

18             **THE COURT:**  That's fine.  I just want to -- she

19   should hear whatever you have to say.  And I just want to get

20   my papers in order.

21       Okay.

22             **MR. RUBINO:**  Of course, Your Honor.

23             **MR. BLANK:**  I am sorry, Your Honor.  I just got a

24   text from her saying she can't hear anything.  So I'm going to

25   try to call her.

```
1              Is that a good idea to try and --
2                   THE COURT:  Okay.
3                        (Simultaneous colloquy.)
4                   THE COURT:  That sounds fine.
5          If she looks to the right of her mute button, the little
6      arrow, she may be able to -- actually that's probably not
7      going to help.
8          All right.  I'll let you call her, Mr. Blank.  And then
9      you --
10                  MR. BLANK:  Thanks.
11                  THE COURT:  -- you let us know when we are good to
12     go.
13                       (Pause in the proceedings.)
14                  PRETRIAL SERVICES OFFICER:  While we're waiting, Your
15     Honor, good morning.  Pepper Friesen with U.S. Pretrial
16     Services.
17                  THE COURT:  All right.  Thank you, Ms. Friesen.
18                       (Pause in the proceedings.)
19                  MR. BLANK:  Okay.  I am going to hang up the phone
20     now.  We don't see you.  Try to say something.
21                  THE COURT:  There she is.
22                  MR. BLANK:  Ms. DuClair, can you -- can you hear us?
23                  MS. DUCLAIR:  Yes.  I can, yes.
24                  MR. BLANK:  Can you turn on your video?
25                  THE COURT:  Is it not on?
```

1              **MR. BLANK:**  If you can't figure that part out,

2       that's -- we will make do, but it would be great if we can see

3       you.

4              **THE COURT:**  There you are.  We see you now.  Great.

5              **MS. DUCLAIR:**  Sorry, about that.

6              **THE COURT:**  No worries.  Okay.

7          So this matter is on both for status regarding the

8       Identity and Removal Hearing and a Detention Hearing.

9          What I have for documents is, I have the Rule 5 paperwork

10      that includes the underlying complaint from the SDNY and --

11      which reflects the charges and, essentially, the conduct that

12      underlies the charges.

13         We also have a bail study from Pretrial Services which

14      summarizes Mr. Lemke's personal history and his residence, and

15      does -- although the assessment reflects -- the -- Pretrial's

16      assessment based on danger to the community, Pretrial Services

17      also -- at a risk of nonappearance, Pretrial Services'

18      recommendation, and I'm just going to put on the record we

19      don't know it -- everybody knows Pretrial Services does --

20      uses a validated risk assessment tool, and through that tool

21      and otherwise, probably qualitative factors has determined

22      that conditions could be fashioned that could mitigate both a

23      danger to the community and has recommended release based on

24      an unsecured bond co-signed by his mother.

25         So that gives us the context.  My understanding is the

1    government is moving for detention.  So recognizing that I

2    have read the complaint, I will begin with the government's

3    motion for detention.

4         **MR. RUBINO:**  Thank you, Your Honor.

5         **THE COURT:**  Yes.

6         **MR. RUBINO:**  So, the government is seeking detention

7    both on the basis that Mr. Lemke poses a risk of flight and on

8    the basis of the danger that he poses to his victims, the

9    prospective witnesses in this prosecution.

10        First, the weight of the evidence is quite strong I

11   summarize in the complaint.  In addition to what's set forth

12   in the complaint, the case has only strengthened since

13   Mr. Lemke's arrest.

14        In short, multiple Congress people and their families

15   received messages from a 614 area code on the day of the

16   Capitol insurrection, January 6th, 2021, including a couple of

17   days after.

18        Those were traced to a cell phone registered to Alameda

19   County Sheriff's Department with a user name realestaters1.

20   That's the same email address that Mr. Lemke maintains,

21   realestaters1@gmail.com.

22        In addition, he has another cell phone registered to his

23   house in Bay Point that is registered to Alameda County

24   Sheriff's Department.

25        His Facebook account claims that he's a retired sergeant

1    with the Alameda County Sheriff's Department and makes --

2    posts messages to his followers that are consistent with his

3    threatening messages including that the election was

4    fraudulent and that they should be ready for war.

5        Already too many coincidences to believe it might be

6    attached to Mr. Lemke, but in addition, at the time of his

7    arrest, the FBI found additional messages on his phone

8    threatening other Congress people.

9        He also told the FBI that he has a LexisNexis account that

10   he uses to find out addresses and telephone numbers for people

11   and that he also knows how to mask his cell phone so that it

12   appears to be coming from a different number.  So there can be

13   little doubt that Mr. Lemke is the person that's behind these

14   messages.

15       As far as the nature and circumstances of the offense,

16   Your Honor, these are pretty disturbing offense (sic) that

17   strongly suggest Mr. Lemke is a continuing danger to his

18   victims.  I would like to supplement some of what you see in

19   the complaint, Your Honor.

20       First, I would like to read a message Mr. Lemke sent to

21   the brother of a Congressman on January 6th, 2021.  That date

22   and time, of course, is important.  At the time Mr. Lemke is

23   sending these messages, an armed mob has overrun the Capitol,

24   and this Congressman --

25            MR. BLANK:  I'm sorry, Your Honor.  I just need to

1    seek clarification.

2        I never received any discovery from the government at all.

3    So if this is beyond what was provided in the complaint, I

4    just want to know if that's the case.  And if it is, why I

5    wasn't provided with that information.

6        **THE COURT:**  Okay.

7        Well, you know, this is an out-of-district case.  I'm sure

8    Mr. Rubino will provide you all the discovery.  The government

9    often -- always proceeds by proffer at the Detention Hearing

10   and doubtless talked with the agent and/or the SDNY and just

11   got this information, probably orally.  But I know that

12   Mr. Rubino knows his discovery obligations and will coordinate

13   with the SDNY to make sure you have the discovery.

14       So I'm going to allow Mr. Rubino to proceed by proffer.

15       **MR. BLANK:**  Thank you, Your Honor.

16       **THE COURT:**  Okay.

17       Mr. Rubino.

18       **MR. RUBINO:**  Thank you, Your Honor.

19       So his family is obviously deeply concerned when they are

20   receiving this message seeing on television the Capitol being

21   overrun and understanding that their brother is inside.

22   That's when they receive this message from Mr. Lemke.

23       "Your brother is putting your entire family at risk with

24   his lies and other words.  We are armed and nearby your house.

25   You had better have a word with him.  We are not far from his

either.  Already spoke to" -- and here Mr. Lemke said the name

of the Congressman's son -- "and we know where his kids are."

Later in the same message, Mr. Lemke continued:  "We have

armed members near your home and" -- gives the address

there -- "also near --" and here he names some other family

members in Florida, indicating he knows they're in Florida.

"Don't risk their safety with your words and lies."

Can you imagine how terrifying this must be, particularly

under these circumstances?  A stranger is sending them their

own address, naming their family members, saying we're armed

and ready to act nearby.  And the message is clear:  If you

don't act consistent with my instructions, your family members

will be hurt.

It's -- it's terrorism.  I mean that's -- that's the word

for it.  It's violent intimidation in pursuit of political

aims.

And those were just the messages to one Congressman --

Congressman's brother.  There were several others.

Here's one message that was sent to another Congressman,

directly to the Congressman, not his family member in this

case.

"No, Joe Biden will not be inaugurated.  What you saw

tonight is just the beginning.  Thousands of us are retired

inactive law enforcement and military.  We have underground

communication networks and have been planning this for months.

Your words are putting you and your family at risk."

Then he gives the name of the Congressman's wife, the name of his son, the name of his daughter.  Says, "we are watching," and then gives the Congressman's address.

Anyone in their right mind would be terrified, particularly under the circumstances that they are receiving these (sic) message.

In addition to Congress people, Mr. Lemke sent messages along these lines to prominent members of the national news media as well as a mayor of a major city, a figure prominently involved in election integrity.

You know, Mr. Lemke might claim that these are just idle threats, he wasn't going to follow through with any of this, but this is enough to traumatize his victims.  And, importantly, this is enough to intimidate them into silence, which is exactly what he was hoping to achieve with these messages.  I think we have already learned how quickly political threats can turn into political violence.

And this is not the first time that Mr. Lemke has been arrested for criminal threats:  It happened in 2015; again in 2016; he was arrested for felon in possession in 2015.

Let me give you the details of one of these charges, Your Honor.  In 2015, Mr. Lemke was arrested for driving under the influence.  He had first told the officers -- he insisted to the officers that he was an Alameda County Sheriff's Deputy

falsely.  I should say for the record, Mr. Lemke, as far as I know, has no association with any law enforcement agency, and certainly not the Alameda County Sheriff's Department.

He also falsely claimed on Facebook, I should note, that he was a member of the U.S. Air Force.  He has not served in the military in any capacity, as far as I know.

Mr. Lemke told these officers that he was a police officer.  And when they arrested him anyway, after finding a shotgun in the back of his car, despite the fact that he's a convicted felon, he made threats to them.  He told them that he was going to find their family, that he was going to find out where their house is.

