UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

  UNITED STATES OF AMERICA

          - v. -

  ROBERT LEMKE,                                    S2 21 Cr. 100 (AKH)

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


### GOVERNMENT'S MOTIONS *IN LIMINE*


                                    AUDREY STRAUSS
                                    United States Attorney for the
                                    Southern District of New York
                                    One St. Andrew's Plaza
                                    New York, New York 10007



Kimberly J. Ravener
Kyle A. Wirshba
Assistant United States Attorneys
-Of Counsel-

# **TABLE OF CONTENTS**

The Charges ................................................................................................................ 1

Factual Background ..................................................................................................... 1

   I. Count One ............................................................................................................. 2
   II. Count Two ........................................................................................................... 3
   III. Count Three ....................................................................................................... 4
   IV. The Search and Arrest of the Defendant .......................................................... 5

Discussion ................................................................................................................... 6

   I. The Court Should Admit Certain Evidence of Other Threats as Direct Evidence of the Charged Crimes or, in the Alternative, Pursuant to Rule 404(b) ............................ 6

     A. Legal Standard ................................................................................................ 7
     B. The Defendant's Other Threats ...................................................................... 8

       1. The January 6, 2021 Threats ....................................................................... 9

         a. The January 6, 2021 Threats Are Direct Evidence of Count Three ............. 12
         b. The January 6, 2021 Threats Are Admissible under Rule 404(b) ............... 13
         c. The January 6, 2021 Threats Are Not Barred by Rule 403 .......................... 16

       2. The Defendant's Statements About His Intent and Identity on His Google Account ................................................................................................................ 17

         a. The Defendant's YouTube Comments ...................................................... 17
         b. The YouTube Comments Are Admissible as Direct Evidence and Pursuant to Rule 404(b) ...................................................................................................... 18

       3. Other Selected Similar Threats from November 2020 through January 2021.. 21

         a. Threats to Victim-6, Victim-7, and Victim-8 ............................................. 21
         b. The Threats to Victim-6, Victim-7, and Victim-8 Are Admissible as Direct Evidence ............................................................................................................. 23
         c. The Threats to Victim-6, Victim-7, and Victim-8 Are Admissible under Rule 404(b) ............................................................................................................... 24
         d. The Threats to Victim-6, Victim-7, and Victim-8 Are Not Barred by Rule 403 ..................................................................................................................... 27

   II. The Court Should Permit the Government to Introduce Limited Background Testimony Regarding the 2020 Presidential Election and the January 6, 2021 Attack on the United States Capitol ................................................................................... 28

Conclusion ................................................................................................................ 32

## **TABLE OF AUTHORITIES**

**Cases**

*Elonis v. United States*, 135 S. Ct. 2001 (2015) ........................................................... 29

*Old Chief v. United States*, 519 U.S. 172 (1997) ........................................................... 20

*Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058
    (9th Cir. 2002) ............................................................................................................. 30

*United States v. Aminy*, 15 F.3d 258 (2d Cir. 1994) ....................................................... 14

*United States v. Brown*, 2017 WL 2493140 (S.D.N.Y. 2017) ........................................ 20

*United States v. Caputoi*, 808 F.2d 963 (2d Cir. 1987) .................................................. 14

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ..................................................... 7

*United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992) ............................................. 7

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) ...................................................... 7

*United States v. Dillard*, 795 F.3d 1191 (10th Cir. 2015) ............................................. 30

*United States v. Downing*, 297 F.3d 52 (2d Cir. 2002) .................................................... 8

*United States v. Germosen*, 139 F. 3d 120 (2d Cir. 1998) ............................................... 8

*United States v. Graham*, 504 F. App'x 63 (2d Cir. 2012) ............................................ 17

*United States v. Gubelman*, 571 F.2d 1252 (2d Cir. 1978) ........................................... 17

*United States v. Hart*, 212 F.3d 1067 (8th Cir. 2000) .................................................... 30

*United States v. Hunt*, 2021 WL 1428579 (E.D.N.Y. 2021) ........................... 19, 28, 31, 32

*United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994) .................................................. 7, 31

*United States v. Ivanova*, 19 F. Supp. 3d 511 (S.D.N.Y. 2014) ................................... 26

*United States v. Jordan*, 591 F. Supp. 2d 686 (S.D.N.Y. 2008) ............................... 12, 17

*United States v. Kadir*, 718 F.3d 115 (2d Cir. 2013) ..................................................... 20

*United States v. Levy*, 731 F.2d 997 (2d Cir. 1984) ........................................................ 8

*United States v. Linehan*, 835 F. App'x 914 (9th Cir. 2020) ........................................ 19

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) ........................................ 16, 20, 32

*United States v. Morrison*, 153 F.3d 34 (2d Cir. 1998) ............................................ 15, 27

*United States v. Mundle*, 2016 WL 1071035 (S.D.N.Y. 2016) ............................ 12, 14, 16

*United States v. Mundle*, 700 F. App'x 70 (2d Cir. 2017) ........................................ 8, 23

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ............................. 8

*United States v. Pascarella*, 84 F.3d 61 (2d Cir. 1996) .................................................. 8

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ....................................................... 16, 20, 32

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) .......................................................... 20

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007) .............................................................. 7

*United States v. Roldan Zapata*, 916 F.2d 795 (2d Cir. 1990) ........................................ 16, 20, 32

*United States v. Santos*, 801 F. App'x 814 (2d Cir. 2020) ........................................................ 23

*United States v. Segui*, 2019 WL 8587291 (E.D.N.Y. 2019) ............................................... passim

*United States v. Towne*, 870 F.2d 880 (2d Cir. 1989) .................................................................. 7

*United States v. Weeks*, 716 F.2d 830 (11th Cir. 1983) ................................................................ 7

## Statutes

18 U.S.C. § 875 ......................................................................................................................... 1, 12

## Rules

Federal Rule of Evidence 402 ........................................................................................................ 8

Federal Rule of Evidence 403 ............................................................................................... passim

Federal Rule of Evidence 404 ............................................................................................... passim

Federal Rule of Evidence 608 ........................................................................................................ 5

The Government respectfully submits these motions *in limine* seeking the following rulings with respect to the upcoming trial of defendant Robert Lemke:

1.  Evidence of selected additional threats made by the defendant is admissible as direct evidence of the charged crimes or, in the alternative, pursuant to Federal Rule of Evidence 404(b); and

2.  Limited background evidence of the November 2020 presidential election and the January 6, 2021 events at the United States Capitol is admissible to provide the jury with necessary context for the defendant's threats.

For the reasons set forth below, the Court should grant the Government's motions.

## THE CHARGES

Defendant Robert Lemke was arrested on January 26, 2021 pursuant to a complaint charging him with one count of making interstate threats, and later indicted on the same charge. *See* Dkt. 1, 4, 18. On July 21, 2021, a grand jury sitting in this District returned a Second Superseding Indictment (the "Indictment") charging the defendant with three counts of making interstate threats against three separate New York-based victims, on November 22, 2020, November 29, 2020, and January 6, 2021, all relating to the outcome of the 2020 U.S. presidential election, in violation of Title 18, United States Code, Section 875(c). *See* Dkt. 28. Trial is scheduled for November 2, 2021.

## FACTUAL BACKGROUND

From November 2020 through January 2021, the defendant sent threatening electronic and audio messages to dozens of victims, all relating to the outcome of the 2020 presidential election. The defendant's threats asserted that the result, specifically, the election of Joseph R. Biden, Jr. as President of the United States, was illegitimate. The defendant threatened violence against his victims—journalists, members of Congress, other public figures, and their families—if they did not stop further actions and reporting supporting the election result, including the Congressional

1

certification of the electoral college results scheduled for January 6, 2021. The defendant sought to instill fear in his victims in order to compel their compliance with his demands. To do so, he hunted on the Internet for the personal information of these journalists, Congressmembers, public figures, and their families: their cellphone numbers, their home addresses, photographs of their neighborhoods and places of personal importance to them, and the names of their children. He acquired at least three different phone numbers for himself and used various electronic accounts to mask his identity. He placed phone calls and sent chilling text messages to his victims. Search warrants executed on the defendant's electronic accounts revealed that he threatened approximately 50 individuals using three phone numbers over the course of just two months. At least three of the defendant's victims, the victims of the threats charged in the Indictment, received those threats in the Southern District of New York.

At trial, the Government will establish these facts through, among other evidence, the defendant's text and audio messages to his victims found on his cellphone, in his electronic accounts, and obtained from his victims, evidence of the defendant's internet search history and other data found in his electronic accounts, service provider records linking the defendant to these accounts, and law enforcement and victim-witness testimony.

## I.  Count One

As reflected in Count One of the Indictment, Lemke threatened a New York-based journalist ("Victim-1") on November 22, 2020. Lemke began sending threatening messages to Victim-1 shortly after watching a video on the Internet of Victim-1's November 15, 2020 appearance on a television show in which Victim-1 stated, among other things, "The 2020 election is over even though President Trump is still in denial about that. The claims of voter fraud are the fraud. . . . Millions of people are buying into this parallel  universe." Lemke next researched Victim-1 and his family members and then used a certain free online voice-over Internet protocol

2

("VOIP") service to contact them from phone number (202) 900-5623 ("the 202 Number"). Lemke began by luring Victim-1 into conversation by referencing, in a text message, "the email with the PDF attached that we discussed."[1] When Victim-1 responded puzzled, Lemke sent a voice message to Victim-1 claiming that he had already "got to"  Victim-1's mother[2] and that it was amazing how "cooperative [Victim-1's brother] was with us." Lemke next stated "you can either choose to dig the hole deeper or stop digging. Because we're not fucking around." That same night, Lemke sent to Victim-1 a message containing a photograph of the gravestone of Victim-1's father, followed by a text message stating, "such a nice place. Nice dense trees behind [Victim-1's mother]'s  house," conveying that he had gone to the gravesite and the home of Victim-1's mother, including the backyard area behind the home.

Lemke also sent messages to Victim-1's family that day, addressing Victim-1's brother by name: "hey [Victim-1's brother] what happened to [Victim-1]," and placed a call to Victim-1's mother. Lemke further sent another message to Victim-1 using a different phone number, (310) 909-9323 (the "310 Number"), stating, "Hey [Victim-1]. Why don't you come downstairs. In let's say, an hour. Will that work?"

## II.  Count Two

As reflected in Count Two of the Indictment, on November 29, 2020, Lemke began sending threatening messages to another journalist ("Victim-2") working at the same news organization as Victim-1. The defendant's threats began shortly after he viewed an article on the Internet that Victim-2 had published, the title of which referenced to an interview with President

---

[1] The defendant's communications are reproduced herein as is, without correction for typographical errors. Descriptions of the defendant's audio recordings reflect draft transcriptions and are subject to change as they are finalized in advance of trial.

[2] This message also asserted that Lemke had "got[ten] to" Victim-1's father, who is deceased. Lemke appears to have realized his mistake and shifted to threatening Victim-1's widowed mother, including by sending Victim-1 an image of his father's gravestone.

Donald Trump that was "filled with lies." Like Victim-1, Lemke lured Victim-2 into communicating with him by inquiring about an "email with a PDF" using the 202 Number. When Victim-2 responded, Lemke demanded that Victim-2 "change [her] ways. Because we are never far. The conformity and collectivist mentality makes me sick. But that's a side note. We are here to protect truth. Stop the narrative." Lemke then sent a message containing a photograph taken from inside the home of Victim-2's father and step-mother, implying that he had entered their home.[3] Lemke also sent Victim-2 a voice message stating:

> Like my colleague whom I worked with in the law enforcement before we both retired . . . explained to [Victim-2's father], the ball is in your court. The ball is in [Victim-2]'s court. What you do with that ball will create good outcomes or conceivably bad outcomes. So, the choice is yours. . . . Your belief that the election was authentic and had zero fraud is based upon your faith and your faith alone. So, stop presenting it as fact. Remember, the ball is in your court. It's very simple. How that ball moves will determine what happens. . . . I ain't fucking around. None of us are.

## III.   Count Three

As reflected in Count Three of the Indictment, on January 6, 2021, the defendant threatened a New York-based family member ("Victim-3") of another journalist ("Journalist-3"). These threats were part of a series of threatening messages that the defendant sent to approximately eight journalists, members of Congress, other politicians, and their families between approximately 4 p.m. and 10 p.m. on January 6, 2021. That day, a group of individuals purporting to protest the 2020 presidential election gathered in Washington, D.C. and stormed the Capitol Building. By approximately 2:15 p.m., the group breached the Capitol Building, assaulting law enforcement officers and damaging federal property.[4] The group occupied the Capitol Building

---

[3] While the photograph actually depicts the inside of Victim-2's parents' home, Lemke's internet search history indicates that he appears to have secured this photograph from a real estate website.

[4] *See* https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/?itid=hp-top-table-main-0106.

and disrupted the certification of election results by the U.S. Congress for a period of several hours. Members of Congress sheltered in place and were evacuated due to the risk posed by the occupation, which continued into the early evening hours.

At approximately 5:02 p.m. and then 5:19 p.m. on that day, the defendant sent Victim-3 the following threatening messages using a third phone number, (614) 810-1898 (the "614 Number"), stating:

> [Journalist-3's] words are putting you and your family at risk.
> We are nearby, armed and ready.
>
> Thousands of us are active/retired law enforcement, military, etc.
> That's how we did it.

Victim-3 understood the defendant's statement that he was part of a group of "thousands" of "active/retired law enforcement, military" and that this experience contributed to "how we did it" to be a reference to the ongoing attack on the U.S. Capitol and those conducting the attack.

## IV.   The Search and Arrest of the Defendant

Several weeks later on January 26, 2021, a judicially-authorized search of the defendant's residence in California recovered two computers, one iPad, and nine different cellphones, including one cellphone found by the defendant's bedside (the "Lemke Cellphone").[5] A search of the Lemke Cellphone revealed that it utilized the 310 Number, and that it was logged into a messaging account bearing the 202 Number. The Lemke Cellphone included messages sent by

---

[5] The search of Lemke's home also uncovered evidence of frauds being perpetrated by Lemke. While the Government will not seek to admit evidence of these frauds in its case in chief, it may seek to cross-examine the defendant, if he chooses to testify, regarding such fraudulent activity bearing on his truthfulness. *See* Fed. R. Evid. 608(b). Similarly, the Government is not seeking to introduce evidence in its case-in-chief of the defendant's prior convictions, which include a conviction for making a false report of an emergency, and obstructing a public officer through threats, among other things, as well as evidence of other threats made by the defendant not identified herein. The Government may seek to cross-examine the defendant regarding these matters as well, should he choose to testify. *See id.*

Lemke to Victim-1 and Victim-2 from the 310 Number as well as messages sent to Victim-1 from the 202 Number. A search of Lemke's Facebook account revealed that Lemke had falsely posed online as a retired law enforcement officer, specifically, with the Alameda County Sheriff's Department, and member of the military. Subscriber information for the 614 Number used by Lemke to threaten Victim-3 on January 6, 2021 showed that it was registered in the name of the "Alameda County Sheriff's Department" and the general information email address for that law enforcement agency. Lemke was arrested on January 26, 2021, and remains in custody.