So he spends the night in jail.  He sobers up.  And what does he do the next day?  He calls the officer's father and claims that he's a private investigator trying to find out information about him.  He calls the officer's sister.

How did he find their numbers?  How did he even know that these were his family members?  I don't know.  But his purpose was clearly to intimidate them even after he had been arrested.

I think this really just underscores the point that we should take no comfort in the fact that Mr. Lemke has been arrested which might suggest he's been scared into silence.  On the contrary.

Mr. Lemke's criminal record also indicates he's a flight

risk.  In 2011, he was convicted of failure to appear in

violation of California Penal Code Section 1320.5, which is a

felony charge for failure to appear.  He was sentenced to 66

days on that charge.  I don't know all the details, but it

must have been egregious because I have never seen someone

convicted of a felony charge for failure to appear.

      Mr. Blank, I'm sure, will argue that we can impose

conditions that would reasonably assure that Mr. Lemke will

show up for his court appearances, he would be confined to his

home.  But perhaps the most important point I would like to

underscore for Your Honor is that Mr. Lemke can do all the

damage that he hopes to do from his home; all he needs is an

internet connection or a cell phone.

      And I think what his behavior has shown is that we

shouldn't believe for a second that when we send him back to

Bay Point, where he lives alone, that he won't immediately get

back on the internet or fire up another cell phone and

continue with this behavior all over again, perhaps even more

radicalized than he was before.

      Now the FBI has come into his home and put him in jail,

which is why I believe he cannot be released on conditions.

Without custodial supervision, we cannot protect his victims

from being -- continuing to be terrorized by Mr. Lemke.

      And these are victims, Your Honor, I would underscore with

extraordinary security concerns even under the best of

1    circumstances, and these are far from the best of

2    circumstances.

3        So I believe for that reason we need to ensure that

4    Mr. Lemke cannot have access to them again, and that can only

5    be done by keeping him in custody.

6        Thank you, Your Honor.

7            **THE COURT:**   Thank you, Mr. Rubino.

8        Mr. Blank.

9            **MR. BLANK:**   Thank you very much, Your Honor.

10       I appreciate the government's proffer.  Your Honor no

11   doubt noted, as I did, that the majority of it dealt with the

12   weight of the evidence, which is proper for Your Honor to

13   consider but is the least important factor.  And I understand

14   why the government spent so much time on that.  It's very much

15   in the forefront of all of our minds and across the nation.

16   So I understand that.

17       But I do disagree about the ultimate conclusion.  I think

18   we can all agree that there are risks, both of nonappearance

19   and of danger, but I agree with Pretrial Services that those

20   risks can be mitigated.

21       Although -- the government didn't mention it, it's a

22   presumption case, and presumption is rebutted by the Pretrial

23   Services report.  It means the burden goes back to the

24   government to prove as to danger, clear and convincing

25   evidence, and as to flight, preponderance of the evidence that

1   no combination of conditions can reasonably assure the
2   appearance and the safety of the community.
3       I -- the conclusion I think we can draw from this is not
4   that Mr. Lemke is an irremediable danger to the community, but
5   that he has a serious alcohol problem.  I note that the DUI
6   supports that.
7       The government referred to a gun.  That was dismissed for
8   lack of evidence.  So, I'm not sure Your Honor can properly
9   take much from that.
10      But Mr. Lemke desperately needs serious intensive
11  treatment.  Maybe it should be residential treatment.  Maybe
12  it should be intensive outpatient.  I don't think he should be
13  living alone.
14      His mother is present.  She is prepared to be a custodian.
15  She's prepared to sign on a bond, whatever the Court would
16  like.
17      I also note that I have been in touch with the defender in
18  New York, and all court proceedings there will be virtual.  So
19  he will have -- Mr. Lemke, if Your Honor were to release him
20  to treatment, like I said, either residential or outpatient
21  here, he would have the opportunity to get the benefit of that
22  treatment while making his appearances in New York.
23      And I agree that there are conditions that can and should
24  be imposed limiting cell phone use, limiting internet access.
25  All of that's fine.  Mr. Lemke needs to focus on getting

1    treatment for his alcohol addiction.  And that's going to be

2    the foremost goal for him as we move forward.

3         So, Your Honor, Mr. Lemke's mother is here if you want to

4    voir dire her at all.  She's prepared to sign and support him

5    however the Court would like.

6              THE COURT:  Okay.  So thank you both for your

7    proffers.

8         Here's my concern.  I look at the record, the extensive

9    contacts with the criminal justice system and I see generally,

10   you know, the -- I mean it's significant contact with a couple

11   volatilities, the so-called law enforcement background,

12   military service not true, not resulting in sentences.  I see

13   diversion, probation, but I also see a reflection of what I'm

14   going to call similar conduct.  And -- at least in part.

15        And then the other part of what I see is, I see escalating

16   conduct here, which is serious and scary, and I would just

17   say, Mr. Rubino, usually what the FBI does, the FBI is very

18   gifted threat assessment people.  They usually can do an

19   assessment.  They really are extremely good.  I know this from

20   my experience.  They do a fair -- usually a very fair

21   assessment of threat.

22        What I don't have here, Mr. Blank, is I don't have

23   confidence about why.  You know, is this idle or is it real?

24   It's scary enough.  I don't know what the situation is, but I

25   do know that there probably is a forensic explanation and

1    perhaps something that can be done to address -- there may or

2    may not be something to address the volatility.

3        I would suggest, Mr. Rubino, that the pattern of the

4    outcomes in State Court gives some suggestion about whatever

5    was going on in State Court they didn't think there was an

6    assessment that resulted in the kinds of outcomes that we see.

7        And on the other hand, Mr. Blank, I am concerned about the

8    volatility of the conduct and the potential danger given the

9    scary aspect of what happened.

10       So on this record, I do not have confidence about -- you

11   know, an explanation about whether there is some kind of

12   mental health treatment model that might address issues, and

13   really what I'm doing is entrusting Pretrial Services' use of

14   its, you know, risk assessment tool.  But I think that I

15   could -- so on this record, I don't have the information to

16   make me feel comfortable setting conditions.

17       I'm not saying that couldn't be remedied.  I think it

18   probably could be remedied if you wanted to do a neuro psych

19   or some kind of a treatment evaluation.

20       It's more than just alcoholism.  You know, it's more than

21   just alcoholism.  I mean, that may be a precipitating factor

22   and it may be something that requires an intervention, but on

23   this record, I'm going to order -- I'm going to order

24   Mr. Lemke detained without prejudice to revisiting this issue

25   if there is some kind of a neuro psych assessment.

1      I don't know what you want to do then about the Identity

2   and Removal Hearing because it is probably not a good idea for

3   anybody to get on a plane to be removed, but I don't have

4   enough of a record to set conditions.

5      So the order is that he is detained.  I will ask the

6   government to submit a short order documenting that this

7   detention decision -- it can say for the reasons stated on the

8   record and primarily based on danger.  The Court does -- on

9   this record, the Court does not conclude that conditions can

10  be set to assure the safety of the community, but this

11  decision is without prejudice to revisiting the issue pending

12  further information.

13     So, Mr. Blank, what do you want to do about the rest of

14  it?

15     **MR. BLANK:**  I wonder if Your Honor would consider,

16  while Mr. Lemke is in custody and pending a follow-up hearing,

17  that I will take Your Honor up on, having him evaluated by New

18  Bridge for --

19     **THE COURT:**  New Bridge will accept him.  They accept

20  everybody.  I wonder if you can do -- again, it doesn't have

21  to be on the government necessarily.

22     I wonder if there's some kind of an evaluation -- I don't

23  know that -- the Pretrial Services report says mental health

24  treatment.  I am fine to have him evaluated by New Bridge, but

25  I'm not sure their assessment that he's appropriate for

1     acceptance in the program is enough.

2              **MR. BLANK:**  I'm not suggesting it would be enough,

3     but it would save time, for example, Your Honor, if we set it,

4     the matter, for two or three weeks.  In the interim, I will

5     have the neuro psych evaluation or whatever appropriate mental

6     health evaluation.  And then if Your Honor is convinced that

7     could be released, then the evaluation by New Bridge will have

8     already happened.

9              **THE COURT:**  Okay.  That's fine.

10         I would suggest you talk with Mr. Rubino and talk with him

11     about what the FBI did -- it sounds like Mr. Lemke was --

12     talked to the agents when they arrested him.  He gave them his

13     phone and he, you know, he talked about what was on it and

14     said what he was able to do.  And they probably had some

15     kind -- I would suggest to you, Mr. Rubino, talk to the agent,

16     and then you and Mr. Blank talk.

17         Again, I will tell you, the FBI assessment folks are, you

18     know, sometimes people are all talk and sometimes people

19     are -- they do have really gifted people to evaluate this, and

20     I would be interested in hearing what they thought in addition

21     to the neuro psych.