## DISCUSSION

## I. The Court Should Admit Certain Evidence of Other Threats as Direct Evidence of the Charged Crimes or, in the Alternative, Pursuant to Rule 404(b)

At trial, the Government seeks to admit as direct evidence of the charged crimes, or in the alternative, pursuant to Rule 404(b), the following:

1.  The series of threats made by the defendant on January 6, 2021, during the same time frame as and similar to the threats charged in Count Three of the Indictment;

2.  Specific statements made by the defendant on his Google account about his intent to threaten and identity; and

3.  Selected threats similar to the charged threats from November 2020 through January 2021 found on the Lemke Cellphone and in his electronic accounts.

Each of these categories of evidence arose out of the same series of events as the charged threats, and will be necessary to complete the story of the crimes on trial and to provide background for the events alleged in the Indictment. This evidence is also admissible pursuant to Rule 404(b) to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident.[6]

---

[6] The Government hereby provides notice of its intent to offer this evidence pursuant to Rule 404(b). The Government plans to continue to meet with potential witnesses between now and trial, and the Government will supplement this notice as necessary should the Government learn of additional Rule 404(b) evidence that it plans to offer, and/or should the Government seek to

### A.  Legal Standard

Evidence of uncharged conduct is not considered "other crimes, wrongs, or acts" subject to Rule 404(b) analysis if the conduct (1) "arose out of the same transaction or series of transactions as the charged offense," (2) is "inextricably intertwined with the evidence regarding the charged offense," or (3) is "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (quoting *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983)).

Moreover, evidence is "not other act evidence within the meaning of Rule 404(b)" if it is "admissible to prove material facts other than [the defendant's] propensity to commit a crime." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). Indeed, relevant evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense."). Such evidence need not "directly establish an element of the offense charged." *United States v. Segui*, 19-CR-188 (KAM), 2019 WL 8587291, at *6 (E.D.N.Y. Dec. 2, 2019) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)). Instead, it may be used "to provide background for the events alleged in the indictment," such as "the circumstances surrounding the

---

introduce additional evidence pursuant to Rule 404(b) in response to evidence or arguments offered by the defense at trial.

The Government is providing under seal a key for the Victims anonymized herein.

events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.*; *see also United States v. Mundle*, 700 F. App'x 70, 72 (2d Cir. 2017).

Alternatively, under Rule 404(b), evidence of a defendant's "other crimes, wrongs, or acts" is admissible when offered for any proper purpose other than the defendant's criminal propensity. *See, e.g., United States v. Germosen*, 139 F. 3d 120, 127 (2d Cir. 1998); *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984). Rule 404(b) itself contains a non-exhaustive list of proper purposes for which "other act or crime" evidence may be admitted, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Fed. R. Evid. 404(b); *see also Levy*, 731 F.2d at 1002. Although the Government "must explain in detail the purposes for which the evidence is sought to be admitted," the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application.

The Second Circuit has described an "inclusionary approach" under Rule 404(b) that permits admission of evidence of prior crimes, wrongs, or bad acts, unless the evidence is (1) "introduced for the sole purpose of showing defendant's bad character" or "propensity" to commit crimes, (2) "it is overly prejudicial under Fed. R. Evid. 403," or (3) it is "not relevant under Fed R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (citations omitted); *Levy*, 731 F.2d at 1002; *see United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006). If evidence is to be admitted under Rule 404(b), an appropriate limiting instruction should be issued to the jury if the defendant requests it. *See United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002).

## B.  The Defendant's Other Threats

The defendant's charged threats to his New York-based victims—Victim-1, Victim-2, and Victim-3—were part of a series of threats that he issued to journalists, politicians, other public figures and their families relating to the outcome of the 2020 presidential election between

approximately November 2020 and January 2021. At the same time that the defendant threatened Victim-1, Victim-2, and Victim-3, the defendant was sending threats, using the same three phone numbers, to other similarly-situated victims (that is, journalists, politicians, other public figures, and their families), echoing similar language to those found in the charged threats, and reflecting the same motive and intent, to advance the same plan. As discussed below, the Government seeks to introduce limited evidence of only a small subset of these other similar threats, which are inextricably part of the story of the charged crimes and constitute direct evidence of those crimes, or alternatively pursuant to Rule 404(b) as highly probative evidence of, among other things, the defendant's intent, motive, plan, knowledge, identity, and absence of mistake in making the charged threats.

### 1. The January 6, 2021 Threats

The defendant issued the threats charged in Count Three using the 614 Number on January 6, 2021, while the attack on the U.S. Capitol was ongoing. On that day, during the same period of time as the defendant's charged conduct, the defendant issued threatening messages using the same 614 Number, to approximately eight other people (the "January 6, 2021 Victims"). The Government seeks to introduce this series of threats sent by the defendant to the January 6, 2021 Victims at trial. A chart of the January 6, 2021 Victim threats is attached hereto as Exhibit A, which includes the specific threats charged in Count Three highlighted in yellow. At trial, the Government proposes to offer evidence of these threats obtained from search warrants on the defendant's VOIP accounts, Google account, and the Lemke Cellphone, which evidence the Government plans to present primarily in summary chart form, and through the testimony of a single victim-witness.

As reflected in the content of the messages, all of these threats were driven by the same expressed motive: the defendant's stated desire to join the Capitol riot's effort to overturn the result

9

of the 2020 presidential election including through violence. All of these threats were similar in nature and kind, as the defendant threatened violent retaliation to ensure that then President-elect Biden "will not be president," claimed to be part of a large armed group, and invoked that day's attack on the Capitol. Ex. A, Rows 7-9, 17-19. Repeatedly, the defendant stated that his victims were placing themselves and their families "at risk," and claimed to be "armed" and "nearby" the victim or the victim's loved ones, often citing their specific names or personal addresses. Ex. A, Rows 2-3, 7-9, 16-19. The defendant also described himself as part of a larger armed group specifically comprised of "active/retired" members of law enforcement or the military. Ex. A, Rows 7, 12-15, 22-25. This repeated reference implied that the defendant possessed training and experience in combat and weapons, access to sensitive information, and the potential ability to impede the victim from seeking aid from law enforcement. Further, the defendant issued these threats within minutes of his charged threats; all of the threats occurred over the course of mere hours, from approximately 4 p.m. to 10 p.m. that day, as the Capitol attack escalated into violence leading to death and destruction before it was finally secured.

Specifically, as Ex. A demonstrates, the defendant's January 6, 2021 threats began at approximately 4:56 p.m., with a message directed towards the mayor of a particular city and the mayor's family, stating in part, "we have people watching you near your home on [street], and also near your families homes. Many of us are retired law enforcement/military." Ex. A, Row 1. Six minutes later, starting at approximately 5:02 p.m., the defendant sent Victim-3 two successive threatening messages, which partially underlie Count Three. Ex. A, Rows 2-3 ("[Cousin of Victim-3]'s words are putting you and your family at risk[.] We are nearby, armed and ready."). Just seven minutes later, Lemke began sending the following electronic messages to a Congressman's brother ("Victim-4") using the 614 Number, spanning approximately 5:09 p.m. to

10

5:35 p.m.:

> Your brother is putting your entire family at risk with his lies and other words. We are armed and nearby your house. You had better have a word with him. We are not far from his either. Already spoke to [the Congressman's son] and know where his kids are. [Photograph of house in Victim-4's neighborhood]. [Victim-4], your words have consequences. Stop telling lies; Biden did not win, he will not be president. We are not[] white supremacists. Most of us are active/retired law enforcement or military. You are putting your family at risk. We have armed members near your home . . . . . Don't risk their safety with your words and lies.

Ex. A, Rows 4-5, 7. At approximately 5:19 p.m., in the midst of sending the above threats, the defendant sent another threatening message to Victim-3 that is part of the conduct charged in Count Three, stating:

> Thousands of us are active/retired law enforcement, military, etc. That's how we did it.

Ex. A, Row 6. The Government expects that Victim-3 will testify, in substance and in part, that he understood the defendant's statements that he was part of a group of "thousands" of "active/retired law enforcement, military" and that this experience contributed to "how we did it" to be referencing the ongoing attack on the Capitol and those conducting the attack. Between approximately 5:36 p.m., and continuing until approximately 9:17 p.m. that night, the defendant sent threatening messages to approximately six more people, including members of Congress and close relatives of Congressmembers, which were highly similar to the threats made to Victim-3 and Victim-4. *See* Ex. A, Rows 1, 8-19 (defendant's threats sent to a U.S. Senator, a U.S. Congressman, the mayor of a major metropolitan city, four family members of Congresspeople, and the CEO of a non-profit organization).[7]

---

[7] As reflected in Ex. A, Row 10, the defendant's messages to Victim-4 included a text stating "10-37 . . . 10-37," which appears to be a police code indicating the presence of a suspicious vehicle.

*a. The January 6, 2021 Threats Are Direct Evidence of Count Three*

The strikingly close timing, similar content, and consistent expressed motive of these threats to the January 6, 2021 Victims demonstrate that they were "part and parcel of the conduct that underlies the crime[] charged" in Count Three of the Indictment. *United States v. Jordan*, 591 F. Supp. 2d 686, 719-20 (S.D.N.Y. 2008) (finding testimony, in case involving 18 U.S.C. § 875(c) charges, by non-party about threats made to the non-party were direct evidence of the charged threats as they were "contemporaneous"); *see also Segui*, 2019 WL 8587291, at *7 (finding that the prior acts of defendant in days leading up to incident were direct evidence because they were probative of defendant's intent to send charged threat). Such contemporaneous, similar threats are admissible as direct evidence of the charged conduct in a Section 875(c) prosecution because they complete the story of the charged conduct, provide background for the defendant's conduct, and are inextricably intertwined with the defendant's conduct and state of mind on that critical day. *See United States v. Mundle*, No. 15-CR-315 (NSR), 2016 WL 1071035, at *2-3 (S.D.N.Y. Mar. 16, 2016) (permitting testimony, in an interstate threats case, about threats against multiple third parties because such evidence provides "crucial context to and is inextricably intertwined with the Defendant's charged conduct").

For example, the defendant's threats to Victim-4 and Victim-4's family, close relatives of a Congressmember, interlocked with the charged conduct. The defendant sent threats charged in Count Three both minutes before and after threatening Victim-4's family—using the same phone number, and stating in both sets of messages that (1) he was armed, (2) he was nearby the victim's home, (3) he was part of a large group of "active/retired law enforcement or military" personnel, and (4) the victim's prominent family member was "putting" the family "at risk" by supporting the results of the election. Ex. A, Rows 3-4, 7, 10. These threats form an inextricable part of the direct evidence because they demonstrate the defendant's knowledge and intent to leverage the

events of January 6, 2021 to instill fear in his victims, and provide context for the defendant's actions at virtually the exact same time he was engaged in the charged conduct.

The defendant's threats to Victim-9 through Victim-15 continued to perpetrate the same menacing scheme. For example, the defendant told each of these victims, like his message to Victim-3, that he was part of a group of "thousands" of "law enforcement and military" members, Ex. A, Rows 6. The defendant further claimed, as he had to Victim-3, that the Capitol attack was the product of this "law enforcement and military" experience by "thousands" of accomplices, whom the defendant claimed had "underground communication networks" and long-standing plans. The defendant repeatedly proclaimed that "Biden did not win" and "Joe Biden will not be inaugurated" because the events of January 6, 2021 were the "just the beginning . . . tip of the iceberg," just as he had threatened Victim-2 to stop publishing journalism "presenting [the presidential election] as fact" and supporting the election as "authentic." Ex. A, Rows 7-8, 16-19. As the defendant had done through photographs and specific references to the homes of his victims and their families in the charged conduct, the defendant repeatedly cited names and addresses of the victims' loved ones. Ex. A, Rows 1, 4, 7-9, 16-19. Each time, the defendant told his victims that the "words" of the victim, or a journalist or politician in their close family, were placing them and their families "at risk." These threats began in the minutes before the defendant's threats charged in Count Three, and persisted throughout that charged conduct, continuing for a period of approximately three more hours. These threats constitute the direct evidence of the conduct charged in Count Three because they provide critical context for the defendant's actions and his state of mind at the time, and serve to further explain the defendant's intent driving his use of certain language and terminology in his threats.

> b. The January 6, 2021 Threats Are Admissible under Rule 404(b)

In the alternative, evidence of the defendant's threats to the January 6, 2021 Victims is also

admissible pursuant to Rule 404(b) to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident in making the charged threats. At trial, the Government anticipates that the defendant's identity as the sender of the threats and his intent to truly threaten his victims will be the central issues in dispute. *See* Dkt. 37 (Def.'s Motions in Limine) at 1 (describing "accounts the government asserts are associated with Mr. Lemke" raising issues of identity); Dkt. 25 (Def.'s Motion to Dismiss) at 3, 9-10 (raising the issue of the defendant's "subjective intent" to threaten his victims). At the time of the defendant's arrest, the defendant contested his identity as the sender of the threats, and the evidence will show that the defendant took steps to mask his identity as the sender of the threats, such as by changing his phone number and using a VOIP service in an attempt to anonymize himself. Particularly in a Section 875(c) prosecution, where the "Government must prove that the Defendant made a communication [either for the purpose of issuing a threat or] with knowledge that the communication [would] be viewed as a threat," "evidence offered to prove intent is proper." *Segui*, 2019 WL 8587291, at *8 (citing *Mundle*, 2016 WL 107035, at *3) (internal quotation marks omitted). When the intent to commit the crime charged is "clearly at issue . . . evidence of prior similar acts may be introduced to prove that intent." *Mundle*, 2016 WL 107035, at *3 (quoting *United States v. Caputoi*, 808 F.2d 963, 968 (2d Cir. 1987)). Evidence of similar acts "need not be identical to the charged conduct to show knowledge or intent pursuant to Rule 404(b)," but rather, "[t]he government must identify a similarity or connection between the two acts that makes the prior act relevant to establishing the knowledge of the current act." *Id*. (citations omitted); *see also United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("[Evidence of a prior act] should not be admitted as proof of the defendant's knowledge or intent unless the other act is sufficiently similar to the conduct at issue to permit the jury reasonable to draw from the act the knowledge [or intent]

inference advocated by the proponent of the evidence." (internal quotation marks and citations omitted)). Here, the defendant's course of conduct in threatening the January 6, 2021 Victims is admissible to prove the defendant's state of mind and contextualize the defendant's intent driving his threats charged in Count Three.