22         I do think as far as the cell phone/internet aspect of

23     things, I think conditions could fashion (sic) especially if

24     he were in a custodial facility such as New Bridge.  I mean,

25     basically, you can't do anything.  You can't leave.  You can't

1    go out and get -- it's pretty restrictive.  So I think that we

2    could fashion conditions, you know, including supervised use

3    of the telephone or, you know, whatever to address that threat

4    situation if the neuro psych gives me confidence about the

5    danger issues.

6        So it may be a combination of both that might result in

7    conditions, but on this record I think that's fine.

8        Mr. Blank, why don't you propose a date out in February

9    two or three weeks.  You pick the date.  I'm here every day.

10   It's better not to do it on a Thursday because Thursday is

11   also my civil calendar.  So to the extent we can, I can do it

12   on any other day.  Usually Tuesdays and Wednesdays are less

13   exhausting.

14           **MR. BLANK:**  Let's set it for February 22nd.

15           **THE COURT:**  Okay.

16           **MR. BLANK:**  Which is three weeks from today.  If I

17   can get everything done earlier, I will talk to government

18   counsel and Your Honor's courtroom deputy and see if we can

19   advance it --

20           **THE COURT:**  That's fine.  So we'll put it on for

21   February 22nd at 10:30 for further proceedings regarding

22   detention, identity, and removal.

23       And so I think that -- I think the speedy trial clock for

24   the formal charges doesn't start ticking until I order him

25   removed, so we've got the 10 days.  I don't think we need to

1  worry about the 30 days for the complaint for the other

2  district.

3      I will say, Mr. Rubino, in the meantime, get some of that

4  additional discovery and I can exclude time.  In any event,

5  I'll just put in the minute order that I exclude time -- and

6  extend time under Rule 5.1 for discovery to Mr. Blank.

7          **MR. BLANK:**  It is so stipulated, Your Honor.

8          **THE COURT:**  All right.  Great.

9          **MR. RUBINO:**  Thank you, Your Honor.

10          **THE COURT:**  Thank you.

11          **PRETRIAL SERVICES OFFICER:**  To clarify, is Your Honor

12  ordering an in-custody New Bridge assessment today?

13          **THE COURT:**  Yes.  Thank you.

14          **PRETRIAL SERVICES OFFICER:**  Okay.

15          **THE COURT:**  Thank you for clarifying.

16      All right.  Thanks everybody.

17          **MR. BLANK:**  Thank you very much, Your Honor.

18          **MR. RUBINO:**  Thank you, Your Honor.

19          **MR. BLANK:**  Thank you, Ms. DuClair for attending.

20  You and I will follow up and talk more.

21      Mr. Lemke, you can call me as well.

22          **MS. DUCLAIR:**  Thank you so much.

23          **THE COURT:**  Thanks.  Okay.

24              (Proceedings concluded at 10:54 a.m.)

25

## CERTIFICATE OF TRANSCRIBER

   I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by the
U.S. District Court, Northern District of California, of the
proceedings taken on the date and time previously stated in
the above matter.

   I further certify that I am neither counsel for, related
to, nor employed by any of the parties to the action in which
this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

*Diane E. Skillman*

   DIANE E. SKILLMAN, TRANSCRIBER

   Thursday, February 4, 2021

Exhibit C



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 11, 2021

**BY EMAIL and ECF**

Hon. Laurel Beeler
United States Magistrate Judge
Northern District of California
United States Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *United States v. Robert Lemke*, 21 Mj. 70156 (LB)

Dear Judge Beeler:

The Government respectfully writes regarding the status of the defendant's Rule 5(c)(3) proceeding. The defendant was arrested on January 26, 2021 based on a Complaint filed in the Southern District of New York (the "SDNY") charging him with making interstate threats directed at, among others, a New York City-based congressman, in violation of 18 U.S.C. § 875(c). On February 1, 2021, the Court held an initial appearance and ordered the defendant detained on dangerousness grounds, but did not order the defendant removed to the SDNY, and instead adjourned the matter until February 22 for further proceedings "regarding detention, identity, and removal." Feb. 1, 2021 Transcript ("Tr."), attached as Exhibit A, at 19. As described below, however, the defendant does not appear to contest identity and the Court should therefore order the defendant removed to the SDNY without the need for further proceedings. In the alternative, the Government requests an identity hearing as soon as possible so that a determination regarding identity can be made and, if identity is established, the defendant can be ordered removed to the SDNY. Defense counsel opposes this request.

As the Court is aware, "[u]pon the appearance before a judicial officer" the defendant must be detained or released on conditions that guarantee his future appearance and the safety of the community. 18 U.S.C. § 3142. When the defendant is arrested outside the district of prosecution, Federal Rule of Criminal Procedure 5(c)(3) governs the initial appearance. Pursuant to that rule, the Court "must transfer the defendant to the district where the offense was allegedly committed if: (i) the government produces a warrant . . . ; and (ii) the judge finds that the defendant is the same person named in the indictment, information, or warrant." Fed. R. Crim. P. 5(c)(3)(D).

On February 1, 2021, at the defendant's initial appearance in the Northern District of California, the Court determined that it was "order[ing] Mr. Lemke detained" but "without prejudice to revisiting the issue," and that detention was warranted "primarily based on danger." Tr. 16-17. The Court then stated, "I don't know what you want to do then about the Identity and Removal Hearing . . . but I don't have enough of a record to set conditions" and adjourned until February 22, at which time it would allow the defense to revisit the Court's detention order.

Page 2

At the initial appearance, the defendant did not appear to contest his identity. The Pretrial Services report reflects that the defendant identified himself to Pretrial Services as "Robert Cory Lemke" and provided a personal history. Defense counsel noted on the record that "Mr. Lemke's mother" was attending by telephone, offered her as a co-signer, and referred to the defendant as "Mr. Lemke" throughout the conference. Tr. 2, 13-14. In any event, were the defendant to contest identity, there is ample evidence to satisfy Rule 5(c)(3)(D): for example, in addition to the indicia of identity included in the Complaint, in an audio-recorded post-arrest interview, the defendant identified himself as "Robert Lemke" to the FBI, provided his middle name, and confirmed his date of birth.

Based on the foregoing, and because the defendant made no reference to contesting his identity at the initial appearance, the Government respectfully submits that the Court should find that the defendant is the same person named in the Complaint and order the defendant transferred to the SDNY without further delay as required under Rule 5(c)(3)(D). To the extent the defendant seeks an opportunity to contest his identity, that proceeding should be held as soon as possible, particularly given that the defendant is detained on the premise that he is the individual charged. The Government is prepared to conduct any identity hearing as soon as the Court will allow. There is no need or basis under Rule 5 for further proceedings in the Northern District of California on the issue of detention, as the defendant has been ordered detained at his initial appearance, and therefore must be ordered removed to the SDNY to face the charges against him in that district. *See* Fed. R. Crim. P. 5(c)(3)(D). The defense will of course be free to make any further applications regarding bail following the defendant's transfer to the SDNY, including on the basis of any psychological assessments or other evidence, and any such further applications revisiting detention are appropriately heard by the SDNY court presiding over this prosecution.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Kyle A. Wirshba / Kimberly Ravener
Assistant United States Attorneys
Southern District of New York
(212) 637-2493 / 2358

cc: Daniel Bank, Esq. (counsel for Robert Lemke)

Exhibit D

[Filed Under Seal]

Exhibit E

Pages 1 - 37

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 21-mj-70156 AGT (LB) |
| | ) | |
| ROBERT LEMKE, | ) | |
| | ) | |
| Defendant. | ) | San Francisco, California |
| _____ | ) | Monday, February 22, 2021 |

**TRANSCRIPT OF PROCEEDINGS**

**FROM THE OFFICIAL ELECTRONIC SOUND RECORDING**

**10:32 A.M. TO 11:14 A.M.**

**APPEARANCES:**

For Plaintiff:        DAVID L. ANDERSON
                      UNITED STATES ATTORNEY
                      450 Golden Gate Avenue, 11th Floor
                      San Francisco, California  94102
                 **BY:  DAN KARMEL**
                      **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:        STEVEN KALAR
                      Federal Public Defender
                      450 Golden Gate Avenue
                      Room 19-6884, Box 36106
                      San Francisco, California  94102
                 **BY:  DANIEL BLANK**
                      **DEPUTY FEDERAL PUBLIC DEFENDER**

Also Present:

                      **TERESSA DUCLAIR**
                      **GUSTAVO RANGEL**, Pretrial Services


Transcribed By:  **BELLE BALL, CSR 8785, CRR, RDR**
                      Official Reporter, U.S. District Court

<u>**Monday - February 22, 2021**</u>                                    <u>**10:32 a.m.**</u>

**P R O C E E D I N G S**

    **THE CLERK:**  Calling Criminal Action 21-70156, USA versus Robert Lemke.

    Counsel, can you please state your appearances for the record.