As reflected in Ex. A, the defendant's threats to the January 6, 2021 Victims used language and techniques highly similar, and at times identical, to the charged conduct. *Compare* threat to Victim-3 ("[Cousin of Victim-3]'s words are putting you and your family at risk. We are nearby, armed and ready. Thousands of us are active/retired law enforcement, military.") *with* Ex. 2, Row 4 ("Your brother is putting your entire family at risk . . . . We are armed and nearby your house"); Row 7-8 ("Most of us are active/retired law enforcement or military. You are putting your family at risk. We have armed members near your home @ [address]"); Row 16-19 ("Thousands of us are retired AND active law enforcement and military. . . . His words are putting you and your family at risk."). The defendant also used the same phone number to make these threats that he used in the course of the charged conduct to threaten Victim-3, within a span of hours, on the same day. The defendant's multiple similar threats to the January 6, 2021 Victims demonstrate that his messages to Victim-3 were not an isolated incident, accident, or error; they were part of a concerted, intentional plan by the defendant. *See United States v. Morrison*, 153 F.3d 34, 41-45 (2d Cir. 1998) (upholding admission of a related bomb threat made to a third party in a threats case, where it was relevant to permit the jury to "draw an inference that in making [other] threating communications regarding [the victim], the defendant acted knowingly and intentionally and as part of a plan, and not because of some mistake, accident or other innocent reason"). The defendant's repeated use of the same 614 Number to send multiple threats over the course of hours on January 6, 2021 also serves as proof of the defendant's identity, because the threats include the

defendant's consistent description of himself as a member of a larger group of people allegedly affiliated with law enforcement or the military, and the consistent nature of the messages demonstrates that the 614 Number was used by a single individual, for the very purpose of issuing anonymous threats. Under these circumstances, the similarity, timing, and connection to the charged conduct plainly make the defendant's threats to the January 6, 2021 Victims relevant to establishing his intent, knowledge, and identity in committing the charged conduct.

### c. The January 6, 2021 Threats Are Not Barred by Rule 403

The proposed evidence of these threats to the January 6, 2021 Victims would also comport with Rule 403. As set forth above, the threats to the January 6, 2021 Victims are relevant to the charged conduct precisely because of their strong resemblance to the charged conduct, including through the use of highly similar language, sent at virtually the same time as the threats to Victim-3, reflecting the same motive, intent, plan, and modus operandi. The proposed evidence would therefore not present any new, unduly prejudicial effect and constitutes a small subset of the more than 50 individuals threatened by Lemke from November to January. Indeed, the proof at trial of the charged conduct will include evidence that the defendant made threats to Victim-1, Victim-2, and Victim-3, which included sending a photograph of Victim-1's father's gravesite to Victim-1 while threatening his still-living mother.

Evidence is not unduly prejudicial when it is not "more inflammatory than the charged crime." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999); *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Accordingly, evidence of similar threats is not barred by Rule 403, particularly in light of the probative value of this conduct in demonstrating a critical element of the charged crimes— Lemke's intent—as well as his motive, plan, identity, and modus operandi. *See Mundle*, 2016 WL 1071035, at *3-4 (finding, in interstate threats case, evidence of other threats and kidnapping to be

permissible under Rule 403); *Jordan*, 591 F. Supp. 2d at 719. Any possible prejudicial effect would be mitigated by the fact that this evidence can be introduced primarily through the use of summary charts, along the lines of Ex. A, allowing for the streamlining of the evidentiary presentation. Further, as to witness testimony regarding the January 6, 2021 threats, that testimony would be very limited. In particular, the Government plans to call Victim-4, whose testimony would be necessary to authenticate the picture message sent by Lemke of a house in Victim-4's neighborhood (*see* Ex. A, Row 5) and to explain the meaning of that photo and the defendant's other messages referencing the names of Victim-4's family members. *See Jordan*, 591 F. Supp. 2d at 719 (allowing live testimony about other threats in interstate threats case); *see also United States v. Graham*, 504 F. App'x 63, 66 (2d Cir. 2012) (approving admission of live testimony about unrelated crimes); *United States v. Gubelman*, 571 F.2d 1252, 1255 (2d Cir. 1978) ("[T]estimony concerning extremely similar acts is not inflammatory in the way that an unrelated violent crime might be.").

### 2.   *The Defendant's Statements About His Intent and Identity on His Google Account*

Evidence of specific statements made by the defendant using his Google account regarding his intent to cause fear of violence and his identity is admissible both as direct evidence of the charged crimes and the defendant's state of mind and under Rule 404(b). The Government seeks to admit at trial three statements of the defendant, made using his Google account, subscribed in his own name, that confirm his knowledge of the events of January 6, 2021 and their violent nature, and match the defendant's claims, in his text messages directed towards his victims, that he was a member of law enforcement and the military and aligned with the Capitol rioters though he did not personally participate in the riot (and the Government will not argue otherwise at trial).

### a. The Defendant's YouTube Comments

A search warrant for the defendant's Google account revealed posts and comments made

by the defendant on Google's YouTube service. On various occasions, the defendant threatened violence against other YouTube users with whom he disagreed. The Government does not seek to admit the vast majority of these comments. Instead, the Government seeks to offer only the following three YouTube comments directly related to January 6, 2021 and the defendant's intent, knowledge, and identity.

On January 9, 2021, the defendant wrote on YouTube:

> Nope. Be careful what you say because we are tracking people down. You forget a majority of law enforcement and military and federal agents and even judges are members of our various militias so you stand no chance why do you think we were allowed in to the capital during session.

On January 14, 2021, the defendant wrote on YouTube:

> VIOLENCE HAS A PLACE WE WON'T STOP YOU JUST TRY US OPEN YOUR MOUTH YOU GET HURT. REPORT ME REPORT ME REPORT ME I'M RETIRED LAW ENFORCEMENT AND TENS OF THOUSANDS OF MY FELLOW MILITIA MEMBERS ARE ACTIVE DUTY MILITARY AND LAW ENFORCEMENT WE WILL NOT BE SILENCED

On January 15, 2021, the defendant wrote on YouTube, in part: "While tens of thousands were storming the capital militia members were on a mission."[8]

> ### b. The YouTube Comments Are Admissible as Direct Evidence and Pursuant to Rule 404(b)

These YouTube messages are direct evidence of the charged crimes. The defendant's statements that "VIOLENCE HAS A PLACE . . . OPEN YOUR MOUTH YOU GET HURT" directly reflect his state of mind in connection with the charged threats, and are admissible for that purpose. Each of the charged threats reflects the same intent: to demand that the victim silence

---

[8] This statement was preceded by a violent threat, in which the defendant stated in part that "[a] lot of people here would have no problem hunting your ass down and hanging you from a tree," which the Government does not seek to offer.

their journalism or political activity or that of their family members ("OPEN YOUR MOUTH"), or face violent repercussions ("YOU GET HURT"). The defendant's statements regarding the January 6, 2021 Capitol attack are similarly admissible to show the defendant's knowledge of that attack and its violent nature, which goes directly to the defendant's state of mind in making the threats charged in Count Three that "we are nearby, armed, and ready . . . . [t]housands of us are active/retired law enforcement, military, etc. That's how we did it." Ex. A, Rows 3, 6. The defendant's YouTube messages that "militia members were on a mission" when they were "storming the capital" establish the defendant's knowledge of the violent nature of the January 6, 2021 attack. *See United States v. Linehan*, 835 F. App'x 914, 916 (9th Cir. 2020) (affirming the admission of other threats made by the defendant because those statements helped establish the "durability and depth" of the defendant's "anger at government officials"); *United States v. Hunt*, No. 21 Cr. 86 (PKC), 2021 WL 1428579, at *6 (E.D.N.Y. Apr. 15, 2021) (admitting text messages sent between the defendant and his father in the days following the 2020 presidential election as direct evidence of the defendant's subjective intent to threaten members of Congress and to show an "unfiltered" view of the defendant's state of mind).

In the alternative, this evidence is admissible pursuant to Rule 404(b) because similarities between the defendant's statements on YouTube and the charged threats serve to establish Lemke's identity, as well as his motive and intent in making the charged threats. Unlike the account used to threaten Victim-3 in the course of the charged conduct, the defendant registered the Google account from which he made threats on YouTube in his own name. Yet, the defendant's YouTube comments claiming that "we were allowed in to the capital during session" because "a majority of law enforcement and military and federal agents and even judges are members of our various militias so you stand no chance" directly parallel his threat to Victim-3 on January 6, 2021 that he

19

was affiliated with "[t]housands of . . . active/retired law enforcement, military, etc." who had used that experience to breach the Capitol. The defendant's YouTube statement lays bare the intent behind the defendant's false invocation of law enforcement and military connections: to instill a fear in his victims that they "stand no chance" against him.

This limited proposed evidence of the defendant's additional statements, using an electronic account subscribed in his name, complies with Rule 403. As with the defendant's other threats, these statements are highly similar to the language used by the defendant in the course of the charged conduct, and they are no more inflammatory than the charged crime. *Livoti*, 196 F.3d at 326; *Pitre*, 960 F.2d at 1120; *Roldan Zapata*, 916 F.2d at 804. Indeed, the charged threats already include imagery of death of the victim's loved ones (such as the photograph the defendant sent depicting Victim-1's father's grave) and the use of weapons to engage in violence and hurt the defendant's victims and their families (such as the defendant's messages to Victim-3 threatening that "[w]e are nearby, armed and ready" and that Victim-3 and Victim-3's family were "at risk"). "Evidence offered by the Government is by design prejudicial to a defendant," and Rule 403's restriction on unfairly prejudicial evidence "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Brown*, No. S2 16 Cr. 559 (DLC), 2017 WL 2493140, at *1-2 (S.D.N.Y. June 9, 2017) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)); *see also United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) ("All evidence introduced against a defendant, if material to an issue in the case, tends to prove guilt, but is not necessarily prejudicial in any sense that matters to the rules of evidence." (citation omitted)). Here, this evidence would not "tend[] to have some adverse effect upon a defendant *beyond* tending to prove the fact or issue that justified its admission into evidence." *United States v. Kadir*, 718 F.3d 115, 122 (2d Cir. 2013)

(emphasis in original) (citation omitted).

### 3. *Other Selected Similar Threats from November 2020 through January 2021*

The investigation revealed that between approximately November 2020 and January 2021, the defendant used the 202 Number, the 310 Number, and the 614 Number to threaten journalists, politicians, other public figures, and their families in connection with the 2020 presidential election. Often, these messages exhibited the same modus operandi, sending an introductory message to bait the victim into a response, before turning to sinister threats of harm to the victim. For example, on at least ten occasions during this time, the defendant sent anonymous messages to journalists asking them to confirm receipt of an email or PDF document, or to meet at their home. Once the targeted victim responded, the defendant would shift to threatening the victim and their family members. The defendant made dozens of such threats over a span of approximately eight weeks. At trial, the Government seeks to introduce only a small sample of these threats made to three additional victims ("Victim-6," "Victim-7," and "Victim-8"), which are inextricably part of the narrative of the charged crimes and highly probative to show the defendant's identity, motive, and scheme, issues likely to be at the heart of the trial. A chart reflecting the threats to Victim-6, Victim-7, and Victim-8 that the Government seeks to introduce is attached hereto as Exhibit B. As with the threats to the January 6, 2021 Victims, the Government plans to offer this evidence at trial primarily through the use of summary charts allowing for the streamlining of the evidentiary presentation, which reflect the defendant's text and audio threats obtained from search warrants on the Lemke Cellphone and the defendant's electronic accounts, as well as media obtained from Victim-7 and the testimony of a single victim-witness, Victim-7.

#### a. Threats to Victim-6, Victim-7, and Victim-8

Victim-6, Victim-7, and Victim-8 worked at the same news organization as Victim-1 and Victim-2 (the "News Organization"). On December 12, 2021, Lemke wrote to Victim-6 using the

310 Number, "Hey are we still meeting at your place on [Street]?" When Victim-6 did not respond, Lemke sent a message from the 202 Number on December 20, 2020, writing: "if you keep up the fake rhetoric something really bad will happen to you and your family. . we are already watching the ones in [city] and [city]." Ex. B, Rows 1, 6.

On December 31, 2020, Lemke sent Victim-7 a photograph from inside Victim-7's home and wrote, "[Victim-7's spouse] didn't make some very secure decision now did he [Victim-7]. I liked the bath tile. Like a floor on the wall." Ex. B, Rows 15, 17-18. Minutes later, Lemke sent three voice messages, stating in part:

> Words have consequences, [Victim-7]. . . . [O]ne thing we will not tolerate, and most of us militia members, at least senior militia members. Thousands of us are retired law enforcement or active law enforcement all the way from local police to federal agencies. . . . It would be my sincere advice to stop the rhetoric . . . . If you don't, there will be consequences. And not just for you, but for [Victim-7's spouse], and the rest of your family. . . . There will be consequences. And you can perceive that statement and that risk assessment as you wish.

Ex. B, Rows 20-22. Lemke then sent a message describing a "news anchor," like Victim-7, who "went missing" after "a struggle" and was "believed to be abducted." Ex. B, Row 23.

On January 9, 2021, the defendant used the 202 Number to send a voice message to Victim-8 saying, "Who is this? Just people that are watching your every move. You know what you have to do to no longer be concerned about your safety. And it's not just you we're watching. It's also your parents up in [county]. The choice is yours. It's not ours. It's your choice." Ex. B, Row 24. Lemke then wrote to Victim-8:

> You do understand not only your life, but your families is at risk, right? We know everything. . . . You forget tens of thousands of militia members are law enforcement and military all the way to the upper brass and upper ranks. We have judges and prosecutors too. Politicians. So don't you find it silly to write such things with your name on top when 200,000 plus members can access databases with you and your family's information that seems very stupid. We even

> have people at [the News Organization's] corporate security that
> released stuff from your employee file.

Ex. B, Row 28. The text and voice messages sent to Victim-6, Victim-7, and Victim-8 were found

on the Lemke Cellphone.

> *b. The Threats to Victim-6, Victim-7, and Victim-8 Are Admissible as Direct Evidence*

The threats to Victim-6, Victim-7, and Victim-8 are admissible as direct proof of the

defendant's intent to commit the charged crimes and the narrative of those crimes, because they

show that the defendant's threats charged in Counts One and Two were part of the defendant's

concerted campaign to threaten journalists at the News Organization in the aftermath of the 2020

presidential election and the January 6, 2021 Capitol attack. The threats demonstrate that the

defendant targeted his victims for a specific purpose—to chill reporting by these journalists on the

outcome of the election—and the defendant sought to do that by instilling fear for their own safety

and that of their loved ones.

As in *Mundle*, 700 F. App'x at 72, these threats constitute evidence which is "necessary to

understand the sequence of events that form the basis for [the defendant's] conviction" and to show

that the defendant "transmit[ted] the communication for the purpose of issuing a threat," in

violation of Section 875(c). Such evidence of the defendant's state of mind is admissible to show

the defendant's intent as he carried out a common scheme or plan. *See, e.g.*, *United States v. Santos*,

801 F. App'x 814, 817 (2d Cir. 2020) (affirming sufficiency of evidence as a "true threat,"

including "additional evidence that [defendant] exhibited open hostility to his probation officers

in two different recorded prison calls prior to his . . . violation hearing"); *Segui*, 2019 WL 8587291,

at *5 (admitting evidence of a defendant's statements prior to the sending of a threat as direct

evidence of the charged crime because such evidence showed the "defendant's mental state when

sending" the threat).