    **MR. KARMEL:**  Good morning, Your Honor.  Dan Karmel standing in for Kevin Rubino, on behalf of the United States.

    **THE COURT:**  Good morning.

    **MR. BLANK:**  Good morning, Your Honor.  Daniel Blank on behalf of Robert Lemke.  He is present in custody, on the Zoom video.

    We do waive our right to an in-person hearing, in light of the COVID pandemic.

    **THE COURT:**  Great.  Thank you for making that record.  And from Pretrial?

    **PTSO RANGEL:**  Good morning, Your Honor.  Gustavo Rangel from Pretrial Services.

    **THE COURT:**  Okay, good morning, Mr. Rangel.

    Okay.  So this matter is on for further detention proceedings, in light of the new submissions by the party, and status regarding identity and removal.

    So, thank you.  You know, just to clarify where we were from the last court appearance, we -- you know, I have as part of the record the underlying complaint from the Southern

1   District of New York.  I did -- and I have Pretrial Services'

2   bail study which did recommend release on a $50,000 unsecured

3   bond.

4        We talked at the last hearing that Pretrial -- and again,

5   I'm not making too big a point on this because the importance

6   of this varies, depending upon case.  But that the Pretrial

7   Services does use a -- a validated risk assessment tool in

8   reaching its recommendations.  It's not just sort of blowing a

9   recommendation, you know, as hot air.  They make it...

10       I was still, I was uncomfortable given -- for the reasons

11  proffered by the government at the last hearing, I was

12  concerned, given the nature of the allegations in the

13  complaint, the additional proffer made by Mr. Rubino during the

14  court hearing, and just sort of the overall context of the

15  issue, I was concerned whether the information I had was a

16  sufficient analysis of risk.

17       And so on that record, at that hearing, I detained -- I

18  detained Mr. Lemke, without prejudice to revisiting the issue

19  with some more robust assessment in the former of a neuropsych

20  evaluation, like the one that Mr. Blank obtained.

21       We also discussed at that hearing -- again, just for the

22  record, this is for Mr. Karmel just a little, to make sure

23  you're up to speed; you probably did read the transcript

24  because I saw that Mr. Rubino ordered one.

25       But, but, you know, I was -- I was uncomfortable.  I

 1   didn't feel like I had the right -- enough of a record to set

 2   conditions.

 3        We talked about New Bridge, because Mr. Blank suggested

 4   that the problem was exacerbated by the alcohol problem, the

 5   addiction issues that were manifest in the -- in the bail

 6   study.  And I said, you know, I just don't have enough

 7   information.  So now Mr. Blank has gotten an additional

 8   evaluation.

 9        I wanted to give the government an opportunity to weigh in

10   with anything else that it wanted to say about its position

11   before I said what I thought I was going to do.

12        So, Mr. Karmel.

13             **MR. KARMEL:**  Thank you, Your Honor.

14        It is the government's position that Mr. Lemke should

15   remain in custody.  And if we do get to the question of

16   detention stay, I'd ask to make a proffer on that.

17        But as an initial threshold matter, I would ask -- I would

18   submit the Court should first address the question of

19   Mr. Lemke's identity, which I think is --

20             **THE COURT:**  Well, no, I understand that.  We will get

21    to his identity.  I appreciate the letter that you submitted.

22    I think there's probably enough.  The identity matter is,

23    like, really small, and that should be a pretty easy thing.

24    But let's get through the bail issue first.  And then we'll

25    deal with identity.  I mean, I 100 percent agree that we

1    should deal with identity.

2        I think that at our last hearing, you know, Mr. Blank --

3    we just had -- Mister -- in light of the pandemic, you know,

4    Mr. Blank's first deal was to get him in the door for a

5    detention hearing.  He didn't really have enough time to talk

6    about the issue with him.  And it's not unusual to just kick it

7    over, to give somebody an ability to discuss the identity issue

8    with a client.  I advise them on the record.  And then we

9    kicked it over a little longer than usual.  It would have

10   ordinarily just been a couple days.

11       And I probably could have put it on earlier for an

12   identity hearing.  Just in overall efficiency, I just put it on

13   for the same day.  So I don't mean to deny the government its

14   identity hearing, 100 percent, I'm, like, on board.  It doesn't

15   belong in this district; I get it.  And we'll get to it today.

16       Okay.  So why don't you tell me what you want to say about

17   the bail issue.

18       I'll just tell you, look, you know, I was -- I am

19   concerned about threat cases.  I said it at the last hearing.

20   I get threat cases myself.  I know the difference with the

21   people who are -- and it's terrible what's in the complaint, so

22   I'm not suggesting otherwise.  It's perfectly dreadful.  And

23   it's not okay.

24       And the way it must have felt to the people on the

25   receiving end of those threats is terrible.  And, and

1   appropriately addressed in the complaint.  And I didn't know

2   whether -- you know, where Mr. Lemke fell on the spectrum of

3   issues.

4        I will say that the neuropsych that Mr. Blank got

5   addressed those issues.  And I think conditions could be set.

6   You know, basically, he's a sad -- it's a sad situation.

7   Mr. Blank can synopsize, you know, the mental health -- the

8   mental health evaluation, but he doesn't have violence in his

9   history.  And, and, and -- which is one of the things that

10  Pretrial Services looks at too, right?  That's the tool.

11  That's part of the risk assessment tool.  And, and, and his --

12  he's got episodic grandiosity and is a kind of a sad

13  mentally-ill guy, and I think all of those things can be

14  addressed by conditions.  I really do.

15       And I feel much better about it because I -- because we

16  got the neuropsych.  I don't want anyone's violence being on my

17  head.  Everybody knows it, that's what drives me, right, in my

18  detention decisions.  And I think conditions can be fashioned.

19  I set conditions.  But danger is the thing, the bridge I do not

20  cross, ever.

21       And so, and so I do -- I am satisfied, based on the

22  additional information.  In the query, I was going to ask

23  Mr. Blank:  What's the next step?  Does he go home?  Does he go

24  to New Bridge?  And I was going to get an update on that.  I

25  think that maybe ultimately a residential situation might be a

 1   good thing, because it would allow Mr. Lemke to develop some

 2   tools.

 3        But I wonder if the government -- so that's what I want to

 4   do.  And so I don't know if you have anything else that you

 5   want to weigh in, given that inclination, because my concerns

 6   about danger are addressed, and the rest of it I think we can

 7   figure out what to do about, so Mr. Lemke can't use the

 8   telephone, as he's very good at doing, to -- to engage in

 9   similar conduct.

10        So Mr. Karmel, I don't know what else you want to offer.

11        **MR. KARMEL:**  Your Honor, fully understanding the

12   Court's position, I would -- the government still does have a

13   number of concerns regarding danger.  And I would like the

14   opportunity to go through those, if that's okay.

15        **THE COURT:**  Sure, sure, sure.  That's totally fine.

16        **MR. KARMEL:**  And just to begin with Your Honor's

17   point, I think a person can both be sad and dangerous.  And so

18   all of the concerns raised regarding Mr. Lemke's -- his past

19   and his condition, none of that -- these are obviously things

20   that need to be taken into account, but I just don't know if

21   -- I think they should be taken into account at a later date.

22   Because the concern right now is whatever the explanation is,

23   whatever the background is, he is still a danger.  And I do

24   want to touch on a few of the things in the report.

25        The first is, even fully crediting the report's findings,

1    I don't know that it actually fully properly takes the position

2    that he is not a danger to the community.  The report appears

3    to focus on the likelihood that he will physically harm

4    someone.  But as the Court knows, there are -- that's not the

5    only way in which a person can be a danger.  And in this case,

6    it could include, for example, threatening victims and

7    witnesses.

8        And I think the report does actually very little to

9    provide any comfort that the defendant won't continue to engage

10   in that behavior.  In fact --

11        **THE COURT:**  If he said New Bridge, if he said

12   New Bridge, he doesn't have a phone; that seems like a pretty

13   good way of letting him -- or he can only use the phone under

14   supervision.  That seems like a pretty good way of addressing

15   that issue.

16       I'm 100 percent with you.  Obviously, the issue is if the

17   pattern of criminal behavior continued, that would pose a

18   danger to the community.  I agree with that, 100 percent.  The

19   issue is whether conditions could be set to address that issue.

20       And I agree with you, the lack of physical danger to

21   someone is only one part of the inquiry.  It also matters

22   whether he's going to continue to engage in the conduct that

23   led to the charges here.

24        **MR. KARMEL:**  And on that point, Your Honor -- and I

25   -- I believe New Bridge is not a secure facility.  And if I'm

1    incorrect, mistaken about that, obviously, please let me know.

2    But I think the concern here -- and this is also I think borne

3    out by the defendant's history -- is that he has shown the

4    willingness to engage in this type of behavior, even in the

5    face of immediate legal authority.

6        So looking at the 2015 DUI, for example, he threatened a

7    police officer.  And then, as shown in the government's

8    submission from Friday from the Southern District of New York,

9    he then contacted the officer's family.

10       And so I think conditions of release --

11           **THE COURT:**  It's terrible.  I completely agree, it's

12   terrible.