### c. The Threats to Victim-6, Victim-7, and Victim-8 Are Admissible under Rule 404(b)

The threats to Victim-6, Victim-7, and Victim-8 are also admissible pursuant to Rule 404(b) as they are necessary to show identity, motive, intent, preparation, plan, absence of mistake, and lack of accident.

Regarding identity, the threats to Victim-6, Victim-7, and Victim-8 demonstrate that Lemke controlled the phones used in the charged conduct, both the 202 Number used to threaten Victim-1 and Victim-2 and the 614 Number used to threaten Victim-3. In particular, these threats include voice messages that provide critical proof of the defendant's identity as the user of the 202 Number. In addition, Lemke contacted Victim-6 in two ways—both using the 202 Number and the 310 Number—proving further that the defendant was the user of both accounts, the later of which was assigned to the Lemke Cellphone found in the defendant's bedroom. The threats to Victim-7 and Victim-8 also serve as important evidence to identify the defendant as the user of the 614 Number, because they show a high degree of similarity in the language used to threaten victims with the 614 Number and that used by the defendant, over his other phone numbers. In particular, the threats to Victim-7 and Victim-8 sent using the 202 Number bear a striking similarity to the defendant's threats underlying Count Three sent using the 614 Number. The Count Three threats include the defendant's messages to Victim-3 stating that "[t]housands of us are active/retired law enforcement, military," and the defendant used nearly identical words in his message to Victim-7, stating "[t]housands of us are retired law enforcement or active law enforcement all the way from local police to federal agencies." Ex. B, Row 20. Lemke also told Victim-3 that "[Victim-3's family member]'s words are putting you and your family at risk" and in parallel, told Victim-8 "you do understand not only your life, but your families is at risk, right?" Ex. B, Row 25. This similarity in language is proof of the defendant's identity as the user, and sender of threats, for both the 202 Number and the 614 Number. This evidence is particularly probative because the

defendant attempted to conceal his ownership over the 614 Number account through bogus subscriber information, falsely registering the phone number in the name of the "Alameda County Sheriff's Department."

The defendant also used similar methods to execute both the charged offenses and the threats to Victim-6, Victim-7, and Victim-8, evidencing his intent, knowledge, preparation, plan, and opportunity to commit the charged crimes. First, these messages demonstrate that the defendant's conduct in Counts One and Two was part of an intentional plan to target journalists at the News Organization. Each of Victim-1, Victim-2, Victim-6, Victim-7, and Victim-8 worked at the News Organization and the message to Victim-8 specifically referencing the News Organization exposes this common plan and the defendant's intent. Second, in preparing to threaten his victims, Lemke used the same kinds of tools to identify the same kinds of personal information about the victims. The defendant would identify the victim's personal information, including cellphone numbers, home addresses, and names of their relatives, using Internet searches and databases. For example, before messaging Victim-7, Lemke visited Victim-7's Twitter account, searched Victim-7's name on Google, visited a website containing Victim-7's contact information, and visited a page containing information about Victim-7's phone number. He underwent similar processes before sending the charged threats using similar websites. Evidence of these other threats therefore demonstrates that the defendant had the knowledge and opportunity needed to commit the alleged crimes (such as how to find personal information for the purposes of sending targeted threats). Third, the defendant used the same hallmark language in his messages, as described above, even when using different phone numbers or platforms.

Threats to Victim-6, Victim-7, and Victim-8 show that the defendant used a similar modus operandi. For example, Lemke's opening messages to Victim-1 and Victim-2 referencing an

"email with a PDF" are not necessarily meaningful in isolation; but when combined with similar messages to Victim-7 and Victim-8 also seeking information on "PDFs," these messages reveal that Lemke deployed a deliberate strategy of opening the conversation with an innocuous text in order to lure his victims into responding. Ex. B, Rows 9, 16. The defendant's messages to Victim-6, alongside the messages to Victim-2, evidence the defendant's further strategy of using multiple phone numbers to confuse and further lure his victims. Ex. B, Row 1. With both Victim-1 and Victim-6, Lemke used the 202 Number to make threats but switched to the 310 Number to ask Victim-1 and Victim-6 to meet at the respective victims' homes. Ex. B, Row 1. This method of using multiple phone numbers to confuse and further engage with his victims would not be apparent without the admission of messages to Victim-6 to contextualize the messages to Victim-1. In addition, the defendant used with not only Victim-1 and Victim-2, but also with Victim-7 the intimidation tactic of identifying the victims' loved ones by name and using photographs of highly personal locations to create the fear that Lemke was in close proximity to the victims' families and able to do immediate harm, Ex. B, Row 15.[9] *See United States v. Ivanova*, 19 F. Supp. 3d 511, 517 (S.D.N.Y. 2014) (permitting evidence of prior similar crime as both proof of identity as well as evidence that the defendant had the knowledge necessary to commit the charged offenses).

Finally, the threats to Victim-6, Victim-7, and Victim-8 demonstrate a lack of mistake or accident. The frequency of these threats, over time, from accounts subscribed to him and to his home, serves to counter any possibility, that the threats were somehow accidentally transmitted

---

[9] While the defendant's contacts with Victim-8 occurred in the days after January 6, 2021 (the date of the threats charged in Count Three), evidence of conduct after a threat is made remains "relevant to [showing] his purpose in sending the communication and his intent to send a threat because those acts allow the jury to consider inferences about [the defendant's] state of mind," particularly where the defendant's conduct consisted of a series of similar threats. *Segui*, 2019 WL 8587291, at *9 (admitting, pursuant to Section 404(b), evidence that post-dated the charged threats).

from his phone numbers and devices. *See Morrison*, 153 F.3d at 41-45. Indeed, while the Government does not intend to offer the defendant's post-arrest statements, those statements signal that the defendant falsely claimed that the presence of the charged threats on the Lemke Cellphone were caused by hacking or some other mistake unbeknownst to him. The threats to Victim-6, Victim-7, and Victim-8 demonstrate, to the contrary, that the defendant acted knowingly and intentionally throughout the period of the charged conduct, consistent with the Government's burden of proof.

### d. The Threats to Victim-6, Victim-7, and Victim-8 Are Not Barred by Rule 403

Admission of the threats to Victim-6, Victim-7, and Victim-8 will not cause any unfair prejudice to the defendant, because none of the proffered evidence is different in nature or degree from the charged threats. The substance of these threats is therefore not more inflammatory than the charged conduct. In fact, the similarities between the charged threats and those to Victim-6, Victim-7, and Victim-8 is the very basis of their probative value to show the defendant's identity, motive, plan, knowledge, intent, and lack of mistake. Moreover, the evidence of the threats to Victim-6, Victim-7, and Victim-8 would substantially overlap with the proof of the charged conduct at trial, including digital evidence from Lemke's cellphone and electronic accounts.[10] As with the threats to the January 6, 2021 Victims, the Government seeks to offer streamlined evidence of the threats against Victim-6, Victim-7, and Victim-8, who represent only a small subset of the at least approximately 50 victims threatened by the defendant, primarily through documentary evidence including summary charts and the defendant's audio messages. As noted

---

[10] While the Government plans to primarily rely on search warrant returns to prove the threats to Victim-6, Victim-7, and Victim-8, certain messages—such as multimedia—are available only through the victims' testimony. Moreover, without testimony from the victims about, for example, the significance of the locations depicted in those pictures or the identities of those mentioned in the messages, the similarities between the these threats and the charged conduct will not be clear to the jury.

above, the Government seeks to call a single victim-witness with respect to these threats, Victim-7, whose testimony will be necessary to authenticate a received multimedia message and to explain the significance of a particular location and names cited in the defendant's messages to that victim. Ex. B, Rows 14-15, 17-18. For these reasons, admission of the threats to Victim-6, Victim-7, and Victim-8 complies with Rule 403.

## II.   The Court Should Permit the Government to Introduce Limited Background Testimony Regarding the 2020 Presidential Election and the January 6, 2021 Attack on the United States Capitol

The Court should permit the Government to introduce limited background evidence of the 2020 presidential election and the January 6, 2021 attack on the Capitol because general knowledge of those events is necessary context for the jury to understand the threats made by the defendant and their violent nature. The Government intends to introduce this evidence through limited testimony from a single law enforcement witness, such as from the U.S. Capitol Police. This testimony would briefly summarize the essential events of January 6, 2021 at the Capitol, specifically including: the planned certification of the presidential election results that day by the U.S. Congress at the Capitol Building, the breach of the Capitol through violence by approximately 2 p.m. that day in response, and the duration of that threat of violence posed to lawmakers over the course of several more hours (corresponding with the timing of Lemke's threats underlying Count Three). A transcript reflecting similar testimony from a Capitol Police witness, admitted in the recent prosecution of *United States v. Hunt*, No. 21 Cr. 86 (PKC) (E.D.N.Y.), which similarly involved charges of threats relating to the 2020 election made by an individual not alleged to have attended the Capitol riot himself, is attached hereto as Exhibit C.

As described above, the defendant made a series of threats directed towards journalists, members of Congress, and their families between November 2020 and continuing into January 2021, including on January 6, 2021, the day of the attack on the Capitol. Each of the defendant's

threats was made in the context of the 2020 presidential election, the ensuing electoral vote certification, and the January 6, 2021 attack on the Capitol, and the threats themselves referenced these events. For example, the defendant's threats to Victim-1 and Victim-2 began shortly after the defendant viewed publications by Victim-1 and Victim-2 regarding the 2020 presidential election. The defendant's threat to Victim-2 explicitly invoked Victim-2's "belief that the election was authentic and had zero fraud" and demanded that Victim-2 "stop presenting [the election] as fact," before threatening Victim-2 that "the ball is in your court. . . How that ball moves will determine what happens. . . . I ain't fucking around. None of us are." *See supra* 4. The defendant's threats to Victim-3 were made at approximately 5 p.m. on January 6, 2021, after the Capitol had been breached through violence by a crowd of thousands. The defendant's threats invoked those particular events to instill fear in Victim-3, citing that "we are nearby, armed, and ready," "[t]housands of us are active/retired law enforcement, military, etc.," and telling Victim-3 "[t]hat's how we did it," referencing the attack on the Capitol. Ex. B, row 2-3, 6. At the time of the Victim-3 threats, the Capitol remained under siege and had not yet been secured. Congress was not able to resume work in the Capitol until approximately 8 p.m. that evening.[11]

Pursuant to *Elonis v. United States*, 135 S. Ct. 2001, 2012 (2015), the Government must prove a minimal level of mens rea to sustain a Section 875 conviction, and the statute is satisfied if the defendant "transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." As a result, the jury will be called upon to determine the defendant's intent by examining the words he used when he made the alleged threats in this case. The context surrounding those messages is critical to making that determination of

---

[11] *See, e.g.*, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (setting forth a timeline of events and associated media coverage).

intent. Because the defendant's statements reference the 2020 presidential election and its aftermath, and in particular, include threats made by the defendant on January 6, 2021 which reference that day's attack on the Capitol, the Court should permit the Government to present limited, general testimony about those events, including the attack on the Capitol. This background evidence is necessary for the jury to understand the import of the words chosen by the defendant, how those words evidence his intent, and their impact on the defendant's victims.

For example, while claiming to be "nearby, armed and ready," the defendant stated to Victim-3 that "[t]housands of us are active/retired law enforcement, military, etc. That's how we did it." Ex. A, Rows 2-3, 6. Without the relevant background testimony about January 6, 2021, the jury will not be able to properly evaluate the import of the words, "[t]hat's how we did it," the impact of the defendant's claim to be part of a group of "thousands" of "active/retired law enforcement, military," or the defendant's intent in choosing those words. *See, e.g., United States v. Dillard*, 795 F.3d 1191, 1197, 1201 (10th Cir. 2015) (threat against abortion provider—"[i]f [Dr.] Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering"—was properly interpreted in the context of the fact that Dr. Tiller, another abortion provider, had been murdered less than two years earlier); *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1078 (9th Cir. 2002), as amended (July 10, 2002) (holding that "context is critical in a true threats case and history can give meaning to the medium"); *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000) (finding that the defendant's alleged threats were properly viewed in the context of their "similarity to the well-known events of the Oklahoma City bombing").

The context and timing of the events of January 6, 2021 are necessary to show that the defendant was referring to the violent actions happening in real time at the Capitol that day. By

the time the defendant began sending his threats to Victim-3, and the other January 6, 2021 Victims at approximately 4:56 p.m., a crowd of thousands had forced entry into the Capitol, destroyed property, assaulted law enforcement officers, and occupied the Capitol for several hours. News coverage had reported on these events as they occurred. Congressmembers were evacuated from the building by early afternoon, including several of the January 6, 2021 Victims whom the defendant targeted that same evening with threatening messages. The timing of the defendant's messages to Victim-3 and the language used by the defendant ("armed" and "ready" by the "thousands," "that's how we did it") can only be properly understood when placed in this context.

The Government intends to introduce this relevant background evidence through the testimony of a single law enforcement witness who was present during the January 6, 2021 attack. The witness will provide generalized testimony about the presidential election and the events that took place on January 6, 2021, including the basic timing of those events during the course of the day. This testimony will provide the necessary context for the jury to evaluate the defendant's statements and his intent, and to place the timing of the defendant's threats in context. *See Hunt*, 2021 WL 1428579, at *18 (admitting similar testimony regarding the events of January 6, 2021 "as background information that is necessary for the jury to understand the context for Defendant's alleged threats" relating to the 2020 presidential election and the Capitol attack); *Inserra*, 34 F.3d at 89 ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

Rule 403 does not bar the proposed testimony. The testimony will be brief, generalized in nature, and limited to the essential facts "necessary for the jury's understanding of the alleged threats." *See Hunt*, 2021 WL 1428579, at *18. The defendant's threats, made in connection with

Count Three on January 6, 2021, already reference and expressly invoke the events of the Capitol attack. As a result, the proposed testimony is no more inflammatory than the charged conduct. *Livoti*, 196 F.3d at 326; *Pitre*, 960 F.2d at 1120; *Roldan Zapata*, 916 F.2d at 804. For these reasons, as in *Hunt*, the proposed testimony does not present any undue prejudice to the defendant and comports with Rule 403. *See Hunt*, No. 21 Cr. 86 (PKC), 2021 WL 1428579, at *18 (permitting similar testimony as background evidence with the precaution that no "unduly inflammatory or graphic testimony regarding what happened at the Capitol that day" be elicited).

## **CONCLUSION**

For the reasons set forth herein, the Court should grant the Government's motions *in limine*.