13           **MR. KARMEL:**  And just -- but on that point,

14   Your Honor, I would say I think the conditions of release

15   here, what they would do is they would ensure that if

16   Mr. Lemke engaged in this behavior, he would likely be caught.

17   But I don't think what it can do is ensure that he won't

18   continue to engage in this behavior.  I think, to quote from

19   the report:  The best predictor of future behavior is past

20   behavior.

21       And, you know, whatever the reasons are, whether it's sad

22   or whatever the conditions, he -- I don't think that the -- the

23   threat of legal consequences are enough to dissuade him from

24   engaging in this behavior.

25       I would also note that while the issue here has been

1   presented as an alcohol-abuse problem, which I think is part of

2   the reasoning behind New Bridge, the report actually suggests

3   that Mr. Lemke hasn't drank since 2019.  So I'm not sure what

4   the real story is, one way or the other.

5        I think it's raising concerns about the cause of the

6   underlying behavior here, and what role rehabilitation -- what

7   the proper approaches are as far as trying to rehabilitate him.

8        And finally, Your Honor, I would just note that the report

9   also suggests -- seems to suggest that the behavior in this

10  case or the conduct in this case may be more prolific than

11  previously understood.

12       Mr. Lemke claimed to have sent between 500 and 1,000 text

13  messages.

14            **THE COURT:**  (Inaudible)

15            **MR. KARMEL:**  And while the report notes -- suggests

16   he was supposedly disgusted by the Capitol siege, he continued

17   to engage in this unlawful conduct, and continued to send

18   threats thereafter.

19       So those are the concerns from the government's

20  perspective, fully understanding the Court's initial

21  inclination.  But I just think -- I think what New Bridge would

22  allow us to do is catch him, likely catch him when he engages

23  in this conduct.  I don't think it will properly prevent him

24  from doing so.

25            **THE COURT:**  Well, his -- you know, his mom who

1   certainly -- and I don't know if she's -- probably we should

2   have promoted here.

3       Is she here today, Mr. Blank?

4       **MR. BLANK:**  She is, Your Honor.  And it would be good

5   to promote her.  She's following along with everything we're

6   saying.

7       **THE COURT:**  Right.  No, of course, she is.

8       Elaine, would you promote her?

9       **MR. BLANK:**  It's "T Duc."  "T Duc."

10      And perhaps as she is being promoted, I can respond to

11  some of the government's --

12      **THE COURT:**  Yeah, talk about, you know, talk about

13  the conditions that you --

14      **MR. BLANK:**  Yeah.

15      **THE COURT:**  I mean, Pretrial Services -- and we can

16  weigh in from Mr. Rangel too.  You know, Pretrial Services

17  proposed release.  The government's points are great ones; I'm

18  not saying they're not.  They're very good points.

19      And, and obviously, it's completely -- you have a shared

20  interest.  It's -- like, like many times in life, parties have

21  a shared interest in making sure this doesn't happen on a

22  going-forward basis.

23      So what's your proposal?

24      **MR. BLANK:**  So Your Honor -- and in doing -- giving

25  you my proposal, it will address some of the legitimate

1    questions raised by the government.

2        My proposal is that Mr. Lemke be released not to

3    New Bridge, but instead, on home detention with electronic

4    monitoring, and his mother be the custodian.  He was living by

5    himself at the time of the alleged incident.  The proposal is

6    to have his mom move in with him and be his live-in custodian

7    there.

8        And there are a couple of reasons for that, why I think

9    it's better, and why I think frankly Pretrial Services got it

10   right the first time, rather than my suggestion of New Bridge.

11       Just, I -- Your Honor directed Pretrial to have New Bridge

12   do an assessment.  I don't think one was done.

13           **THE COURT:**  It's fine.  I actually tend to think that

14    for the reasons Mr. Karmel advances, if he really hasn't had

15    anything to drink since 2019, --

16           **MR. BLANK:**  Yeah.

17           **THE COURT:**  -- that mental health counseling that he

18    can do under Pretrial's, you know, supervision is -- you know,

19    and they can monitor his internet use, right?  They've got

20    monitoring software that they could do.

21       You know, one of the things that was discussed in the

22   report was, you know, the problem is therapy's all, you know,

23   remote during the pandemic.  But I think that -- and he's going

24   to have to learn some skills to do something different because

25   obviously -- you know, I would just say, too, I said this at

1    the last hearing, when you look at the criminal history and

2    what you see with Mr. Lemke, every time he comes up against the

3    criminal history, there are problems here.  Right?

4              **MR. BLANK:**  Yep.

5              **THE COURT:**  And so there are problems here that drive

6    the behavior.  And they -- and I don't -- you know, we're

7    going to have to figure out way to start addressing them.  And

8    that's his lawyer's job, to help him with that.

9              **MR. BLANK:**  So I think -- both mom and I had

10   suspicions early on, before we had a chance to really get into

11   this case, that Mr. Lemke might have fallen off the wagon.

12   And that's why there was a concern that alcohol may have

13   played a big role, that I now think it did.

14        So I think that New Bridge hasn't evaluated him, and may

15   be unlikely to take him, because I think he would truthfully

16   say he hasn't had a drink since 2019, that that's -- they're

17   going to say: We're not the right thing for you.

18        If there was a straight-up residential mental health

19   program, I think that might be the better fit.  I'm not aware

20   of one.  But I think if mom is living with Mr. Lemke,

21   monitoring any time -- you know, so he's not going to be using

22   the phone or the internet, unless mom is supervising.

23        So whatever counseling he's doing, or court, mom will do

24   it.  She'll be the one ordering the groceries or whatever from

25   Amazon.  And she's willing to do that.  You know, she lives

1   with her husband in her own home, but she's willing to relocate

2   and move in with Mr. Lemke, at least for the foreseeable

3   future.  That's not a long-term solution, but I don't think we

4   are talking about a long-term solution anyway.  I think that

5   that's the best way to do it.

6        And that way he doesn't really need to be on any kind of

7   device, except with her supervision.

8             **THE COURT:**  Okay.  So, so I --

9             **MR. KARMEL:**  Your Honor?

10            **THE COURT:**  Yeah.  I appreciate the mother's being

11   willing to make that -- Elaine, will you pull up the bond

12   form?

13        Did you want to say something, Mr. Karmel?

14            **MR. KARMEL:**  Yeah, if I could be heard just quickly

15   on the issue of the mother.

16        I think -- the report also raises concerns about the

17   mother's ability to exercise moral suasion over the defendant.

18   While she has expressed a willingness to live with him, or

19   perhaps even moving now, it sounds like, I think -- I would

20   note, for example, that there are a number of comments that

21   raise concerns, including her quote that it's -- the

22   defendant's *modus operandi*, deny accountability for his

23   actions.  And her statement that they sometimes do not

24   communicate for months at a time, during which she is unaware

25   of his whereabouts.  So I think --

1        **THE COURT:**  It would be a little different if he's on

2  home detention, subject to electronic monitoring, with his

3  mother living with him.  That's not going to happen, right?

4  And the issue is -- what you quite rightly said, that what

5  New Bridge gives us is the ability to catch him.  So, too,

6  does his mother acting as custodian.

7      And whether we can put into place some mental health

8  components to address the danger issues, I think on this

9  record, I think the answer is yes.  And if that turns out not

10  to be so, we have our -- we have other options.

11        **MR. KARMEL:**  Your Honor, if I could -- just one final

12  point.  The Southern District -- since it appears Your Honor

13  is leaning towards ordering the release of the defendant, the

14  Southern District of New York has asked that I request a

15  48-hour stay of the order.

16        **THE COURT:**  Not a problem.

17        **MR. KARMEL:**  And I would -- just on that point

18  Your Honor, I think that that underscores the point I was

19  trying to start off with, which, if the Court does not want to

20  address the identity issue --

21        **THE COURT:**  Oh, I do.  I do want to address the

22  identity issue.  We should address that today.

23      Mr. Blank, are you going to be prepared to admit identity?

24        **MR. BLANK:**  Yes.  He will be prepared to admit

25  identity.

1          **THE COURT:**  Yes.  See, he's going to admit identity.

2    He's not going to jam you up on that.  So it'll be fine.

3          So we'll admit identity and, you know, we'll just --

4    you'll decide -- we'll order -- I don't know whether you have

5    -- I don't know whether you know how court appearances are

6    conducted in the SDNY.

7          **MR. BLANK:**  I do, Your Honor.  At least, I talked to

8    the Federal Public Defender there.  And for the moment,

9    they're all by video.  I mean, with the vaccinations -- which

10   is great news -- that may be changing in the future.  But for

11   now, they're all video.

12         So I think a date could be set for Mr. Lemke to make an

13   initial appearance by video, and he'll make --

14         **THE COURT:**  So we'll order him removed today, and we

15   can -- and you know, we'll set a date for him to appear

16   essentially on the duty MJ's calendar.

17         Do you happen to know the date that -- you know, the time

18   of the duty calendar, Mr. Blank?

19         **MR. BLANK:**  That I don't know, but it will be easy to

20   find out.