DATED:          New York, New York
                October 8, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney
                                        Southern District of New York

By:     ___/s/_____
                                        Kimberly J. Ravener
                                        Kyle A. Wirshba
                                        Assistant United States Attorneys
                                        Tel: (212) 637-2358 / 2493

# Exhibit A

***United States v. Robert Lemke***
***21 Cr. 100 (AKH)***

**January 6, 2021 Messages**

| # | Time Sent (EST) | Sender | Recipient | Message |
|---|---|---|---|---|
| 1 | January 6, 2021<br>4:56 PM | 614 Number<br>*Robert Lemke* | Victim-9 | [Victim-9], you need to cease and desist and let the events unfold.  You and your family will be put on a naughty list.  [Names]...  we have people watching you near your home on [street], and also near your families homes.  Many of us are retired law enforcement/military. Careful what you say and do. |
| 2 | January 6, 2021<br>5:02 PM | 614 Number<br>*Robert Lemke* | Victim-3 | [Cousin of Victim-3]'s words are putting you and your family at risk |
| 3 | January 6, 2021<br>5:02 PM | 614 Number<br>*Robert Lemke* | Victim-3 | We are nearby, armed and ready. |
| 4 | January 6, 2021<br>5:09 PM | 614 Number<br>*Robert Lemke* | Victim-4 | Your brother is putting your entire family at risk with his lies and other words.  We are armed and nearby your house.  You had better have a word with him.  We are not far from his either.  Already spoke to [famiy member of Victim-4] and know where his kids are. |
| 5 | January 6, 2021<br>5:11 PM | 614 Number<br>*Robert Lemke* | Victim-4 | [Photograph of house] |
| 6 | January 6, 2021<br>5:19 PM | 614 Number<br>*Robert Lemke* | Victim-3 | Thousands of us are active/retired law enforcement, military, etc.  Thats how we did it. |
| 7 | January 6, 2021<br>5:35 PM | 614 Number<br>*Robert Lemke* | Victim-4 | [Victim-4], your words have consequences.  Stop telling lies; Biden did not win, he will not be president.  We are note white supremacists.  Most of us are active/retired law enforcement or military.  You are putting your family at risk.  We have armed members near your home @ [address].  Also near [name] and [name] in florida.  Dont risk their safety with your words and lies. |
| 8 | January 6, 2021<br>5:36 PM | 614 Number<br>*Robert Lemke* | Victim-10 | [Victim-10], your words have consequences.  Stop telling lies; Biden did not win, he will not be president.  We are note white supremacists. Most of us are active/retired law enforcement or military.  You are putting your family at risk.  We have armed members near your home @ [address].  Also near [name] and [name] in florida.  Dont risk their safety with your words and lies. |
| 9 | January 6, 2021<br>5:56 PM | 614 Number<br>*Robert Lemke* | Victim-11 | Tell [name], her words have consequences. Stop telling lies; Biden did not win, he will not be president.  Most of us are active/retired law enforcement or military.  She is putting your family at risk.  We have armed members near your home @ [address]...  Also near [names]...  Dont risk their safety and yours with her words<br>and lies. |
| 10 | January 6, 2021<br>6:26 PM | 614 Number<br>*Robert Lemke* | Victim-4 | 10-37.  10-37.  professional courtesy |
| 11 | January 6, 2021<br>6:35 PM | 614 Number<br>*Robert Lemke* | Victim-5 | [Victim-5].  calm your husband down. |
| 12 | January 6, 2021<br>6:36 PM | Victim-5 | 614 Number<br>*Robert Lemke* | Who is this? |
| 13 | January 6, 2021<br>6:36 PM | Victim-5 | 614 Number<br>*Robert Lemke* | Your number is only coming up not your name. |
| 14 | January 6, 2021<br>6:36 PM | 614 Number<br>*Robert Lemke* | Victim-5 | Does that matter?  We saw on the hidden camera, he was quite stirred up. |
| 15 | January 6, 2021<br>6:38 PM | 614 Number<br>*Robert Lemke* | Victim-5 | You need to have him talk to [brother-in-law of Victim-5].  Thanks. |
| 16 | January 6, 2021<br>8:11 PM | 614 Number<br>*Robert Lemke* | Victim-12 | No, Joe Biden will not be inaugurated.  You are making a fool of yourself.  What you saw tonight is just the beginning.  Tip of the iceberg.  The spark and ignition.  Thousands of us are retired AND active law enforcement and military.  We have underground communication networks and have been planning this for months.  Your words are putting you and your family at risk...  [Names]...  we are watching.  [Address]. |
| 17 | January 6, 2021<br>8:22 PM | 614 Number<br>*Robert Lemke* | Victim-13 | Warn your husband.  No, Joe Biden will not be inaugurated.  He is making a fool of himself.  What you saw tonight is just the beginning.  Tip of the iceberg.  Thousands of us are retired AND active law enforcement and military.  We have underground communication networks and have been planning this for months.  His words are putting you and your family at risk...  [Names]...you... we are watching.  [Address] here now |
| 18 | January 6, 2021<br>8:25 PM | 614 Number<br>*Robert Lemke* | Victim-14 | Warn your husband.  No, Joe Biden will not be inaugurated.  [Name] is making a fool of himself.  What you saw tonight is just the beginning.  Tip of the iceberg.  Thousands of us are retired AND active law enforcement and military.  We have underground communication networks and have been planning this for months.  His words are putting you and your family at risk...  [Names]...you... we are watching.  [Address]..here now |

| # | Time Sent (EST) | Sender | Recipient | Message |
|---|---|---|---|---|
| 19 | January 6, 2021 9:17 PM | 614 Number *Robert Lemke* | Victim-15 | No, Joe Biden did not win.  You are making a fool of yourself.  What you saw tonight is just the beginning.  Tip of the iceberg.  The spark and ignition.  Thousands of us are retired AND active law enforcement and military.  I am am a former military officer and retired law enforcement.  We have underground communication networks and have been planning this for months.  Your words are putting you and your family at risk with your words... [Names]... we are watching.  [Address]. |

# Exhibit B

**United States v. Robert Lemke**
**21 Cr. 100 (AKH)**

**Similar Threats Messages**

| # | Time Sent (EST) | Sender | Recipient | Message |
|---|---|---|---|---|
| 1 | December 12, 2020 1:10 PM | 310 Number *Robert Lemke* | Victim-6 | Hey are we still meeting at your place on [street]? |
| 2 | December 18, 2020 4:13 AM | 202 Number *Robert Lemke* | Victim-8 | [Victim-8].. did you get the pdf in ur email we discussed last week |
| 3 | December 18, 2020 09:11 AM | Victim-8 | 202 Number *Robert Lemke* | sorry, who is this? |
| 4 | December 18, 2020 12:06 PM | 202 Number *Robert Lemke* | Victim-8 | [multimedia file] |
| 5 | December 18, 2020 12:07 PM | Victim-8 | 202 Number *Robert Lemke* | again, who is this? |
| 6 | December 20, 2020 6:51 PM | 202 Number *Robert Lemke* | Victim-6 | if you keep up the fake rhetoric something really bad will happen to you and your family. . we are already watching the ones in [town] and [town]. |
| 7 | December 20, 2020 6:54 PM | 202 Number *Robert Lemke* | Victim-6 | [multimedia file] |
| 8 | December 23, 2020 1:16 AM | 202 Number *Robert Lemke* | Victim-8 | [multimedia file] |
| 9 | December 29, 2020 10:06 PM | 202 Number *Robert Lemke* | Victim-7 | Hi [Victim-7], sorry it's late but I wanted to confirm you got the PDF regarding tomorrow's press release that we discussed. |
| 10 | December 29, 2020 10:11 PM | Victim-7 | 202 Number *Robert Lemke* | Who is this? |
| 11 | December 31, 2020 9:29 PM | 202 Number *Robert Lemke* | Victim-7 | Do I have the wrong #? |
| 12 | December 31, 2020 9:29 PM | 202 Number *Robert Lemke* | Victim-7 | Sorry |
| 13 | December 31, 2020 9:30 PM | Victim-7 | 202 Number *Robert Lemke* | Who is this for? |
| 14 | December 31, 2020 9:34 PM | 202 Number *Robert Lemke* | Victim-7 | I had this number I my.phone for [Victim-7].  I must have entered a digit incorrectly.  Have a happy new year!! |
| 15 | December 31, 2020 9:37 PM | 202 Number *Robert Lemke* | Victim-7 | [photograph of home] |
| 16 | December 31, 2020 9:37 PM | Victim-7 | 202 Number *Robert Lemke* | Who is this? |
| 17 | December 31, 2020 9:38 PM | 202 Number *Robert Lemke* | Victim-7 | [Fiance of Victim-7] didn't make some very secure decisions now did he [Victim-7]. |
| 18 | December 31, 2020 9:39 PM | 202 Number *Robert Lemke* | Victim-7 | I liked the bath tile.  Like a floor on the wall. |
| 19 | December 31, 2020 9:40 PM | 202 Number *Robert Lemke* | Victim-7 | In either case, are you ready? |
| 20 | December 31, 2020 9:42 PM | 202 Number *Robert Lemke* | Victim-7 | *Voice Text:*  Words have consequences, [Victim-7]. And you're entitled to your beliefs. I'll agree with you. Ol' Don Trump, he's an asshole. But one thing we will not tolerate, and most of us militia members, at least senior militia members. Thousands of us are retired law enforcement or active law enforcement all the way from local police to federal agencies.  Our access to databases is unprecedented. |
| 21 | December 31, 2020 9:42 PM | 202 Number *Robert Lemke* | Victim-7 | *Voice Text:*  It would be my sincere advice to stop the rhetoric, at least from the position and point of view that you have, and the audience you have. Stop it. Retract it and stop it. If you don't, there will be consequences. And not just for you, but for [Family Member of Victim-7], and the rest of your family. |

| # | Time Sent (EST) | Sender | Recipient | Message |
|---|---|---|---|---|
| 22 | December 31, 2020 9:43 PM | 202 Number *Robert Lemke* | Victim-7 | *Voice Text:* One thing we will not tolerate is one's words, which you're entitled to one's beliefs. But we will not tolerate one's words brainwashing the masses. And distracting them from truth. That won't be tolerated. There will be consequences. And you can perceive that statement and that risk assessment as you wish. |
| 23 | December 31, 2020 9:48 PM | 202 Number *Robert Lemke* | Victim-7 | Jodi Sue Huisentruit /ˈhuːzɪnˌtruːt/(born June 5, 1968 – declared legally dead May 2001) was an American television news anchor for KIMT, the CBS affiliate in Mason City, Iowa. Huisentruit went missing in the early morning hours of June 27, 1995, soon after telling a colleague that she overslept and was running late for work. Since there were signs of a struggle outside her apartment, she is believed to have been abducted. However, extensive investigations have failed to uncover any clues to her disappearance. Huisentruit was declared legally dead in 2001. |
| 24 | January 9, 2021 1:45 AM | 202 Number *Robert Lemke* | Victim-8 | *Voice Text:* Who is this? Just people that are watching your every move. You know what you have to do to no longer be concerned about your safety. And it's not just you we're watching. It's also your parents up in [county]. The choice is your's. It's not our's. It's your choice. |
| 25 | January 9, 2021 1:45 AM | 202 Number *Robert Lemke* | Victim-8 | end of of presidency. You do understand not only your life, but your families is at risk, right? We know everything. |
| 26 | January 9, 2021 9:26 AM | Victim-8 | 202 Number *Robert Lemke* | Who is this? |
| 27 | January 9, 2021 6:13 PM | 202 Number *Robert Lemke* | Victim-8 | I'm actually a sr federal agent. |
| 28 | January 9, 2021 6:16 PM | 202 Number *Robert Lemke* | Victim-8 | A lot of crazy people out there now. and you publish your opinions as facts, with your name on top. You forget tens of thousands of militia members are law enforcement and military all the way to the upper brass and upper ranks. We have judges and prosecutors too. Politicians. So don't you find it silly to write such things with your name on top when 200,000 plus members can access databases with you and your family's information that seems very stupid. We even have people at [New Organization's] corporate security that released stuff from your employee file. |
| 29 | January 9, 2021 6:25 PM | 202 Number *Robert Lemke* | Victim-8 | [multimedia file] |

Exhibit C

309

1                   UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

   - - - - - - - - - - - - - X

3

UNITED STATES OF AMERICA,    : 21-CR-86 (PKC)

4                       :

                      :

5                       :

     -against-           : United States Courthouse

6                       : Brooklyn, New York

7                       :

                      : April 23, 2021

8  BRENDAN HUNT,            : 9:00 a.m.

                      :

9        Defendant.         :

                      :

10

   - - - - - - - - - - - - - X

11

12                 TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE PAMELA K. CHEN
         UNITED STATES DISTRICT COURT JUDGE

13

14  A P P E A R A N C E S :

15  For the Government:   MARK J. LESKO
                    Acting United States Attorney

16                  Eastern District of New York
                   271 Cadman Plaza East

17                  Brooklyn, New York 11201
              BY:   DAVID K. KESSLER

18                  FRANCISCO NAVARRO
                 IAN RICHARDSON

19                  Assistant United States Attorneys

20  For the Defendant:    FEDERAL DEFENDERS OF NEW YORK, INC.
                   One Pierrepont Plaza

21                  Brooklyn, New York  11201
              BY:   JAN ROSTAL, ESQ.

22               BY:   LETICIA OLIVERA, ESQ.

23  Court Reporter:   Michele D. Lucchese, Official Court Reporter
                E-mail: MLuccheseENDY@gmail.com

24

25  Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

DIRECT - DESROSIERS - NAVARRO                373

1    their next witness.  And ladies and gentlemen, we're going to

2    take our morning break around 11:30, is every one okay with

3    that?  Okay.  Good.

4              MR. NAVARRO:  Your Honor, the government calls

5    Christopher Desrosiers.

6              THE COURT:  Mr. Desrosiers, if you go to the jury

7    box, which has been converted to the witness stand.

8              THE WITNESS:  Can I go all the way around.

9              THE COURT:  Pull the plexi.

10             (Pause in proceedings.)

11             THE COURTROOM DEPUTY:  Please rise and raise your

12   right hand.

13             (Witness sworn.)

14             THE WITNESS:  Yes, I do.

15             THE COURTROOM DEPUTY:  Thank you.  Please have a

16   seat.  Please state and spell your name for the record.

17             THE WITNESS:  Christopher Desrosiers.

18   C-H-R-I-S-T-O-P-H-E-R.  Last name, D-E-S-R-O-S-I-E-R-S.

19             THE COURT:  You may inquire, Mr. Navarro.

20             MR. NAVARRO:  Thank you, Your Honor.

21   **CHRISTOPHER DESROSIERS**, called as a witness, having been first

22   duly sworn/affirmed, was examined and testified as follows:

23   DIRECT EXAMINATION

24   BY MR. NAVARRO:

25   Q    Please tell the jury what you do for work.  And could you

1   pull the microphone up close to you and perhaps angle it up a

2   little bit.

3   A    Sure, is that okay?

4   Q    Much better, yes.

5             Could you just tell the jury what you do for work?

6   A    I'm a special agent with the United States Capitol

7   Police.

8   Q    And is the Capitol police the law enforcement body

9   charged with protecting both members of Congress as well as

10  the United States Capitol buildings?