21         **THE COURT:**  Easy to find out.  Mr. Blank can take

22   responsibility.  We'll pick a day, and then Mr. Blank and you

23   can take responsibility for letting Mr. Lemke know.

24         So that'll -- we'll deal with the identity and that

25   hearing date in a minute.  We'll see what's reasonable.  And

1    so, that'll take care of that.

2         And so I'm fine -- so let's just talk procedurally how

3    this is going to work with the stay.  I -- 48 hours from now,

4    which would be Wednesday at 11:00.  And I'm happy to stay it

5    longer if you need to, but we're going to set the conditions of

6    release, right?  And we'll get the mom on board with the

7    custodial acknowledgment.

8         I'll hold the letter so that at the hearing, the duty --

9    the duty calendar -- you know, we can just put a notation,

10   Elaine, I don't think we need to call the case.  What I can do

11   is I can just issue the wet release order on the duty calendar

12   on Wednesday.

13        Are you on duty this week Mr. Blank?

14        **MR. BLANK:**  We are not on duty per week.  We're on

15   duty per day, unlike the AUSAs.

16        **THE COURT:**  Okay.

17        **MR. BLANK:**  But I'm available to appear at

18   Your Honor's convenience.

19        **THE COURT:**  Yeah, I just want to make sure we somehow

20   calendar it so it doesn't fall through the cracks.  Because --

21        **PTSO RANGEL:**  Your Honor, this is Gustavo Rangel with

22   Pretrial Services.

23        **THE COURT:**  Yes.

24        **PTSO RANGEL:**  I'd like to update you on some

25   information that may be of assistance to you, Your Honor?

1       **THE COURT:**  Okay, great.  Thank you.

2       **PTSO RANGEL:**  Your Honor, so as Your Honor knows, you

3   ordered the in-custody assessment.  It was not done.

4       It was scheduled, but however, on the day that it was

5   going to be conducted, Mr. Lemke did not -- refused to come out

6   of the cell to be interviewed by New Bridge.

7       **THE COURT:**  (Inaudible)

8       **PTSO RANGEL:**  In addition --

9       (Simultaneous cross-talk)

10      **MR. BLANK:**  -- my understanding about what happened,

11  so I can address that --

12      **THE COURT:**  That's all right, we're not going to

13  overly worry about it; let's hear from Mr. Rangel, what

14  information he has.  And, it's -- it's not fatal.  I mean,

15  it's not great, but it's not -- you know, I'm not surprised.

16  Let's just -- I'll make that observation.

17      Let Mr. Rangel finish.

18      **PTSO RANGEL:**  Your Honor, in speaking with -- as

19  Your Honor knows, I was the one who actually wrote the report.

20  So in speaking with his mother, and Mr. Lemke, there are

21  inconsistencies with the stories.

22      And I kind of do believe that there may be a mental health

23  condition.  And it's -- it's -- from an observer, it's not the

24  alcohol.  I think the underlying issue is a mental health

25  condition that hasn't been addressed.

1    And that's why, Your Honor, I would -- I would say that he

2   probably should -- he probably needs to be evaluated by a

3   mental health professional to get a formal diagnosis.

4    What Mr. Blank was referencing is a neuropsych -- a

5   neuropsychology assessment.  I have not received it.  I have

6   not seen it.  So I don't know anything of that, so I would not

7   be able to answer any questions of that nature, Your Honor.

8         **THE COURT:**  All right.  So Mr. Blank, do you have any

9    problem with sharing the assessment with Pretrial Services?

10   Because I think it will help them with their treatment model.

11         **MR. BLANK:**  Of course not.  And I apologize for not

12    doing that.  I just sort of did "Reply All" after government

13    counsel sent their submission, and I failed to insure that

14    Mr. Rangel got it.

15    I apologize.  I'll get it to you right now.

16         **THE COURT:**  Perfect.  And then you can decide,

17    Mr. Rangel, whether you want Alicia, Dolan to do a further

18    assessment to come up with a treatment plan.

19    But I think the next step would be to have the Dolan

20   professionals weigh in, you know, on what the treatment plan

21   is.  This will be a lot of information that will be helpful.

22   And then, I'll leave that in your hands.

23    So let's just do the -- Elaine, do you have the bond form

24   in front of you?  It was on the G drive.

25         **THE CLERK:**  I do.

1          **THE COURT:**  Okay, great.  So, where is the -- which

2     address is Mister -- because I think the mom's address is, um,

3     on her -- I mean, on the bond form that you submitted you've

4     got the San Ramon, the Bollenger Canyon Road, San Ramon.  Is

5     that her address?  Or is that Mr. Lemke's address?

6          **MS. DUCLAIR:**  That's mine.

7          **PTSO RANGEL:**  Your Honor, that address is the mother,

8     mother --

9          **THE COURT:**  All right.  So Elaine, Mr. Lemke's

10    address, as I understand it, is 779 Azores -- A-Z-O-R-E-S --

11    Circle, Bay Point, California, 94565.

12        Okay.  So, that's the address that goes in the bond form.

13    I'm sure he doesn't have a telephone number, because the agents

14    seized the phone from him when they arrested him.

15        So, you know, he's going to have to have some kind of a

16    communication system to communicate with Pretrial Services, so

17    he's going to need a phone.  I agree with the government about,

18    like, having conditions to address the fact that he can't use

19    the phone inappropriately.

20        So I would just say that one of the conditions that we'll

21    add to the bond form is Elaine will also add -- for

22    Ms. DuClair, we have her marked as "Surety."  We also need to

23    check "Custodian" by her name.

24        And Ms. DuClair, we'll go through all of this on the

25    record.  I really appreciate you being here.

1        Elaine, you'll also check the box "Remain in the custody

2   of custodian," you know, at -- at the Azores Circle address.

3        For the travel restriction, Elaine -- well, actually,

4   we've got that typed in.  That's fine.

5        We're going to check the box for location monitoring, as

6   directed by Pretrial Services.

7        So --

8        **PTSO RANGEL:**  Your Honor, Gustavo Rangel with

9   Pretrial Services?

10       **THE COURT:**  Yes.

11       **PTSO RANGEL:**  Are you going to -- is Your Honor going

12  to require a time, a curfew, or home detention?

13       **THE COURT:**  Well, I think that he's -- I think for

14  now, we can deal with it later, 30 days down the road.  I

15  think he should be on home detention, subject to electronic

16  monitoring, except for medical, substance abuse or

17  mental-health treatment, we'll check that box; attorney

18  visits, check that box; court appearances, check that box;

19  Court-approved obligations, check that box.  And other

20  activities approved in advance by Pretrial Services.

21       And so that's 30 days to kind of calm things down, get a

22  sense of the status quo, get the mental health piece taken care

23  of so we can come up with some kind of a plan to address the

24  situation.

25       I think -- and then Elaine, also check the box -- well,

1   substance-abuse treatment, that's fine.  That's all fine.

2       And I guess we'll check the box so that drug and/or

3   alcohol testing is directed by Pretrial Services.  Again,

4   Pretrial Services doesn't have to do those things, but it can.

5       The Pretrial Services bond amount, recommended a $50,000

6   unsecured bond, co-signed by his mom.  So that will be the bond

7   amount, Elaine.  It'll be unsecured -- check the box -- $50,000

8   bond.

9       Okay.  So, so all the -- and so let's -- let's just take

10  care of this first, let's just take care of the identity

11  hearing first, because it's quicker, and that way we can

12  problem-solve what the next date is.

13      So Mr. Blank, Mr. Lemke did say you were prepared to admit

14  your identity (sic).  As I told -- as you were informed as your

15  initial hearing, the issue is not whether you did it; it's

16  whether you're the person who's charged with doing it in the

17  other district.  We have a formal charging document, one piece

18  of it.

19      The second piece of it is:  Are you the person that they

20  accuse of doing it?  That's the issue of your identity.  You're

21  entitled to a hearing on that issue.

22      Other than that, the challenge to the case happens in the

23  SDNY.  But the issue of your identity, you are entitled to a

24  hearing where the government would have to prove it, and the

25  government's made a proffer that they can prove it.  But, so

1  that's the issue of your identity hearing.

2      And so I understand that you wish to admit that you were

3  the person charged in the Southern District of New York.  Is

4  that correct, Mr. Lemke?

5          THE DEFENDANT:  Yes, it is.

6          THE COURT:  Okay.  So just -- if you can just say

7   your full name for the record, and state your age.

8          THE DEFENDANT:  Robert Corey Lemke, age 35.

9          THE COURT:  Okay.  And you (inaudible) charged in the

10  Southern District of New York.

11          THE DEFENDANT:  Pardon me, what was that last bit?

12  You cut out.

13          THE COURT:  So you admit that you are the person

14  charged in the criminal complaint in the Southern District of

15  New York.

16          THE DEFENDANT:  I'm the person that's charged in the

17  criminal complaint in the Southern District of New York.

18          THE COURT:  Okay.  So the issue of identity is

19   admitted.  So we're going to go through the bond form.