11  A    Yes.

12  Q    How long have you been with the Capitol police?

13  A    Since 2007.

14  Q    And you said your title is special agent; is that right?

15  A    That's correct.

16  Q    How long have you been a special agent?

17  A    Since 2013.

18  Q    So from 2007 to 2013, what did you do for the Capitol

19  police?

20  A    I was a uniformed officer.

21            THE COURT:  I'm going to ask you both to slow down

22  for our court reporter.

23            THE WITNESS:  Okay, sorry.

24            THE COURT:  Yes.

25  BY MR. NAVARRO:

1  Q    Prior to becoming a Capitol police officer, can you tell

2  the jury about your education.

3  A    I have a bachelor's degree from the university of Rhode

4  Island and --

5           THE COURT:  Rhode Island?

6           THE WITNESS:  Rhode Island, yes.

7           THE COURT:  Okay.

8  A    And I graduated from both the uniformed police training

9  program at the Federal Law Enforcement Training Center in

10 Brunswick, Georgia for uniformed training, and then when I

11 became an investigator I had to go to training for the

12 criminal investigator training program, once again at the

13 Federal Law Enforcement Center, Brunswick, Georgia.

14          THE COURT:  Say that again.  You went to the Federal

15 Law Enforcement Training Center in Glynco, Georgia?

16          THE WITNESS:  Correct, yes.

17 BY MR. NAVARRO:

18 Q    Are you aware of an investigation regarding the defendant

19 Brendan Hunt?

20 A    I am.

21 Q    When did the Capitol police first become aware of it?

22 A    To the best of my knowledge, January 8th.

23 Q    And --

24          THE COURT:  Slow down, slow down, folks.  You both

25 speak very fast, go slower.  I can see the court reporter

DIRECT - DESROSIERS - NAVARRO                    376

1    struggling to keep up.

2            MR. NAVARRO:  I apologize, your Honor.

3            THE COURT:  Yes.

4    BY MR. NAVARRO:

5    Q    You said January 8th?

6    A    Correct.

7    Q    How did the Capitol police become aware of it?

8    A    It's my understanding one of our task force agents who is

9    on the task force with the FBI passed an FBI Guardian report

10   to the supervisors from the investigations division for

11   Capitol police as well as the other task force agents.

12   Q    When you say task force agent, that's a Capitol police

13   officer?

14   A    It's a Capitol police, in this case it's the Capitol

15   police special agent that sits on an FBI task force, yes.

16   Q    So that Capitol police officer is embedded with the FBI?

17   A    That is correct.

18   Q    And on January 8th, the task officer made the Capitol

19   police aware of the Brendan Hunt investigation?

20   A    Correct.

21   Q    And when did you personally first learn about the

22   investigation into Mr. Hunt?

23   A    March 2nd.

24   Q    2021?

25   A    Correct.

1  Q    So let's talk about what the Capitol police does.  Can

2  you explain to the jury the main functions of the Capitol

3  police.

4  A    Sure.  So on Capitol Hill we're the primary law

5  enforcement agency.  So through a uniformed presence, both

6  foot patrol --

7            THE COURT REPORTER:  I'm sorry.  Foot patrol?

8            THE COURT:  Yes.

9            THE WITNESS:  I'll pace myself.  I apologize.

10            THE COURT:  Hang on, hang on.  The Court Reporter,

11  do you want to sit outside this box so you can see him better?

12  I can see that you're trying to see his face.

13            THE COURT REPORTER:  No, that's all right.  It will

14  be too much to move, Your Honor.

15            THE COURT:  Okay.  Just remember you're looking away

16  from the court reporter for one, I understand why, but it

17  makes it harder for her to watch you speak, if that makes

18  sense, so just go slower --

19            THE WITNESS:  Okay.

20            THE COURT:  -- please.

21            THE WITNESS:  I apologize again.

22            THE COURT:  Yes.

23  A    So, we have a uniformed presence, like a more standard

24  municipality you would think of.  We have patrols both

25  vehicle, foot, motorbike, bicycle around the Capitol Hill

1    complex.  When I say Capitol Hill complex, what I'm talking

2    about is the Capitol building itself and its grounds as well

3    as the House office buildings, the Senate office buildings,

4    the Library of Congress and then we have some adjacent

5    properties that are support properties for Congress that we

6    are in charge to protect.

7            In addition to that, we have a series of what you

8    would equate more to security posts, like you have here in the

9    courthouse to control pedestrian and vehicle access coming on

10   and off those properties, to keep those properties safe and

11   the members safe.

12           In addition to that, we have a K9 unit, a S.W.A.T

13   team, a bomb squad all supporting to help us keep the members,

14   employees, visitors and facilities safe on Capitol grounds.

15           Additionally, we have in our protective services

16   bureau, which is where I work, we have a dignitary protection

17   division and they provide protection details for Congressional

18   leadership.  So what most people might see them working out in

19   public and think it's the Secret Service, it is doing a

20   similar function obviously but for members of Congressional

21   leadership, Speaker of the House being the most prominent, the

22   most recognizable member of Congressional leadership that you

23   would equate with that.

24   Q    When you use the word "member," what does that refer to?

25   A    A member of the House of Representatives or a Senator.

1    Q    So there are 100 Senators, correct?

2    A    Correct.

3    Q    And 435 members of the House of Representatives?

4    A    That is correct.

5    Q    If you add that together there are 535 members of

6    Congress; is that right?

7    A    Yes.

8    Q    Now you mentioned that Congressional leadership has

9    security details.  Do all Congress folks -- all members of

10   Congress have security details?

11   A    No.

12   Q    And Senators and Representatives have offices inside the

13   Capitol complex in D.C., correct?

14   A    Correct.

15   Q    And do they also have offices in their home districts?

16   A    Yes.

17   Q    And what role, if any, does the Capitol police have in

18   providing security for district offices?

19   A    So we are primarily located in Washington, D.C., but what

20   we do is we work with our federal, state and local partners

21   nationwide to try to create an as secure environment as we can

22   for our protectees out in the district, out in their home

23   districts.  And when I say "protectees" I also want to make

24   the point to say it's not just the members and the Senators --

25   or members of Congress themselves, it's also their employees

1  in their official capacity, and their staff -- I'm sorry.

2  Their staff, employees in their official capacity as well as

3  their families.

4          So I might investigate a threat against a member of

5  their family at some point in my career as well.  Just so you

6  understand kind of the breadth of that.

7          So to --

8  Q    Sorry.

9  A    So to further answer your question, we'll travel out with

10 the Sergeant-At-Arms staff and do things like security

11 awareness briefings if a district office does not have a local

12 police point of contact.  So when they dial 911 in Sacramento,

13 California, as an example, we are obviously not the first

14 responders.  So we want to make sure they're tied in to

15 somebody who is local that they can liaison with if they have

16 any security issues for the local office that those first

17 responders have to take care of and then we also create those

18 relationships so that if that is the case, we are made aware

19 of those issues and can work with those partners moving

20 forward.

21 Q    And you mentioned working with law enforcement partners,

22 do you work regularly with federal law enforcement partners?

23 A    Yes, sir.

24 Q    Who would you say is the primary federal law enforcement

25 partner you work with?

1  A     FBI.

2  Q     And how does the FBI assist the Capitol police in

3  carrying out its mission?

4  A     FBI has a wider range of resources than we have.  They

5  have offices in all of the states, so we're able to -- in many

6  of our threats throughout the year, as an example, we will

7  work very closely with the FBI to leverage those resources in

8  many cases where there can be a more immediate response or a

9  more thorough response because we would have to travel out to

10  those areas.  So we're able to work with our FBI partners both

11  in Washington, D.C. and nationwide to help protect our

12  members.

13  Q     Is working with the FBI on threat cases a regular

14  occurrence?

15  A     Yes.

16  Q     Are there instances in which the Capitol police defers to

17  the FBI as the lead investigative agency?

18  A     Yes.

19  Q     Is that a regular occurrence?

20  A     Yes.

21  Q     So let's talk about threats generally.  What section of

22  the Capitol police do you specifically work in?

23  A     The Threat Assessment Section.

24  Q     What is the Threat Assessment Section?

25  A     We essentially handle looking into reports of any unusual

1  direction of interest toward a member of Congress, their staff

2  in their official capacity, or their families.  And when I --

3  just so you understand what I'm talking about when I say staff

4  in their official capacity, if a member of Congressional staff

5  has a property dispute with their neighbor, that's not going

6  to be a U.S. Capitol Police involved matter, that will be a

7  local police matter for them.  But if they are being

8  threatened or targeted because of their position, because of

9  who they work for, we would also look into that.  So we look

10 into, when I say any unusual direction of interest, everywhere

11 from stalking and harassment, all the way through to threats

12 against their lives.

13 Q    And in the Threat Assessment Section that you work in,

14 how are threats brought to your attention?

15 A    A variety of ways.  We could receive a citizen report

16 through our public information office.  We could receive a

17 Tweet to the Capitol police, phone calls from staff, reports

18 from citizens to staff members in the home district that

19 they've overheard something or seen something, whether it be

20 online, in public.  Then obviously the members themselves are

21 able to communicate with us if they have a security concern

22 they want to bring to our attention.

23 Q    Based on your prior testimony, am I correct that

24 sometimes other law enforcement agencies will also bring

25 threats to your attention?

DIRECT - DESROSIERS - NAVARRO                    383

1   A     Absolutely.

2   Q     Do the Capitol police investigate all threats?

3   A     All threats that are brought to our attention, yes.

4   Q     Do you investigate threats that are made directly to

5   members of Congress?

6   A     Yes.

7   Q     Do you investigate threats that are posted online?

8   A     Yes.

9   Q     So like let's say if someone posts a video somewhere

10  threatening to kill members of Congress, is that something the

11  Capitol police will take an interest in?

12  A     Yes.

13  Q     Do you -- in your experience, do you take online threats

14  less seriously?

15  A     No.

16  Q     Why not?

17        MS. OLIVERA:  Objection.

18        THE COURT:  Overruled.

19  A     Well, I think -- you can't on its face take any threat

20  less seriously than another until we've looked into it or our

21  partners looked into it and provided us with more information.

22  And in this day and age, especially in our current climate, I

23  think online communication is a -- becoming more, more of a

24  prominent method of communication for people.

25  Q     If a threat comes in to kill members of Congress as a

1   whole, so for example kill Senators, kill Congressmen, does

2   the Capitol police provide notification to all 535 members of

3   Congress?

4   A    That would be a decision made from the supervisors.  I

5   would say that, generally speaking, that is what we're there

6   for, so the members understand that there are -- that the

7   Capitol Hill itself, the body of Congress is a target and

8   that's why we have all of the security measures that we have

9   on the Hill.  Certainly if there were additional mitigating

10  factors that we needed to change their posture or change

11  Congress going into session or what have you for an imminent

12  threat, those notifications would need to be made, but

13  generally speaking, we're handling those matters and by virtue

14  of our function there they understand that that's what we're

15  there to do.  So a notification may not be made to all 535

16  members if the threat is more generalized to an event or the

17  complex itself unless we need to further the issue.

18  Q    And am I correct that threats are made against members of

19  all political parties?

20  A    Correct.

21  Q    And the Capitol police investigates threats against

22  members of all political parties?

23  A    Yes.

24       MR. NAVARRO:  Your Honor, I'm at a natural breaking

25  point here.

1          THE COURT:  Yes, perfect.  We'll take our morning

2     break now.  Ladies and gentlemen, it's about 11:25, but be

3     ready to go at a quarter of 12.

4          Remember don't talk about the case, keep an open

5     mind, don't do any research.

6          THE COURTROOM DEPUTY:  All rise.

7          (Jury exits courtroom.)

8          THE COURT:  You may step down, Mr. Desrosiers, and

9     take a break as well.  If you figured out you may want to come

10    out this way.

11         MR. KESSLER:  Did you say 11:45?

12         THE COURT:  Quarter of we'll come back.

13         MR. KESSLER:  Thank you.

14         (Recess.)

15         THE COURT:  While Ms. Abdallah is getting the jury,

16    I do want to mention something that's been brought to my

17    attention that I find a little troubling.  The defendant's

18    father Mr. Hunt was sitting on a bench like right in front of

19    where the jury courtroom is now.  Now, it's not an issue in

20    the sense that I've instructed the CSOs just to make sure that

21    there is no improper contact, because we don't have the usual

22    arrangement where the jury room is in a secure hallway.  They

23    unfortunately can be -- they're more vulnerable to contacts

24    from anyone, family, friends, the press, the public.  So I

25    have instructed the marshals just to keep an eye, or the CSOs

1    to keep an eye on anyone sort of trying to interact with the

2    jury.  But I think it behooves the defense team to maybe

3    reinforce with Mr. Hunt's father that it would not help his

4    cause if tried in any way even, quite frankly, visually, you

5    know, to communicate with people or give signs.  I just want

6    to avoid even the appearance that that's going on given our

7    current logistical situation.  And at various points I'll

8    probably re-admonish the jury that if anyone tries to

9    establish contact with them or make contact, they need to let

10   me know immediately.

11          So, again, just to reinforce with Mr. Hunt, I

12   understand he's concerned but he should know better.

13          THE COURTROOM DEPUTY:  All rise.

14          (Jury enters courtroom.)

15          THE COURT:  Please be seated everyone.  Welcome

16   back, ladies and gentlemen of the jury, I hope you had a good

17   morning break.

18          Mr. Navarro will resume his examination and,

19   Mr. Desrosiers, I'll remind you that you're still under oath

20   and yes, very good, to slow down.

21          Mr. Navarro, remember to take a break between the

22   question and the answer so our court reporter can keep up with

23   you folks.  As good as she is, you guys are speaking fast,

24   although, Mr. Desrosiers, you're doing much better.

25          THE WITNESS:  Thank you.

DIRECT - DESROSIERS - NAVARRO                    387

1          THE COURT:  You get a gold star.  You're doing much

2   better.

3          THE WITNESS:  Thank you.  I appreciate that.

4          THE COURT:  Mr. Navarro, you're working on it.

5          MR. NAVARRO:  I'm working on it.

6          THE COURT:  You're working on it.

7   DIRECT EXAMINATION (Continued)

8   BY MR. NAVARRO:

9   Q    Agent Desrosiers, I want to ask you some questions about

10  the period between last November's presidential election on

11  November 3rd and the inauguration in January 2021 --

12  January 20th, 2021.

13  A    Okay.

14  Q    Now you're familiar that there was a presidential

15  election that took place on November 3rd, 2020, correct?

16  A    Yes.

17  Q    And on that day people across the country went to the

18  polls and they cast their vote for their preferred candidate

19  for president, correct?

20  A    Yes.

21  Q    And then after that, after the votes were cast each state

22  counts the votes of its citizens, correct?

23  A    Yes.

24  Q    And then awards electoral votes to the candidate that

25  received the most votes in the particular state?

1    A    Yes.

2    Q    And the electoral votes are then reported to Congress,

3    correct?