20      I want to put on the bond form the date of his initial

21  appearance in the SDNY.  Do you have a suggestion, Mr. Karmel?

22  We'll put a date, it will -- and Elaine will put whatever the

23  date is that Mr. Karmel requests.

24      And then you'll put:  At the duty magistrate calendar.

25  And then we'll charge Mr. Blank and you with making sure

1    Mr. Lemke knows it.

2        So what date would you propose?  Do you want to do a week?

3    I mean, if you're appealing this, the order, that's two days to

4    appeal it.  But -- so I don't know if you want to put it on

5    next week, and then we can also -- whatever happens with the

6    appeal in the SDNY, we can always adjust the date of the

7    initial appearance by stipulation.  But I'm happy for you to

8    propose something.

9            **MR. KARMEL:**  Your Honor, I did -- can we set it for

10    two weeks from today?

11           **THE COURT:**  Sure.  So two weeks from today would be

12    March 8th, and before the duty MJ in the Southern District of

13    New York.

14       We'll put on the minute order, Elaine, Mr. Blank will make

15   sure that Mr. Lemke has the exact date.

16       So it's -- your job, Mr. Lemke, is to show up for your

17   video appearance before the -- before the duty MJ, which will

18   be a remote appearance.

19       Okay, so I'm going to go through the release conditions.

20           **MR. KARMEL:**  Your Honor --

21           **THE COURT:**  I'm just going to get my --

22           **MR. KARMEL:**  Sorry, Your Honor.  Can I quickly  jump

23    in on one issue?

24           **THE COURT:**  Yes.

25           **MR. KARMEL:**  Just on the subject of -- I'm not sure

1    if this should be addressed at this point, over objection to

2    the form.  But on the subject of devices, I'm not sure if

3    Pretrial knows how many devices are in the home or if -- the

4    types of devices that Pretrial can monitor.

5        I think -- my understanding is that depending on whether

6    they're Apple or Android, I mean, there are some challenges, so

7    I would --

8            THE COURT:  Okay.  The way we deal with every case

9    involving child pornography, they have monitoring software.

10   So it's super-easy to do.  Pretrial Services can monitor his

11   use of devices.  And it's not a problem.  And until they

12   install monitoring software, his mom can monitor the use of

13   devices.

14       So the condition that we'll put on the bond form, Elaine,

15   will be under the travel thing you'll say: Use of devices,

16   paren, phones, comma, computers, comma, and any other

17   communication devices, close paren, will -- must be monitored.

18       And that way, it can be monitored by the Pretrial Services

19   software, or the mom, as custodian.  And I'll ask her to

20   promise -- it must be monitored by Pretrial Services -- PTS,

21   Elaine, is enough -- or the custodian.

22       Okay.  So let me just -- so I just want to make sure

23   that -- I know the mom was here at the previous court

24   appearances.

25       Were you at the court appearance where I advised your son

1   of the charge in the other district, and the penalties he was

2   facing?  I just wanted to make sure you heard the charges and

3   the penalties in the Southern District.

4           **MS. DUCLAIR:**  Yes, I was.

5           **THE COURT:**  Good.  So she's aware of the charges and

6    the penalties.  So all conditions will be in writing.

7           Mr. Lemke, I'm going to go through the charges, and I'll

8    ask your mom to listen, too -- or these conditions.

9           And then at the end, I'll ask you, Ms. DuClair, if you

10   agree to abide by the conditions.  And these will hopefully be

11   first steps.  We'll have 30 days to try to sort things out, to

12   try to impose some measure of predictability.

13          So Mister -- all conditions will be in writing.

14   Mr. Lemke, if you violate any of the conditions, you're

15   violating a court order.  So not only could you go back to

16   custody, but you would be committing the separate crime of

17   contempt of court.

18          One of your appearances is to appear at all proceedings as

19   ordered by the Court, and surrender for the service of any

20   service imposed.  If you don't do that, that's a crime, too.

21          If you -- it's a crime to harass, threaten, intimidate,

22   injure, tamper with or retaliate against anyone, witness,

23   victim, informant, juror or officer of the court, or otherwise

24   obstruct justice in your criminal case.

25          So all of those crimes, all of those are separate crimes

1    carrying up to five years in prison and a $250,000 fine.

2         While on release, you must not commit another federal,

3    state or local crime.

4         You don't have to post any money.  The amount of the bond

5    is $50,000, unsecured.  But if you violate any of the

6    conditions of your supervision, the Court will declare the bond

7    forfeit, and come after both you and the surety -- who is your

8    mom -- for the full amount of the bond, including interest and

9    costs.

10        And the idea is if you violate the conditions of your

11   supervision, you're not only risking your own liberty, you're

12   jeopardizing the financial security of your mother, who is

13   standing up beside you in court, and quite literally putting

14   her life up to move in with you, and a significant financial

15   responsibility.  So you would be -- you would be jeopardizing

16   your mother's financial security.

17        And it is that condition that gives the Court an

18   additional assurance that you will abide by the conditions of

19   your supervision.

20        You'll submit to supervision by Pretrial Services, and

21   report immediately on release, and thereafter as directed.

22        Elaine, we'll put on the bond form:  Call Pretrial

23   Services on release at (415) 436-7501.

24        If you get out late, you'll call them at 10:00 a.m. the

25   next morning.

1       You're not to have any passports.  So you'll surrender all

2   passports and travel documents to Pretrial Services.  And

3   you'll do that this week.  You know, if he gets out on

4   Wednesday, you'll do that on Thursday or Friday this week, as

5   directed by Pretrial Services.

6       You'll not possess a firearm, destructive device or other

7   dangerous weapon.  That box is checked.

8       Not use alcohol to excess, not use or possess any narcotic

9   or other controlled substance without a legal prescription.

10       I'm not (inaudible) of the employment or the educational

11   program at this point.  You know, Pretrial Services will work

12   with you to try to figure out something productive to do with

13   your time, along the lines of idle hands are the devil's work.

14       I think we'll do the mental health component first, and

15   try to figure out a way that is productive, and medical

16   landscape as possible.

17       Submit to drug or alcohol testing, as directed by Pretrial

18   Services.  Participate in substance-abuse treatment on an

19   outpatient or residential treatment as directed by Pretrial

20   Services.

21       I think we all agree that probably the approach is

22   mental-health treatment, as directed by Pretrial Services.

23       You know, I want to emphasize:  "Not commit another

24   federal, state or local crime" means you cannot make these

25   harassing calls or harassing communications or threatening

1 | communications with anybody.  I'm emphasizing that.

2 | You cannot change residence without the approval of
3 | Pretrial Services.

4 | You will remain in your mother's custody.

5 | You'll be subject to location monitoring, as directed by
6 | Pretrial Services.

7 | You will comply -- in addition to -- the travel is
8 | restricted to the Northern District of California and the
9 | Southern District of New York and any intermediate districts in
10 | between, for the purposes of attending any court obligations.

11 | You must comply with the following location restrictions.
12 | You are -- essentially, you're on electronic monitoring.  And
13 | you're on home confinement.  The box -- home confinement is at
14 | all times, except for medical, substance or mental-health
15 | treatment; attorney visits; court appearances; court-approved
16 | obligations; or other activities approved in advance by
17 | Pretrial Services.  And those are all -- and then as I said,
18 | location monitoring.

19 | So those are -- and as I mentioned, use of devices must be
20 | monitored by Pretrial Services, with your mother as custodian.

21 | So those are all the conditions of supervision.  From
22 | Pretrial Services' perspective, have I missed anything?

23 | **PTSO RANGEL:**  No, Your Honor.

24 | **THE COURT:**  From the government's perspective,
25 | recognizing that you are not agreeing to release, but is there

1    anything else that, should the release order be upheld, that

2    you want to add?

3              **MR. KARMEL:**  No, Your Honor.  I would want to address

4    exclusion of time at the appropriate time, but nothing --

5              **THE COURT:**  We'll figure out all that in just a

6    second.  Thanks for reminding me.

7        Mr. Blank, anything else that you think I've missed?

8              **MR. BLANK:**  No, I think it's right.

9              **THE COURT:**  Okay.  So Mr. Lemke, do you agree to --

10   do you promise me that you will abide by all the conditions of

11   your release?

12             **THE DEFENDANT:**  Yes, of course, Your Honor.

13             **THE COURT:**  Okay.  And, and so, from -- so I've

14   described what it means to be a surety, Ms. DuClair.  Do you

15   understand what it means to be a surety, and do you agree to

16   be your son's surety?

17             **MS. DUCLAIR:**  Yes, I do.

18             **THE COURT:**  Okay.  And then the custodian obligation,

19   I'm just going explain, it's a really big thing that you're

20   moving in with your son to address the situation.

21       Being a custodian means you're promising to help supervise

22   him.  And I know you can't necessarily control his conduct.

23   But what you can do is you can tell Pretrial Services if he's

24   violating any of the conditions of his supervision.

25             **MS. DUCLAIR:**  Definitely.