4    A    Correct.

5    Q    And on January 6 Congress gathers in what's called the

6    joint session --

7    A    That's correct.

8    Q    -- right?

9         Can you tell the jury what a joint session is?

10   A    It's when the entire body of Congress is meeting

11   together.

12   Q    So that means the Senate and the House are in the same

13   room together; is that right?

14   A    Yes, sir.

15   Q    And at this particular joint session did Vice President

16   Mike Pence preside?

17   A    Yes.

18   Q    And the purpose of this joint session was to present the

19   electoral votes to Congress and for Congress to then decide

20   whether to accept the votes, correct?

21   A    Correct, to certify the electoral college votes.

22   Q    Right.  To certify the winner of the presidential

23   election.

24   A    That's correct.

25         MS. OLIVERA:  Objection.

1              THE COURT:  Overruled.

2    Q    The purpose was to certify the winner of presidential

3    election; is that right?

4    A    Certify the votes and it confirms a winner, correct.

5    Q    Then the winner is inaugurated on January 20th; is that

6    right?

7    A    That's correct.

8    Q    So just to summarize, November 3rd, 2020 is the election,

9    January 6 -- you need to answer orally.

10   A    Yes.

11   Q    January 6th, 2020[sic] is the counting and certification

12   by Congress?

13   A    Yes.

14              THE COURT:  Go a little slower.

15   Q    And January 20th, 2020[sic] is the inauguration?

16   A    Yes.

17              MR. KESSLER:  2021.

18   Q    2021.

19   A    Yes.

20   Q    So let's talk about January 6th, 2021.  Were you working

21   that day?

22   A    I was.

23   Q    Can you tell the jury what your shift was that day.

24   A    So my shift is 6 a.m. to 2 p.m.  Due to our COVID

25   protocols, I was teleworking from my residence during that

1   shift and toward the end of the shift, between one and

2   2 o'clock, received notification that there was a security

3   issue on Capitol Hill and that we may need to return or be

4   recalled -- those of us who were off Capitol Hill maybe to be

5   recalled back to the Hill to assist.

6   Q    At that time when you first got the notification, did you

7   have an indication of what specifically was happening?

8   A    Not in its totality.  Turned the TV on and there was news

9   coverage and you could see that there had been a breach of the

10  outer perimeter around the Capitol building and there looked

11  to be a large-scale demonstration going on at which point I

12  got dressed, in presuming that we were going to be recalled,

13  and actually got into my vehicle and started my drive back to

14  Capitol Hill, at which point shortly into the drive we

15  received a confirmation that they needed us to come back to

16  the Hill.

17  Q    How long did it take you to drive from your home to

18  Capitol Hill?

19  A    Between 30, 35 minutes.

20  Q    When you arrived at Capitol Hill, did you go to Capitol

21  police headquarters?

22  A    Yes.

23  Q    When you arrived there, what was happening?

24  A    The event was continuing.  At that point the building

25  itself had been penetrated and I got my gear on, turned my

1    radio on -- by gear I mean my bulletproof vest and my

2    equipment, and responded down to an investigations division

3    command post on the fifth floor of our headquarters building.

4    Q    What was the tone like in the building at that point?

5    A    Very uneasy.  It's -- thinking back on that day a word

6    that I would use for myself, I don't want to speak for

7    individuals who were in the building itself and fighting that

8    fight, but for myself, surreal comes to mind.  I'm starting

9    year 15 with the U.S. Capitol Police and I've worked a great

10   number of demonstrations, some more contentious than others,

11   and I honestly would not have thought we would see what

12   happened on the 6th ever happen in my career to be perfectly

13   honest with you.

14        THE COURT:  Next question, Mr. Navarro.

15   Q    Yes.  Were you able to hear police radio chatter from

16   where you were?

17   A    I was.

18   Q    What was the tone of that radio chatter?

19   A    Definitely heightened concern.  People were yelling for

20   help.

21        MS. OLIVERA:  Objection.

22   A    I'm sorry?

23        MS. OLIVERA:  Your Honor, we made an objection.

24        THE COURT:  Oh, you did make an objection.  I didn't

25   hear you.  I'm sorry.

1          MS. OLIVERA:  Yes.

2          THE COURT:  Overruled, but let's have this be the

3   last question about tone, okay.

4   Q    You can answer the question.

5   A    People were calling for help from various parts of the

6   building.  It was clear that the force in the building was

7   being overwhelmed.

8   Q    When you say "force," you mean the police force?

9   A    That's correct.

10  Q    At that time were both houses of Congress and the vice

11  president in the building?

12  A    Yes.

13  Q    And you said that forces were being overwhelmed.  Were

14  they being overwhelmed at one location or multiple locations?

15  A    Multiple.

16  Q    And were there supervisors present in the building?

17  A    Yes.

18  Q    What were the supervisors doing?

19  A    Again, calling for additional resources to deal with the

20  ongoing issue.

21  Q    Now we talked a little bit about the radio.  Were you

22  able to see things on television screens as well?

23  A    Prior to receiving my assignment, which took me outside

24  of the building, I could see the news coverage again of the

25  ongoing event.

DIRECT - DESROSIERS - NAVARRO                393

1    Q    To your knowledge, was this a peaceful encounter with the

2    police?

3    A    No.

4    Q    What was it?

5    A    There was violence taking place all over Capitol grounds.

6    Q    Were people engaging in physical contact?

7              MS. OLIVERA:  Objection.

8              THE COURT:  Sustained, sustained.  Let's move this

9    along.

10   Q    You mentioned that the members of Congress and the vice

11   president were in the building.  What, if anything, was done

12   to provide for their security?

13   A    They were evacuated from the chambers.

14   Q    Were they taken to a location, sheltered in place or

15   something else?

16   A    Secure locations.

17   Q    And what about the vice president?

18   A    Again, a secure location.

19   Q    Did your supervisors task you with any specific

20   assignment that day?

21   A    Yes.  My assignment was to assist in preparation in the

22   event that Congress had to be moved off of Capitol Hill.

23   Q    Did that ever become necessary?

24   A    No.

25   Q    And why is that?

1   A    Through the help of our partner agencies we were able to
2   regain control of the situation and eventually the building
3   was cleared, swept and rendered safe, and Congress was brought
4   back into session.
5   Q    Can you go into a little more detail about that, about
6   the partner agencies, how that was accomplished?
7   A    We reached out for help from multiple agencies and a sea
8   of backup came, for lack of a better way to explain that, to
9   assist and we were able to push individuals unauthorized to be
10  on the grounds and the building out of the building, resecure
11  the building, sweep for any further security issues, and then,
12  far above my pay grade, a decision is made at some point that
13  it is safe for Congress to come back into the building and
14  resume the session.
15  Q    You mentioned that members of Congress and the vice
16  president had to be evacuated from the chamber and shelter in
17  place.  In your years on the Capitol police force that ever
18  happen before?
19  A    I can't recall a time off the top of my head.
20  Q    And did Congress, in fact, reconvene later that day and
21  finish certifying the results of the election?
22  A    Yes.
23  Q    And at the end of the day were there injuries to
24  personnel, both civilian and law enforcement?
25  A    Absolutely.

1  Q    And were there casualties?

2  A    Yes.

3  Q    And was one of the casualties included a police officer;

4  is that right?

5  A    Yes.

6  Q    Was there damage to Capitol?

7  A    Yes.

8  Q    Can you describe the damage?

9  A    There was several thousand dollars of worth or more of

10 property damage to the interior and the exterior of the

11 building.  Offices, for lack of a better way to explain it,

12 were ransacked in areas.  Items were taken.  There was a

13 tremendous amount of damage to the building itself.

14        THE COURT:  What was the last part you said?

15        THE WITNESS:  A tremendous amount of damage to the

16 building itself.  Sorry.

17        MR. NAVARRO:  Your Honor, at this point I'd like to

18 play Government Exhibit 24 which is in evidence and I believe

19 the jury has the binders, so if I could ask them to turn to

20 Tab 24.

21        THE COURT:  All right.

22        MR. NAVARRO:  Tab 24, ladies and gentlemen.

23        (Video recording played.)

24        (Video recording stopped.)

25 BY MR. NAVARRO:

1  Q    Agent Desrosiers, I've paused the video at a minute and

2  38 seconds.  Do you recognize where this scene is taking

3  place?

4  A    Yes, sir, that's the base of the Pennsylvania Avenue

5  walkway on the west front of the Capitol.

6  Q    In the background that is the U.S. Capitol building, the

7  main building with the rotunda?

8  A    Correct.

9  Q    And in the background of this photo it looks like there

10  is fencing set up with, it looks like, some officers standing

11  behind it, am I correct about that?

12  A    Yes.

13  Q    What was the purpose of the fencing and the officers?

14  A    On the west front that's -- the purpose of the fencing is

15  to secure that area.  Part of what you see there, kind of

16  below the building and mostly white -- it's hard for, maybe,

17  the jury to make out there, is the inaugural platform.  So

18  once we have the inauguration, the platform that the president

19  walks out on to and takes the oath of office.  When that

20  starts to be built there's a perimeter securing the west front

21  the Capitol to keep people away from that project, an ongoing

22  project.  So you're seeing some of the snow fencing and signs

23  and perimeter set in place for that as well.

24           (Continued on the next page.)

25

Desrosiers  - direct - Navarro                397

1   (Continuing)

2   DIRECT EXAMINATION

3   BY MR. NAVARRO:

4   Q    Let me pause that.

5        Do you recognize the uniform on the officers?

6   A    Yes.

7   Q    What force are they with?

8   A    United States Capitol Police.

9        MR. NAVARRO:  For the record, that was at 1:52.

10       (Video playing.)

11       (Video paused.)

12       MR. NAVARRO:  I'm pausing it at about 1:27 there.

13  Q    And the fencing appeared to have what was called -- it

14  appeared to say area closed.  Did you see that?

15  A    Yes.

16  Q    Is that an area that is restricted to members of the

17  public?

18  A    Yes.

19  Q    And continuing at 228.

20       (Video playing.)

21       (Video paused.)

22       MR. NAVARRO:  I'm going to pause right there.

23  Q    It looks like there is an individual laying on the ground

24  there.  I'm going to replay it, from 231 on the right side of

25  the screen, and Agent Desrosiers, do you recognize that

Desrosiers   - direct - Navarro                398

1    individual that gets knocked to the ground?

2    A     Yes, it is a U.S. Capitol police officer.

3              MR. NAVARRO:  Stop it there at 3:15.

4              I'm now going to show you what has been previously

5    admitted as Government Exhibit 25.

6              And ladies and gentlemen, that's tab 25 in your

7    binders.

8              (Video recording played.)

9              (Video recording paused.)

10             MR. NAVARRO:  Let me pause it at 1:27.

11   Q     There was a reference in that video to Pelosi.  Do you

12   have an understanding as to who Pelosi is?

13   A     I believe to be a reference to Speaker Nancy Pelosi,

14   Speaker of the House.

15   Q     And how about AOC?

16   A     A reference to Congresswoman Alexandria Ocasio-Cortez.

17   Q     What about Schumer?

18   A     Reference to Senator Charles Schumer from New York.

19   Q     And Illhan Omar?

20   A     The Congresswoman Illhan Omar from Minnesota.

21   Q     Resuming the video at 127.

22             (Video recording played.)

23             (Video recording paused.)

24   Q     Let me pause it here at 129.  Can you tell where this is

25   on the Capitol complex?

Desrosiers  - direct - Navarro                  399

1   A    Yes, it's on the west side of the Capitol building, the

2   Senate wing area.

3   Q    I notice there are some individuals on scaffolding?

4   A    Yes.

5   Q    And is that -- what's on the other side of those windows?

6   A    The senate offices.

7            MR. NAVARRO:  I am going to resume at 129.

8            (Video recording played.)

9            (Video recording paused.)

10           MR. NAVARRO:  I'm going to pause it.  I am pausing

11   at 1:47 and back.

12   Q    Agent Desrosiers, at 1:29 in the video, it looks like in

13   the crowd there's at least one, at least two yellow flags.

14   Are you able to see though?

15   A    Not terribly clearly.  I believe see what appears to be

16   yellow flags.

17   Q    Do you recognize them?  I realize the video is a little

18   grainy.  Do you recognize what those flags are?

19   A    They appear to be consistent with the don't tread on me

20   flag.

21   Q    Thank you.

22           MR. NAVARRO:  I'm going to resume the video at 129.

23           (Video played.)

24           (Video paused.)

25           MR. NAVARRO:  Pausing it at 2:52.

Desrosiers  - direct - Navarro                400

1   Q    Agent Desrosiers, do you recognize where this is taking

2   place?

3   A    It's inside the Capitol building on the senate side.

4   Q    Thank you.

5              MR. NAVARRO:  Resuming the video.

6              (Video playing.)

7              (Video paused.)

8              MR. NAVARRO:  Pausing it at 3:28.

9   Q    Agent Desrosiers, in that video we saw what looked like

10  one officer and then he was later joined by it looks like two

11  or three more officers.

12             Is that fair to say the Capitol police were

13  outnumbered by the attacker that day?

14  A    Yes.

15  Q    And were the Capitol police concerned about there being

16  weapons in the crowd?

17  A    Yes.

18  Q    Now, earlier you testified about the security measures

19  that the Capitol police regularly takes to secure the Capitol.

20             Have those measures changed since January 6th?

21  A    Yes.

22  Q    Can you give the jury a couple of examples?

23  A    In the mediate aftermath of the events of the 6th, we

24  pushed our perimeters out, our secured perimeter out

25  significantly to include fencing, razor wire, National Guard

1    troops, vehicle checkpoints, pedestrian checkpoints, pushing

2    the public accessible area of the Hill further out to prepare

3    and attempt to defend against any further attacks.

4            MR. NAVARRO:  Thank you.  No further questions.

5            THE COURT:  Thank you, Mr. Navarro.

6            Cross-examination?

7            MS. OLIVERA:  One moment, Your Honor.

8    CROSS EXAMINATION

9    BY MS. OLIVERA:

10   Q    Good afternoon, Special Agent Desrosiers.

11   A    Good afternoon.

12   Q    Now, you testified that you've been with the U.S. Capitol

13   Police since 2007; correct?

14   A    That's correct.

15   Q    And the mission of the U.S. Capitol Police is to protect

16   members of Congress; right?

17   A    Correct.

18   Q    You mentioned also their staff and their families; right?

19   A    Yes.

20   Q    But since 2013 you worked in threat assessment for the

21   Capitol police; is that right?

22   A    That's correct.

23   Q    And you're trained in threat assessment; is that right?

24   A    Yes, ma'am.

25   Q    You're trained on how to respond to threats?

Desrosiers  - cross - Olivera                402

1   A    Yes, ma'am.

2   Q    And you're trained on it how to investigate threats;

3   correct?

4   A    Yes.

5   Q    And you're trained on when to notify members of Congress

6   of a threat; right?

7   A    We have certain policies and procedures, but, yes.

8   Q    U.S. Capitol Police standard operating procedures for

9   threats involves a notification to a congressional office;

10  right?