1        **THE COURT:**  And Mr. Rangel will tell you how to do

2   that, and Pretrial Services, they will notify me.

3        And so, you know, it's basically a promise to the Court

4   that -- you know, to help supervise your son, and to report if

5   he's doing anything wrong.  Because if you didn't report it,

6   that also would be a separate crime, called contempt of court.

7   And so, I know you're not going to do that.

8        With your background and experience, and as I said, I

9   really appreciate your standing up for your son.  But do you

10  understand what it means -- by the way, for both a surety and a

11  custodian, if you change your mind at any time, if it becomes

12  too much for you, you can come back to the Court and I will

13  relieve you of your obligations.  But if you agree to be surety

14  and custodian -- you've already agreed to be surety -- those

15  are your responsibilities.

16       Do you agree to be your son's custodian?

17       **MS. DUCLAIR:**  Oh, certainly.  I definitely want to

18  get him the help.

19       **THE COURT:**  Thank you.  I have every con- -- I mean,

20  it's obviously -- you know, some of the things that are

21  revealed in the report are tough things to deal with, I

22  understand that.  And at least maybe we'll have a crack at

23  doing something that will help him.

24       Elaine because the SDNY is going to need a copy of the

25  bond order, what you should do is -- we're not going send it to

1   Santa Rita.   The way people get out is we send it over --

2   there's something called a "wet release order."

3       So the minute order -- and on the bond form, Elaine, you

4   can say:   Stayed for 48 hours, until Wednesday -- until

5   2-24-21, at -- too many 2s in that date -- at 11:00 a.m.

6   Because that'll be right in the middle of our duty calendar.

7       I would ask the government, if you decide not to appeal,

8   if after talking to the AUSA you decide not to appeal it, you

9   should let me know, and then we'll issue the wet -- I don't

10  want him to just stay in jail an extra day.

11      So if you talk to the AUSA and tell him what happened and

12  the conditions that were set -- Elaine will file that order

13  with a stay noted on it -- let us know, and then we can issue

14  the wet release order pretty much any time once you notify us.

15      And if you could notify us by email that you plan not the

16  appeal, or however you want to do it -- you can put it on the

17  docket.   But recognize that we don't get the docket, it doesn't

18  push to our computers because we're not counsel of record and

19  the case isn't assigned to me.   So cases that are assigned to

20  me push to my docket, but not ones that are not assigned.

21      So if you could just let us know if you decide not to

22  appeal, I would appreciate that.   All right.

23          **MR. KARMEL:**   We will --

24          **THE COURT:**   Okay.   So since people are not here, do I

25  have your permission, both of you, Ms. DuClair and Mr. Lemke,

1    to sign the bond form for you?

2                **THE DEFENDANT:**  Yes, Your Honor.

3                **THE COURT:**  All right.  So Elaine, you can do the

4    slash-S for them both.

5        We won't put my signature on it because it's not an order,

6    unless my signature's on it.  But just to make sure everybody

7    has confidence, it'll say it's stayed; Elaine won't stamp my

8    signature on it until we get the word one way or the other,

9    whether it's appealed or not.  And that'll be the order for

10   now.

11       I think what we'll do is just because I like control

12   dates, because I like things to be calendared, it makes me

13   nervous when things aren't calendared, Elaine, we'll put a

14   control date on it for Thursday, with the expectation that

15   we'll vacate it depending on what happens in the Eastern

16   District.  Okay?

17       Okay.  So I think that's everything that we can accomplish

18   today, unless somebody --

19                **MR. BLANK:**  So Your Honor, Thursday back before

20   Your Honor at 11:00 a.m.?

21                **THE COURT:**  Well, Thursday -- the 48 hours is up on

22   Wednesday.  I just want it calendared, because I get nervous

23   not having it calendared.  I don't have to, because we're not

24   going to have another court date in front of me.

25       What we'll do is we'll probably -- Mr. Rangel, once he

1   gets -- Pretrial Services gets the lay of the land, they may

2   want to set a followup with me, you know, 30 or 45 days out,

3   assuming he is in custody -- or is out of custody, so we can

4   revisit the conditions.

5              **MR. BLANK:**  So then Thursday, unless it's vacated,

6   would be in front of the Magistrate Judge?  The duty

7   Magistrate Judge?

8              **THE COURT:**  That's me.  I am the duty Magistrate

9   Judge.

10             **MR. BLANK:**  So it will be you.

11             **THE COURT:**  Last time I checked.

12             **MR. BLANK:**  Sorry.  Senior moment, there.

13             **THE COURT:**  I think you're too young for a senior

14   moment, blessedly.  Or if you are, then we're all in trouble.

15   So, okay.  All right.

16      Okay.  Good.  Thanks, everybody.

17             **MR. KARMEL:**  Your Honor --

18             **THE COURT:**  Yes.

19             **MR. KARMEL:**  Your Honor, sorry to jump in.  On the

20   exclusion of time --

21             **THE COURT:**  Oh, yeah, exclusion of time.  Thank you.

22   So --

23             **MR. KARMEL:**  The discovery --

24             **THE COURT:**  You would like an exclusion of time.

25      I wonder, Mr. Blank, under the circumstances, if you would

1 agree until the next court date in New York to extend the time

2 for preliminary hearing under Rule 5.1, and exclude time under

3 the Speedy Trial Act?

4    **MR. BLANK:**  Yes.  One hundred percent Your Honor.

5    **THE COURT:**  And maybe as an extra, like, nudge in the

6 direction of good will, maybe you could exclude time until

7 March 15th, which is one week later, even though the

8 appearance is March 8th, and so, whatever good will that might

9 engender in the other district?

10    **MR. BLANK:**  I think that is entirely appropriate.

11    **THE COURT:**  Okay.

12    **MR. BLANK:**  We will be reviewing discovery.

13 Mr. Lemke is going to have to figure out if he's going to go

14 there in person or not.  Even if he's out of custody, they may

15 by then have in-person hearings.  All of this, I think, weighs

16 in favor of a stipulation to --

17    **THE COURT:**  Okay, good.  So the hearing date, the PX

18 status before the MJ in New York will be on March 8th.  The

19 exclusion of time under Rule 5.1 -- Elaine, if you could put

20 in the minute order:  Exclude time under Rule 5.1 and -- oh,

21 sorry -- Extend the time period under Rule 5.1 for good cause,

22 and exclude time under the Speedy Trial Act for effective

23 preparation.

24   I'll find that the ends of justice served by the

25 continuance outweigh the best interests of the public and

 1   Mr. Lemke in a speedy trial, under the circumstances.

 2        Okay, so that's everything.

 3        I think that probably, on reflection, since we have a

 4   date, you guys will let me know if there's a problem; the

 5   government will let me know if they appeal.  I'm not going to

 6   put it on Thursday for hearing, Elaine, in retrospect.  If

 7   there is a problem, we can always put it on calendar to address

 8   any problems.

 9        So Mr. Lemke, what is going to happen -- and your mom

10   knows this -- if you get out, you could get -- if the

11   government decides not to appeal and lets us know that today,

12   you'll get out sometime today.  If they let us know tomorrow,

13   you'll get out sometime tomorrow.  If you get out Wednesday --

14   if they let us know by Wednesday, you'll get out Wednesday.

15        As you know, you'll walk out -- they'll given you the

16   ability to call your mom.  You'll walk out the front door.  You

17   can sit -- I don't know how -- you know, is it BART -- is it

18   BART-able?  They'll give you BART fare to go home.  But you

19   need to go home, directly.

20        You need to call Pretrial Services, who likely will

21   instruct you to come in for a fitting with the electronic

22   monitoring.  But I'll let Pretrial Services deal with that once

23   you get out and call them.

24        **MR. BLANK:**  And Teressa, you can call me or text me,

25    and we will talk about how this will work, because I know

1 you're going to want to help with this whole process.

2    **MS. DUCLAIR:**  Exactly.

3    **THE COURT:**  Yeah.  And depending on what happens,

4 Pretrial Services may tell you if he gets out, you know, at a

5 normal time, he can come in the next day at 9:00 a.m. and get

6 the electronic ankle bracelet fitted to monitor the location

7 monitoring.

8    **MR. BLANK:**  Very good.

9    **THE COURT:**  All right.  So good luck, everybody.

10 Thanks.

11    **MR. BLANK:**  Thank you Your Honor.

12  Corey, --

13    **MR. KARMEL:**  Thank you, Your Honor.

14    **MR. BLANK:**  Corey, give me a call.

15    **THE DEFENDANT:**  Okay, yeah, I will.

16    **MR. BLANK:**  Thank you very much, Your Honor.

17    **THE DEFENDANT:**  Thank you, Your Honor.

18    **THE COURT:**  Of course.

19  (Proceedings concluded)

20

21

22

23

24

25

## CERTIFICATE OF TRANSCRIBER

I, BELLE BALL, CSR 8785, CRR, RDR, hereby certify that the foregoing is a correct transcript, transcribed to the best of my ability from the official electronic sound recording of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

*Belle Ball*

_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Monday, February 22, 2021