11  A    Correct.

12  Q    Now, on January 6th, you were assigned to investigate the

13  Capitol riot along with the FBI; right?

14  A    Correct.

15  Q    And you described the FBI as the U.S. Capitol Police as

16  primary law enforcement; correct?

17  A    Part of federal law enforcement partner, correct.

18  Q    So after January 6th, you began working out of an FBI

19  field office; is that correct?

20  A    That is correct.

21  Q    One of your duties was to coordinate evidence sharing

22  between the FBI and U.S. Capitol Police; is that right?

23  A    That's correct.

24  Q    And you continued working at that FBI field office until

25  at least March; right?

1   A    Correct.

2   Q    So it's fair to say that you were in regular contact with

3   the FBI in January, February, and March; right?

4   A    I am, yes.

5   Q    Now, after the riot, the U.S. Capitol Police was

6   concerned about people returning with guns for the

7   inauguration; right?

8   A    Yes.

9   Q    And the Capitol police was working with the FBI to

10  prevent that from happening; correct?

11  A    Yes.

12  Q    And you were aware that some individuals had made

13  statements about returning with guns; right?

14  A    Yes.

15  Q    But prior to the inauguration, you had never heard the

16  name Brendan Hunt, had you?

17  A    I had not.

18  Q    You had never heard of X-ray Ultra before January 20th?

19  A    No.  Before March 2nd.

20  Q    Before March 2nd?

21  A    Yes.

22  Q    So you learned about Brendan Hunt on March 2nd from the

23  NYPD; correct?

24  A    That is correct.

25  Q    The FBI wasn't the one who told you about Brendan Hunt?

Desrosiers  - cross - Olivera                    404

1   A    They're not the ones who told me, no.

2   Q    All right.  And you received an e-mail from the NYPD

3   asking for information about Brendan Hunt; is that right?

4   A    That's correct.

5   Q    Okay.  But, as you've testified, you didn't know about

6   him when you received that e-mail, did you?

7   A    I did not.

8   Q    So you looked up Mr. Hunt in a U.S. Capitol Police

9   database; right?

10  A    That is correct.

11  Q    And you found no results?

12  A    Correct.  I did not find any record for him.

13  Q    And then you went to the internet and you found an

14  Eastern District of New York U.S. Attorney's Office press

15  release about Mr. Hunt's arrest on January 19th; right?

16  A    Correct.

17  Q    So on March 2nd, when you learned about the Hunt

18  investigation, you contacted the FBI; right?

19  A    Yes.

20  Q    And an agent told you about the Hunt investigation;

21  correct?

22  A    That's correct.

23  Q    And the agent gave you a copy of the Complaint filed

24  against Mr. Hunt?

25  A    I don't recall if the agent gave me -- my supervisor gave

Desrosiers  - cross - Olivera            405

1  me a copy of the Complaint, so I did have a copy the

2  Complaint, yes.

3  Q    And you have reviewed the Complaint; correct?

4  A    I did.

5  Q    And you saw Agent Erica Dobin's name on it; is that

6  right?

7  A    Yes.

8  Q    And you knew Agent Dobin from other investigations;

9  correct?

10  A    Right.

11  Q    And you recognize Agent Dobin sitting at the prostitution

12  table; right?

13  A    I do.

14        MS. OLIVERA:  Let the record reflect the witness has

15  identified Special Agent Erica Dobin.

16        THE COURT:  It shall so reflect.

17  Q    Around March 2nd, you were in regular contact with Agent

18  Dobin; right?

19  A    Yes.

20  Q    And you were in regular contact about other FBI

21  investigations; correct?

22  A    I was not in regular contact with her about other FBI

23  investigations.  I had known her from a previous inquiry on an

24  FBI investigation that we were working on with the January 6th

25  events, yes.

Desrosiers  - cross - Olivera                406

1   Q    Okay.  So, but prior to March 2nd, you had never

2   discussed the investigation into Brendan Hunt?

3   A    That's correct.

4   Q    So when you saw Agent Dobin's name on the Complaint, you

5   called her; right?

6   A    I did.

7   Q    And you discussed the Hunt matter with her?

8   A    Correct.

9   Q    And you asked her to start giving you updates on the Hunt

10  investigation going forward?

11  A    Yes.

12  Q    Now, the day after you learned about Brendan Hunt, you

13  made contact with certain members of Congress; is that right?

14  A    That's correct.

15  Q    On March 3rd, you contacted the office of House Speaker

16  Nancy Pelosi?

17  A    Yes.

18  Q    You contacted the office of Senator Chuck Schumer?

19  A    Yes.

20  Q    And you contacted the office of Congresswoman Alexandria

21  Ocasio-Cortez?

22  A    I did.

23  Q    You contacted them all via e-mail; right?

24  A    Correct.

25  Q    Now, these three members of Congress were not

1  specifically mentioned in the January 8th video that began the

2  investigation into Brendan Hunt, were they?

3  A    Not to my knowledge, no.

4  Q    Now, when you contacted these members of Congress, you

5  told them that you were the U.S. Capitol Police agent assigned

6  to the Hunt matter; correct?

7  A    That's correct.

8  Q    Fair to say that nobody else was assigned at the time?

9  A    Not to my knowledge.

10  Q    And you told them that you would be in contact with the

11  FBI going forward about Brendan Hunt; correct?

12  A    That is correct.

13  Q    And you told them that you would provide them with any

14  updates about the Hunt investigation; right?

15  A    Any updates I received, yes.

16  Q    And you told them that they could call you with any

17  questions; correct?

18  A    Yes, ma'am.

19  Q    Now, sometime after March 2nd, you opened an

20  investigation into Brendan Hunt; correct?

21  A    I did not open an investigation.  It was informational

22  because the investigation had been completed by the FBI, but I

23  documented the steps that I took in gathering background

24  information and documented that in our case system.

25  Q    You prepared a report of investigation for the U.S.

1    Capitol Police; correct?

2    A    Yes, ma'am.  Yes, ma'am.

3    Q    Now, as part of that investigation, you learned that Mr.

4    Hunt had posted a video on January 8th; correct?

5    A    Yes.

6    Q    And you learned that he was arrested on January 19th;

7    right?

8    A    Yes.

9    Q    And you knew that between January 8th and January 19th

10   Mr. Hunt was at home in Queens; correct?

11   A    Can you repeat your question?

12   Q    Between -- Mr. Hunt -- I'm sorry -- strike that.

13            You learned that Mr. Hunt posted a video on January

14   8th; correct?

15   A    Yes.

16   Q    And that he wasn't arrested until 11 days later, on

17   January 19th?

18   A    Yes, ma'am.  Thank you for clarifying.

19   Q    Okay.

20            Another thing that you learned was that the U.S.

21   Capitol Police was notified of the Hunt investigation on

22   January 8th?

23   A    Yes.

24   Q    So that means that someone told -- I will rephrase it.

25            An agent at the U.S. Capitol Police learned about

1   Mr. Hunt's social media post on January 8th?

2   A    Correct.

3   Q    But that person did not enter Mr. Hunt into the U.S.

4   Capitol Police system, did they?

5   A    Not to my knowledge.

6   Q    That person did not notify any members of Congress of Mr.

7   Hunt's social media posts?

8   A    Not to my knowledge.

9   Q    Now, you mentioned that one of the ways the U.S. Capitol

10  Police learned about threats is when members of Congress

11  contact them with security concerns; is that right?

12  A    That is right.

13  Q    Between January 8th and January 19th, did any member of

14  Congress contact the U.S. Capitol Police with security

15  concerns about Brendan Hunt?

16  A    Not to my knowledge.

17  Q    As far as you know, before Mr. Hunt's arrest on January

18  19th, did any federal law enforcement agency, whether FBI or

19  U.S. Capitol Police notify a member of Congress of Mr. Hunt's

20  social media posts?

21  A    I know that the FBI in the process of our investigation

22  did make contact with the offices, I was told.  I'm not sure

23  the exact date of that notification.

24  Q    So I'll just ask the question more specifically.  Did

25  anyone from the FBI notify a member of Congress of Mr. Hunt's

Desrosiers  - cross - Olivera                410

1   social media posts prior to January 19th?

2   A    I do not know the exact day of the notification, ma'am.

3           And if I could offer a point of clarification to

4   you.  I base this off of, A, my conversation with the FBI and,

5   B, when I made my notifications in March, officers were

6   already aware of the investigation.  So I just don't know the

7   exact date the notification might have been made.

8           THE COURT:  Ms. Olivera, we really need to move this

9   along, so maybe you can come back to it after you find what

10  you're looking for.

11          MS. OLIVERA:  I would like to show a document to the

12  witness, please.

13          THE COURT:  Okay.

14  Q    Can you see the screen, Special Agent Desrosiers?

15  A    I can.

16          THE COURT:  Can you read it?

17          THE WITNESS:  I can read it, yes.

18  Q    Please review these documents and let me know if it

19  refreshes your recollection as to when the FBI notified

20  members of Congress of Mr. Hunt's --

21  A    It appears from this document that -- I don't know that

22  I've ever seen this document before.

23          MR. NAVARRO:  Objection, Your Honor, refresh your

24  recollection.

25          THE COURT:  I'm sorry.  So you're asking him to look

1    at it to refresh his recollection?

2              MS. OLIVERA:  Yes.

3              THE COURT:  You don't have to have ever seen it

4    before.  The question is does looking at it does it refresh

5    your recollection -- what was your question about does it

6    refresh his recollection on?

7              When the FBI notified members of Congress, looking

8    at this document, does it refresh your memory, and I don't

9    want you to read the document, but does it refresh your

10   memory?

11             THE WITNESS:  This appears to show that the --

12             THE COURT:  No, no, no.  Don't do that.

13             THE WITNESS:  Okay.

14             THE COURT:  The question is you looked at the

15   document?

16             THE WITNESS:  Yes.

17             THE COURT:  Is your memory refreshed as to when the

18   FBI notified the members of Congress?

19             THE WITNESS:  No, ma'am, because I do not know the

20   exact date that notification was made.  I didn't want to

21   misspeak that notification was not made, because I knew that

22   they were contacted; I just didn't know the exact date.

23             THE COURT:  Did you ever know?

24             THE WITNESS:  No.

25             THE COURT:  Move on, please.

1            MS. OLIVERA:  I will just ask one more question.

2    Q    Special Agent Desrosiers, was the FBI's -- I'm sorry,

3    I'll strike that.

4            The FBI notified members of Congress of Mr. Hunt's

5    arrest after his arrest on January 19th; correct?

6    A    That's what it appears here, ma'am, yes.

7            THE COURT:  Hold on.

8            Again, do you know, based on your memory -- and

9    let's take that document down.

10            Do you know when they were notified in relation to

11    Mr. Hunt's arrest, before or after?  Do you know?

12            THE WITNESS:  No, ma'am.  I did not know the date of

13    notification by the FBI to those officers.

14            THE COURT:  I also have to mention, Ms. Olivera, you

15    are eliciting a fair amount of hearsay.  You're asking him did

16    the FBI do something on a certain day and I don't think he is

17    a competent witness on this.  So I think you should move on

18    and talk to an FBI agent instead about this.

19            MS. OLIVERA:  We have no further questions.

20            THE COURT:  Okay.

21            MR. NAVARRO:  Brief redirect.

22            THE COURT:  Already, hold on.  Go ahead.

23    REDIRECT DIRECT

24    MR. NAVARRO:

25    Q    Agent Desrosiers, the guardian that was received by the

Desrosiers  - redirect - Navarro                413

1   Capitol police from the FBI, did that guardian mention any

2   specific members of Congress?

3   A    No.

4   Q    The e-mail that you testified about earlier from one of

5   your colleagues forwarding the guardian, did that e-mail

6   indicate that the FBI was taking the lead on the

7   investigation?

8           MS. OLIVERA:  Objection.

9           THE COURT:  Hold on.

10          Sustained.  Sustained.

11          You can rephrase that.

12  BY MR. NAVARRO:

13  Q    Did you have an understanding, when you learned about the

14  Brendan Hunt investigation, as to who had taken the lead?

15  A    Yes.

16  Q    Who was that?

17  A    The FBI.

18  Q    And after January 6th -- so, let's say around January 8th

19  and thereabouts, what was the U.S. Capitol Police doing at

20  that point in time?

21  A    Post January 6th, our resources were completely max'ed

22  out, both on the Hill preparing for any future incidents that

23  may be coming up and trying to prepare for the inauguration,

24  and in that as far as the investigations division.

25          We had a high influx of cases coming in and we were

Desrosiers  - redirect - Navarro                    414

1    leaning heavily, especially on the FBI, to assist us with

2    processing through those cases to include threats towards

3    members of Congress capitol police capitol police.

4              (Continued on next page.)

Desrosiers/Cross/Olivera                              415

1   (Continuing.)

2   BY MR. NAVARRO:

3   Q    And was there another significant event that the Capitol

4   Police was preparing for?

5   A    Yes, sir.

6   Q    What was that?

7   A    The inauguration.

8           MR. NAVARRO:  No further question.

9           THE COURT:  Thank you, Mr. Navarro.

10          Any cross, Ms. Olivera?

11          MS. OLIVERA:  Just briefly, Your Honor.

12  CROSS-EXAMINATION

13  BY MS. OLIVERA:

14  Q    Special Agent Desrosiers, the FBI is an investigative

15  agency, correct?

16  A    Yes.

17  Q    Its mission is different from the U.S. Capitol Police,

18  correct?

19  A    Yes.

20  Q    The U.S. Capitol Police's mission is protecting members

21  of Congress, correct?

22  A    Yes.

23          MS. OLIVERA:  No further questions.

24          THE COURT:  All right.  Thank you.

25          You may step down.  Thank you, Mr. Desrosiers.

1          THE WITNESS:  Thank you.

2          THE COURT:  Government, please call your next

3    witness.

4          MR. RICHARDSON:  Your Honor, the Government calls

5    Nicole Kwasnaza.

6          (Court reporter seeks clarification.)

7          MR. RICHARDSON:  Kwasnaza, K-W-A-S-N-A-Z-A, and I

8    expect she'll be stating and spelling her name.

9          THE CLERK:  Please raise your right hand.

10          (Witness sworn.)

11          THE CLERK:  Please state and spell your full name

12    for the record.

13          THE WITNESS:  Nicole Kwasnaza, N-I-C-O-L-E,

14    K-W-A-S-N-A-Z-A.

15          THE COURT:  You may inquire, Mr. Richardson.

16          MR. RICHARDSON:  Thank you, Your Honor.

17    **NICOLE KWASNAZA**, having been duly sworn, was examined and

18    testified as follows:

19    DIRECT EXAMINATION

20    BY MR. RICHARDSON:

21    Q    Ms. Kwasnaza, where do you work?

22    A    I work at the Federal Bureau of Investigation.

23    Q    How long have you worked for the FBI?

24    A    In a full-time capacity since September 2018.

25    Q    Are you assigned to a particular unit?